## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL ACTION NO. 16-cv-1960(LSS) |
| EX REL. HASSAN FOREMAN, | ) | |
| | ) | AMENDED COMPLAINT |
| Plaintiffs, | ) | |
| | ) | **FILED IN CAMERA AND** |
| v. | ) | **UNDER SEAL** |
| | ) | |
| AECOM; AECOM GOVERNMENT | ) | |
| SERVICES, INC.; AC FIRST, LLC; | ) | |
| AECOM/GSS LTD, d/b/a GLOBAL | ) | |
| SOURCING SOLUTIONS, INC. | ) | **DO <u>NOT</u> PLACE ON PACER** |
| | ) | |
| Defendants. | ) | **JURY TRIAL DEMANDED** |

<u>**DOCUMENT TO BE KEPT UNDER SEAL**</u>

By:

Russell D. Paul (NY Attorney ID #2361939)
Susan Schneider Thomas (PA Attorney ID #32799)
Jonathan D. Berger (PA Attorney ID #44323)
Arthur Stock (PA Attorney ID #64336)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
rpaul@bm.net
sthomas@bm.net
jdberger@bm.net
astock@bm.net

## Table of Contents

I.      Introduction ............................................................................................................. 1

    A.      Parties ........................................................................................................... 2

II.     Factual Background ................................................................................................. 3

III.    Overview of False Claims Submitted by AECOM .................................................. 5

    A.      Property Claims: False Claims Relating to Parts-Only Work Orders, Double-Purchasing and Failure to Track and Turn-In Recoverable Items ......................... 9

    B.      False Billing for Labor ................................................................................ 22

        1.      Pre-Signing Timesheets ................................................................ 25

        2.      Other Timesheets Errors ................................................................ 30

        3.      Historical Timesheet Corrections .................................................. 32

        4.      Examples of Falsified Timesheets ................................................. 33

        5.      Billing for Unqualified and Uncertified Employees ...................... 35

    C.      Violations of Man Hour Utilization Reporting Requirements ...................... 39

        1.      Actual MHU below 85% ............................................................... 40

        2.      The Corrective Action Report ....................................................... 41

        3.      Internal Identification of MHU below 85% and Work Force Adjustments .................................................................................. 43

        4.      AECOM Devised its Own Reporting Format, Rather than Using SAMS, As Required ..................................................................... 45

    D.      Improper Salary Increases Connected to Bluefish Global Payroll Solutions Cards ............................................................................................................ 47

IV.     Retaliation ............................................................................................................ 49

.

<u>**RELATOR'S AMENDED COMPLAINT**</u>

I.    <u>**Introduction**</u>

1.      This case concerns fraudulent claims by a major defense contractor on a billion dollar-plus contract in Afghanistan.  The claims arise from a multi-year contract for the 401st Army Field Support Brigade, Afghanistan, under the U.S. Army's Field and Installation Readiness Support Team (FIRST)[1] contract vehicle.  The relevant contract (technically a Task Order under the FIRST contract vehicle) is called the Maintenance & Operational Support Contract ("MOSC-A" or "the Contract).

2.      Provisions in the MOSC-A contract, like other defense contracts, required defense contractors to utilize strict controls for property control and accountability, essentially mandating a complete, current and auditable trail for all property. Additionally, the labor component of the contract – a substantial percentage of total cost – was required to be tracked and billed using a timekeeping system that met strict Department of Defense standards.  As the Defense Contract Audit Agency (DCAA) has stated:  "Timekeeping procedures and controls on labor charges are areas of utmost concern.  Unlike other costs, labor is not supported by external documentation or physical evidence to provide an independent check or balance."  Further, certain employees were required to meet certification and qualification standards, as well as specified levels of security review.

3.      On a broad, global level, as described in multiple documents, including its Management Plan – Contract Performance Plan, September 2013, which was submitted to and approved by the government as part of the MOSC-A contract, AECOM, through its contracting party, AC-First, was to provide "efficient utilization of facilities, personnel, equipment, and time"

---

[1]      Abbreviations in this Complaint are defined in Appendix 1, the Glossary of Abbreviations.

and to allocate "proper resources to accomplish the [requested] work in the most prudent and cost effective manner possible."  As stated by the government in awarding the MOSC-A contract to AC FIRST, "Due to the mission critical nature of many services to be provided under this task order and AC FIRST's proposed performance resulting in this award, it is the expectation of the parties that AC FIRST will strive to maintain (and improve) a high level of responsibility, management, and quality of performance throughout the life of this task order."

4.      These controls and checks and balances regarding labor, spending and acquisition in the vast range of enormous and complex contracts and operations in Afghanistan were deemed especially important during the volatile and chaotic period when this contract was being performed.  Prices paid to defense contractors were calculated on the basis that controls would be provided by the contractors to minimize waste, mismanagement, fraud and corruption.

5. Each aspect of fraud identified herein involves specific false claims for payment that were submitted to the Army. Additionally, each aspect represents a failure of defendant AECOM to provide the administrative and cost controls that had been contracted for.  Parties

5.      Defendant, AECOM ("AECOM" or the "Company", and formerly known as AECOM Technology Corp.), is a publicly traded company on the New York Stock Exchange (NYSE: ACM).  AECOM is headquartered in California and has its main US offices in Los Angeles, California and New York, New York.

6.      Defendant AECOM Government Services, Inc. ("AGSI") is the named partner on behalf of AECOM in the joint venture (AC First) that was awarded the MOSC-A Contract.  AGSI is a subsidiary of AECOM.

7.     AC First, LLC, is a joint venture, limited liability company between AGSI, a subsidiary of AECOM, and CACI Technologies Inc.  AC FIRST is the contracting party with the US Army on the MOSC-A Contract.

8.     AECOM/GSS Ltd., also known as and doing business as Global Sourcing Solutions, Inc. ("GSS"), is a wholly-owned subsidiary of AGSI.

9.     Relator's employment contract was with AECOM/GSS, although his termination agreement came from AC First/AECOM.   The Company often used the two names interchangeably with respect to the contract at issue and the name AECOM will be used in this Amended Complaint to refer collectively to the Company and its subsidiaries, as well as the joint venture, AC FIRST.

10.     AECOM is the majority owner of AC First and controls its operations.  CACI reported that its share of the net income of AC FIRST was $1.5 million and $2.6 million, respectively, for the years ended June 30, 2014 and 2013, when AC First was billing up to $400 million per year on the contract.

11.     Claims are brought on behalf of the United States, specifically the US Army.

12.     Plaintiff/Relator is Hassan R. Foreman, a resident of Florida.  Relator is a former employee of AECOM, having been employed by the Company from August 2013 until July 2015. Foreman was hired as a Finance Analyst in August 2013 and was promoted to Finance Supervisor in May of 2014.  Foreman was terminated by AECOM in July 2015, shortly after he brought up various compliance issues with the Company.

## II.   Factual Background

13.     In 2010, AC First, the joint venture between AECOM and CACI, was awarded a maintenance and supply services task order -- the Maintenance & Operational Support Contract (MOSC-A) -- under the US Army's FIRST contract vehicle.  This was a cost-plus fixed fee

contract, Contract No. W911SE07D0004-BA01, with a period of performance from 04/01/10 – 01/27/15.   Army Contracting Command, Rock Island Arsenal, Illinois, is the contracting activity.

14.     Under the MOSC-A contract, AECOM provided maintenance and management support services for the Army Prepositioned Stock (APS-5) program in Afghanistan.  AECOM's obligations under the contract included tactical vehicle and equipment maintenance, facilities management and maintenance, supply and inventory management and transportation services in support of the 401st Army Field Support Brigade at multiple locations across Afghanistan.

15.     Although the initial contract with its optional extensions was listed for $378 million, that amount escalated rapidly during the course of the performance and an Amendment of Solicitation/Modification of Contract in mid-2014 listed the total dollar amount as $1,369,985,865.99.  AECOM was billing as much as $400 million annually on this contract from 2010 and throughout Relator's time of employment, with as many as 4800 employees. During this period, AECOM was one of the largest defense contractors working in Afghanistan and was the largest managed by the 401st Army Field Support Brigade.

16.     The MOSC-A task order continued work that had been performed by AECOM for nearly 5 years previously under the Army's global maintenance support and service (GMASS) II contract, from approximately 2005 until early 2010.  As explained by AECOM in a statement before the Commission on Wartime Contracts dated April 19, 2010:

> The most significant contingency contract for AECOM was competitively awarded in 2005 and again on recompete in 2010.  This contract has surged with the increase in U.S. forces and AECOM was recently awarded a follow-on competitively awarded contract that now numbers in excess of 2,000 personnel, including expats, TCNs and local nationals with main operations at Bagram and  Kandahar and 27 forward operating bases."

4

Statement by Jay Ward, Chief Operating Officer, AECOM Government Services, "The Use Of Service Contracts In Support Of Wartime Operations And Other Contingencies" before The Commission On Wartime Contracting, April 19, 2010.

17.     As one aspect of the Army's reliance on contractors to control fraud, waste and abuse, one requirement under the MOSC-A contract was ISO-9001 certification, an independent quality management system recognized for increasing efficiency, saving time and expense, and ongoing monitoring of multiple quality metrics. Relator was told on a number of occasions by AECOM management such as the deputy project director and the finance director that AECOM formed its joint venture with CACI Technologies specifically to be able to bid as a company with ISO 9001 certification.

18.     Numerous documents relating to the contract refer to the significance of the ISO 9001 certification, including Performance Work Statements (PWS) provided by the Army to AECOM; documents submitted by AECOM to the Army, such as Management Plan – Contract Performance Plan, submitted to Rock Island Contracting Command, as required by a Contracts Data Requirements List (CDRL); and various internal contract status documents such as one or more of AECOM's Monthly Program Reviews; AC First Business Center Reviews; and MOSC-A Weekly PM [Project Management] Briefs. Compliance with ISO-9001 requirements was subject to audit during the term of the contract.

### III.   Overview of False Claims Submitted by AECOM

19.     There are four types of false claims at issue:

   a.     The Property claims relate to the failure to properly track and account for goods under the contract, including double purchasing of goods, "parts only work orders" where parts were purchased with no recordation of their purpose or expected use; and failure to track and turn in recoverable items.

b.    Labor billing claims address timesheet/labor violations and billing for unqualified, uncertified personnel contrary to contract requirements.

c.    Man-hour utilization ("MHU") claims address improper and inflated reporting of Man-Hour Utilization.

d.    Bluefish claims concern inflated billing to the 401st to offset charges arising from an improper crony contract with Bluefish, a payroll processing company.

20.    The false claims were submitted pursuant to the multi-year MOSC-A contract. W911SE07D0004-BA01.

21.    A more recent task order award to AECOM under the Army's FIRST contract vehicle is a $62,683,121 cost-plus-fixed-fee incrementally funded bridge contract, which began on or about January 29, 2015, with an initial estimated completion date of Dec. 27, 2015.  Army Contracting Command, Rock Island Arsenal, Illinois, is the contracting activity (W52P1J-15-C-0040). Many of the violations and false claims alleged by Relator have continued on that task order as well as on further "add-on" contracts continuing the work previously contracted under MOSC-A.

22.    Notably, there have been many other issues raised about AECOM's administrative, management and record-keeping problems on defense contracts, both MOSC-A and others.

23.    In November 2013, the Defense Contract Management Agency, Cost and Pricing Center, notified AECOM of "significant deficiencies" on MOSC-A in its Contractor Business Systems and Earned Value Management Systems, both mandated by the government.  Numerous problems were highlighted, including insufficient budget documentation, inadequate estimates of funding and effort to complete tasks, lack of cost and schedule system integration, systemic

6

deficiencies related to baseline change documentation and Contract Performance Reports that failed to comply with contract data requirements.

24.     This was followed up in February 2014 with a Final Determination of Disapproved Earned Value Management System.  The systemic deficiencies included the absence of required management procedures "that provide for generation of timely, reliable, and verifiable information for the Contract Performance Report (CPR) and the Integrated Master Schedule (IMS)" that were required under the MOSC-A contract.

25.     Starting no later than 2014, the Department of Defense Inspector General ("DODIG") began chronicling serious problems with AECOM's role in the Army's Redistribution Property Assistance Team ("RPAT") under the MOSC-A contract.

26.     The RPAT was established to handle excess Army property in theater, redistribute equipment to fill storages, and retrograde excess equipment to the United States. Essentially, RPATs in Afghanistan relieve redeploying Army units of their Theater Provided Equipment (TPE) and clear TPE from the units' property books. After the units are relieved of accountability, the RPATs either process TPE for retrograde or hold the equipment at the RPAT yards for incoming personnel.

27.     The DODIG conclusions regarding AECOM's tracking and accounting systems for TPE shed light on the different property acquisition and tracking issues detailed below.  The DODIG report found that "during 2014 there were several months when AC First could not account for several hundred pieces of equipment…. [In] monthly … audits, they documented the loss of accountability of several hundred pieces of equipment.  For example, in February 2014, AC First could not account for 426 pieces of equipment at the KAF [Kandahar] RPAT yard." More specifically, under that separate aspect of its MOSC-A work, AECOM lost track of at least four

surveillance drone systems during the Afghanistan drawdown, worth $500k apiece and failed to report for over eight months that sensitive technology was missing.

28.    In an unrelated, but similar, defense contract awarded to AECOM in Iraq, the Special Inspector General for Iraq Reconstruction reported "questionable costs billed by AECOM Government Services. The questionable costs relate to invoices submitted on one of the larger Iraq Security Forces Fund contracts, a Department of Defense contract to provide maintenance and supply services to the Iraqi Army." Iraq Security Forces Fund: Weak Contract Oversight Allowed Potential Overcharges by AECOM to Go Undetected, SIGIR 10-005, October 30, 2009 ("SIGIR Report"). For example, according to the SIGIR report, "the contractor billed $210.00 each for inner-tubes that SIGIR identified on the open market priced at $19.70 each."

29.    The SIGIR Report further concluded as follows: "During the contract bidding process, AECOM submitted proposals stating how and at what price it intended to perform specific tasks. According to the contractor, these proposals and prices were included as a part of the contract. Two such proposals provided to SIGIR by the contractor included prices for certain vehicle parts. SIGIR identified instances where AECOM billed above these agreed prices. For example, AECOM billed $29.60 each for oil filters that had an agreed price of $14.80 each—100% over the allowable rate. When multiplied by the total units purchased on the four invoices, that one item resulted in over $43,000 in potential overbillings. Moreover, due to a lack of detailed invoice and proposal data, SIGIR could not match some invoice billings to the contractually agreed-to rates."[2]

30.    Although the findings from those reports are not directly relevant to the issues raised herein, they provide a backdrop to evaluate the false claims alleged.

---

[2]    AECOM challenged many of the findings and conclusions of that report.

A. **Property Claims: False Claims Relating to Parts-Only Work Orders, Double-Purchasing and Failure to Track and Turn-In Recoverable Items**

31.     There was widespread misappropriation or improper accounting for items procured by AECOM in connection with its performance of the MOSC-A contract.  Numerous items were purchased twice and charged twice to contracts, possibly allowing personnel to illegally sell the equipment for profit on the side.  Even if some or all of these goods were not sold illegally, AECOM's failure to track and account for the goods violated its contractual obligations and resulted in substantial overbillings to the government because unnecessary goods were ordered and billed to the government or were not returned for credit to the government.

32.     All of the property tracking and accounting issues were exacerbated by AECOM's persistent failure to hire and utilize employees who were certified and competent to use the Army systems.  As described in a formal Memorandum for Record filed by a LISMX supervisor: "Current S&S SAMSE workforce does not meet established company qualifications and security SAMSE requirements to operate the SAMSE (SBU) systems. The result of this is non-compliance with security standards and the system generating numerous user errors that cause inaccurate information and a lack of control. A few examples include inexperienced operators double ordering of parts on WO s that excessively charge the government, transferring of parts to temporary locations in an attempt to move the double ordered parts that result in OHQ, a failure by operators of not using EUM system built solutions or reports to identify problems caused by operator errors because of lack of experience/qualifications or understanding of the SAMSE system. Additionally the failure to send the mandatory daily SFTP to LIW interface causing an inaccurate or false picture to all levels of system assessment as well as the sleeping giant with the current issues related to recoverable items."  These issues are further described below.

33.     AECOM committed to using and maintaining STAMIS (Standard Army Management Information Systems) for parts management and materiel expenses, as directed by the Army, including, but not limited to, AWRDS SAMS-E/1E (Standard Army Maintenance System Enhanced), PBUSE (Property Book Unit Supply Enhanced system), and GTN.  AC First LLC, Management Plan – Contract Performance Plan, September 2013.  FSS requisitions for Class IX parts used in the performance of the contract are required to be processed thru the SAMS-E STAMIS system. This system interlinks with the SARSS-1 at the local Supply and Services where the request is processed and items are released to the contractor. All parts acquired through the local SSA are consumed on work orders received from the customer.

34.     The SAMS-E system is widely required to be used by both Field and Sustainment level ground maintenance and Logistics Readiness Center (LRC) installation maintenance personnel worldwide.  SAMS-E is the Army's tactical Logistics Information System [LIS] of record for ground maintenance and assists in managing unit level maintenance management, supply, and readiness reporting functions. Of relevance herein, SAMS-E allows tracking of maintenance events, work-order management and supply transactions for issue, receipt, and turn-in of property and equipment purchased by contractors to perform their contractual obligations.[3]

---

[3]     Use of the SAMS-E and STAMIS systems that are at issue in these property allegations was intended, in part, to prevent the loss of accountability that AECOM exhibited with regard to the Army property that it was supposed to track under the RPAT program, as discussed in a recent DODIG report and referenced above.  Contract Oversight for Redistribution Property Assistance Team Operations in Afghanistan Needs Improvement (Project No. D2015-D000JB-0061.000) DODIG-2015-126 (May 18, 2015). That DOD IG Report also refers to issues with tracking and accounting for property, but that Report concerned property that the Army had turned over to AECOM specifically for AECOM to inventory, track and store or redirect the property to locations where it was needed.  As is made clear in Army PWS's and internal AECOM documents discussing the tasks under MOSC-A, this function of dealing with Army equipment through the Army's RPAT programs was a distinct scope of work from the acquisition and tracking AECOM was required to do with regard to property that it had to procure in order to perform its vehicle maintenance functions under MOSC-A.

### 1.    Parts Only Work Orders

35.    One means through which AECOM bypassed the property accounting and tracking systems was that employees used what is called a "parts only" work order ("POWO"), which is not authorized and does not provide for proper tracking of equipment.  Thousands, if not tens of thousands, of parts were ordered through POWOs on the MOSC-A contract.

36.    Concerns about this issue surfaced no later than late 2013, with inquiries being made to supervisors to determine whether there was some exception in place allowing POWOs. In an email dated Dec. 14, 2013, Joseph H. Cox, Training and Development Supervisor (Northeast) AC First, Afghanistan, stated that employees were not taught to do parts only ordering because it is "just a backdoor way to order parts fraudulently."   He continued to explain that "[p]arts ordered on a work order which is not tied to equipment is not authorized and has never been authorized, all parts must either be ordered through the supply process, or through offline transaction."

37.    During the life of the MOSC-A task order, AECOM opened "a ton of parts only [sic] for existing work orders," according to Training & Development supervisor Cox.

38.    In January 2014, personnel from Task Force White Eagle indicated that they would be creating a "parts only" work order, which various AECOM personnel quickly told them would not be appropriate.

39.    By email dated Jan. 23, 2014, Mandalyn Ford, LISMX Technician, informed them that parts only work orders should not be opened and raised the following questions: "A Work Order is to capture work and parts. Why are we doing just a parts work order? Where are the parts going? How and why were they consumed? Are we doing the labor? Are we going to capture the labor with parts?"

40.     The "parts only" work orders violated the contract provisions (as detailed in various Performance Work Statements and contract clause at FAR 52.245-1) because AECOM was required to use SAMS-E STAMIS as the platform for reporting operational data to the Army and DOD. The End User Manual for the SAMS-E system, which was incorporated into the contract, also included extensive detail about these systems and their functionality with regard to ordering parts pursuant to a valid work order.

41.     Essentially, ordering on a "parts only" work order bypassed checks and balances built into the procurement system to avoid excessive ordering. For example, if tires were properly ordered pursuant to an established vehicle program or work order, the system would trigger an alert if the number of tires didn't match the number of trucks or the expected tire usage. A POWO could not be monitored in that fashion because it would not tie to an actual WO.

42.     More specifically, the POWO's violated Army accountability standards in several ways.

      a.     Invalid Admin numbers: EUM required field for equipment tab. Provides specific identification for equipment being worked on, what type of work, what parts are needed, accountability of those parts and the estimated total costs;

      b.     Invalid NSN: National Stock Number provides specific identification for equipment being worked on, what type of work, what parts are needed, accountability of those parts, and the estimated total costs;

      c.     Invalid Serial Number: The serial number is a unique code identifying individual pieces of equipment. Provides specific identification for

12

equipment being worked on, what type of work, what parts are needed, accountability of those parts, and the estimated total costs; and

d.    Invalid Nomenclature: The name of the equipment Provides specific identification for equipment being worked on, what type of work, what parts are needed, accountability of those parts, and the estimated total costs.

43.    Specific examples include the following:

a.    WO 6HN26C700006z, which has an invalid admin number, invalid NSN, invalid nomenclature, invalid serial number, and improper WO Description. A standard work order for a specific item of authorized equipment would have listed the equipment and would be auditable to validate time charged and accounting of parts.   This was especially significant for security-sensitive parts.

b.    WO 6HN26J700247, which did not include an admin number; had a dummy NSN, referred to a carpentry job that was likely outside the scope of the MOSC-A contract and would have required a Letter of Technical Direction ("LOTD").

c.    WO 6HN26S603914 – which was listed without a valid NSN, stated "Parts Only" under Nomenclature and was not linked to any piece of equipment. The estimated cost for this WO was >$45K.

d.    WO 6HN26S603868 – no valid admin number or NSN, not linked to any piece of equipment.  Estimated cost $129K.

44.     Since there is time associated with ordering, receiving, storing and otherwise processing the goods, there would also be impermissible labor charged in connection with that equipment.

45.     The supervisor also discovered evidence of over 8,700 line items, likely tens of millions of dollars, in additional purchases that were not tracked properly and/or were duplicative.

46.     Screen shots of different line items from the SAMS-E system show entries were not done properly, including instances where there was no record at DODAC (the system on which purchases should be accounted for), which should have existed if AECOM personnel had been running the right reports.

47.     Among the reports and interfaces that were not being run were the CWO ("Contract Work Order") – to be sent to LOGSA [Logistics Support Activity] and the Daily Data Transfer (LOGSA/LIW [Logistics Information Warehouse]).  This suggests that the records reflecting the double purchases were either purged, or perhaps the proper records had not been created in the first place.

48.     In order to properly track and account for parts, and minimize duplicative ordering, the systems focus on what is referred to as a work packet, essentially a record of everything pertaining to a particular vehicle assignment.  Parts necessary to complete the needed repairs or maintenance are identified and should be ordered through the SAMSE system, to minimize duplicative ordering or ordering parts already available.

49.     Also, once the maintenance is completed, there would often be parts that had not been used, which needed to be tracked or turned in.  The packet closure and quality control were required to audit the packets to track duplicate or unused parts.

### 2.    Double Purchasing of Parts

50.    Various schemes were employed by AECOM to avoid proper tracking and accounting for property purchased on this contract.  Sometimes AECOM procured goods through the government supply system and simultaneously purchased the same items on the commercial market. This avoided many of system controls that might have forestalled this double ordering otherwise.

51.    Notably, serious concerns about duplicative purchases by AECOM had also been raised in the SIGIR Report (concerning an AECOM contract in Iraq), also involving processes that rendered it impossible for the government to invoice by work order numbers:

> ### Duplicate and Triplicate Work Orders
>
> On invoice 9, AECOM potentially overbilled about $177,000 in duplicate and triplicate work orders out of the $1.1 million in work orders we analyzed.  Specifically, SIGIR's analysis of invoice 9 found over 200 instances where specific parts, ordered for a specific vehicle, were double- and triple-billed.  In one case, AECOM charged for 3 windshields, 12 headlamps, and 3 batteries for the same Nissan vehicle, on the same day. According to an Anham official, *starting with invoice 10 part procurement activity was combined, making it impossible to invoice by work order numbers* or vehicle identification numbers.  Consequently, we were unable to perform this same analysis for invoice 10, which contained more than four times as much in local purchase work orders as invoice 9." (emphasis added) (footnote omitted)

### 3.    Failure to Track or Turn in Recoverables

52.     Pursuant to Sec. 3.3.1 of the SAMS-E End User Manual, which AECOM was contractually obligated to follow, certain items that were removed from vehicles or other equipment were required to be tracked and turned back in to the Army, through a process known as "recoverables."

53.    The requirement to run a recoverables operation stems from the following: SAMSE Operator End User Manual, AISM -25-L21-AHO-ZZZ-EM; Supply Policy Below the National

Level, AR 710 -2, (paragraph 2-6E); Supply Support Activity Supply System: Manual Procedures, DA PAM 710 -2 -2; WI 120.01.06 Parts Turn-in Procedures and WI 120.01.01 SAMS-E Operator Functions.

54.     If the STAMIS systems were being used properly, items would be identified as recoverables in various ways, including in work orders in the maintenance process, against equipment faults in the Fault Management process and when placing an offline supply transaction.

55.     In fact, however, on a wide-scale basis, the work order was not being properly created, closed or audited, resulting in recoverable items not being returned or duplicates not being controlled.  No comprehensive audits were performed comparing SAMSE data with the individual packets.

56.     The failure to comply with the recoverables function was concealed in part by AECOM's failure to comply with another system requirement – sending Mandatory Daily Interfaces to the Army's Logistics Information Warehouse ("LIW"), a database intended to allow all Army units to order parts regardless of vendor.

57.     These issues were raised a number of times with project management, including meetings with project manager, Robert L. Shirron (a former Army colonel), deputy project manager Bobby Doyle, and others.  Project management stated that it would be cheaper to pay a settlement than to fix the problem.

58.     This sentiment was documented by the LISMX supervisor in a formal Memorandum for Record dated May 23, 2015: "it was briefed to me that management has two choices to decide on - come forward and acknowledge the non-compliance or to wait and see if DCAA catches the issues and then bring up internal findings since they did not intend fraud, and

that [due] to their previous experience with DCAA the risk of the issue being brought to light was minimal or not at all. The latter course of action was chosen ..."

59.     The employee reasoned that "the decision was mainly based on current records in LIW which are inaccurate due to the AC-FIRST SAMSIE user base never using the mandatory daily interfaces to LIW causing an inaccurate picture of operations to higher [due] to either a lack of understanding of the systems basic day to day functions or intentionally not sending to LOGSA/LIW."  In other words, since the required interfaces had not been performed, there was a belief that the illegal conduct would not be caught.

60.     An undated internal memo entitled "AC-FIRST LISMX/SASMO LIW Concerns" reflects discussions with project management about these issues, including that mandatory interfaces weren't being run and that efforts were made to avoid detection.  The memo expressly noted that "S&S [Supply & Services] unaware or intentionally not sending Mandatory Daily interfaces to LIW."

61.     In late December 2014, the LISMX supervisor reported to the AC-First IT Manager as follows: "Not turning the recoverable items in using the EUM method (no credit for the parts SUPER BAD [tire example 6k etc] and incorrect records for the ones that have any legacy data at all as well as the table stack up 3900 on the front side 10K ++ back side risk of discovery during long term audit and not being able to show what the heck we did with the parts or that we did it wrong)."

62.     The SAMS-E End User Manual, terms of which were expressly incorporated into the MOSC-A contract, includes detailed instructions about the reports and interfaces that are required.

63.     Even if the failure to meet those requirements might have been mistakes initially, the failure to correct the problem and begin proper reporting thereafter was clearly intentional.

64.     On February 25, 2015, AECOM issued a Bagram Air Field ("BAF") ICAR (internal corrective action report) identifying failure to properly turn in recoverable items through the SAMSIE system.   Over 10,000 records were involved in that investigation.   In its internal document, labeled "Severity: Major," AECOM characterized the non-conformance as follows: "Incorrect disposition has caused recoverable items to be left on AC FIRST SAMSIE database, and failure of proper credit to the USG [US Government] and significant liability to AC FIRST.

65.

In March 2015, an LISMX supervisor stationed in Afghanistan detailed $15-16M of improper or undocumented turned in recoverables from one system query only.

66.     In an internal meeting in mid-May 2015, various issues were discussed about the recoverable items.  Confirmation was provided that mandatory daily LOGSA/LIW interfaces for SAMS-E were not being run, contrary to requirements set out in the End User Manual (EUM), AISM-25-l2S-AHN-ZZZ-EM.   At one point, the IT supervisor was directed to make certain changes in the computer records in an effort to hide these double purchases.

67.     Specifically, in a [draft] memo dated 29 April 2015 and finalized on May 15, 2015, Naomi Annino-Luat, Manager, Class IX, AC First – Afghanistan, "requested" that recoverable records from DODAACs W912C4 and W91Y6H from calendar years 2010 - 2013 be removed from the SAMSIE system.   A copy of this memo was circulated to Jerrold Allen, Director, Supply & Services, who was the "Person in Charge" for this instruction, as well as to Douglas Harrison, Frank Palafos and others.

68.     The memo instructed as follows: "Request the AC-FIRST LISMX attempt to purge recoverable items from the SAMSIE that can be removed without creating a system error and those records that are not tied to an active/open work order. Below is a breakdown of the records by DODAAC and Calendar Year (CY)."  Attached were 125 pages of single-spaced listing of lines or items to be purged, with unit prices listed and a total value of $16,869,642.86.

69.     The document directing the LISMX supervisor to cover up this conduct was shared with project management and was specifically approved by Jerrold Allen, who was the director of client services at the time.

70.     Despite the order to purge records, there are ways in which this can all be tracked because it backs up into another system that these project managers did not understand.

71.     The LISMX supervisor was threatened internally, in about late April, early May 2015, based on his efforts to have this misconduct addressed.

72.     This LISMX supervisor provided AECOM/AC First with recommendations about how to fix the problems and prevent this type of theft of government property, but his suggestions were never taken seriously.  In his memo detailing steps to take to prevent this misconduct, the employee estimated over $16 million in problem purchases, with line by line breakdown of the items.   Again, he was told by senior project management that it would be cheaper to pay if they were caught, rather than to correct these problems.

73.     On May 23, 2015, the LISMX supervisor shared specific concerns and documents with Frank Palafos, AC FIRST IT Manager, including memos about the recoverables, SAMSIE concerns and security concerns about the un-cleared employees being given access to the Army servers.  On the recoverable issue, the employee wrote that his concerns included the following: "[r]etaliation or liability for very large & expensive issues identified; [s]till no detailed written

guidance or memo for record stating what we are changing after numerous meetings with higher [sic] and detailed solutions offered; [n]o written plan of action for the two LIVE UIC in the SAMSIE system that have the same issues; [n]o written plan of action for the outstanding improper operational issues with the SAMSIE system …; [n]o guidance on the mandatory LOGSA/LIW interfaces."

74.    The LISMX supervisor also documented the history of the problem and the failure of AECOM's management to address the problem, in late May 2015: "Serious concern were raised five months ago, as I brought to the attention of Senior Management the extremely large and growing Recoverable Items Table within the SAMSIE and the adherent problems to include the incomplete records of 6000+ lines, 13K + items at a system billed value of approximately 16.1 million dollars to the 401st, not counting losses in recoverable items credit to the 401st or the liability from operating outside of scope. Shortly after providing a breakdown of the issues and concerns, AC-FIRST quality contacted me to request further details on the slides I had provided my higher, but they were unable to grasp the full scope due to their limited understanding of the SAMSIE system and operations. Multiple meetings were held with appropriate leadership. However my concerns over incomplete records and improper process were not addressed and are still an issue at present."

75.    This employee had concerns that there may have been documents deleted from his computer.

76.    In late 2011 and first quarter of 2012, prior to Relator's employment at AECOM, some of these same issues had been the subject of a Defense Contract Management Agency ("DCMA")  Property Management System Analysis conducted of AECOM (AC FIRST) at Bagram Airfield, Afghanistan.   The conclusion from that analysis was that "AC FIRST's system

for control and accounting of Government Property at Bagram Airfield is INADEQUATE." On the basis of this Analysis, AC FIRST was considered "a high risk" and the shortcomings were deemed to "affect the ability of DoD officials to rely upon information produced by the system."

77.     Of particular significance to the allegations herein, the 2012 Analysis noted that the failure to record and manage inventory "can lead to questions of reasonableness of consumption and verification that property was consumed only in the performance of the contract," which suggests the same concerns about theft of property. With regard to acquisition of needed materials, the Analysis reviewed many of the same systems as the IT Supervisor checked and observed that the contractor was "unable to locate over half of the records in the sample."

78.     As Relator alleges and supports, similar problems continued after the 2011 time period that was the subject of the DCMA report.   AECOM's requests for payment were tainted because the mandatory underlying controls were not in place and did not allow for reliable information from AECOM's systems.

79.     Many internal documents as well as Army Corrective Action Requests (CARs) discuss these property concerns over at least a three year period.

80.     In addition to the specific concerns raised by the IT supervisor, there were many other indicators that AECOM management was aware of significant problems. For example, on numerous occasions in the MOSC-A Weekly Project Management briefing, particularly in 2013, one of the concerns listed under Supplies and Services, an area listed under the supervision of Jerry Allen, was "movement of property without proper documentation and notifications."

81.     A memo from January 2013 states that a large quantity of equipment in Large Area Maintenance Shelter [LAMS] will not be entered into AWRDS -- system for tracking APS (Army Pre-Positioned Stock).

### 4. Use of Unqualified and Uncertified Employees, Including Many Who Lack Security Clearance

82.     Another issue that was raised frequently in connection with the fraudulent purchasing and tracking issues was the Company's use of unqualified employees to handle some of these functions, directly in violation of contractual requirements, and the use of Other Country Nationals ("OCNs") in violation of clear regulations concerning national security.

83.      In addition to the fact that these uncertified and unqualified personnel were wrongly billed to the government, the use of these employees facilitated AECOM's ongoing thwarting of Army system requirements and reporting because the employees did not understand the requirements.

84.     The reliance on unskilled or untrained personnel violated the PWS and contributed to substantial cost overruns to the government through recoverable items not being processed correctly; materials not being accounted for properly; duplicative ordering of parts sometimes already in stock; and lack of proper documentation.

### B.    False Billing for Labor

85.     Reporting of hours worked on a government contract is governed by the Federal Acquisition Regulations (FAR).   Specifically, pursuant to FAR 31.201-2(d), a government contractor:

> *is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles in this subpart and agency supplements.*

86.     The specific delineation of what is required in connection with claims for labor payments is found in the DCAA Contractor Audit Manual and Standard Form SF-1408.   The provisions for a timekeeping system (Para 5-908 & 909), and Enclosure 3, p 20,  require, in relevant part, the following:

- All hours worked for all employees are recorded
- Daily recording of time worked by the employee
- An audit trail for any and all changes
- Employee review and approval of the time recorded
- Supervisor review and approval of the employee's time recorded
- Certifying the hours on the timesheet reflect the hours worked and the appropriate cost objective **at the end of each work period.**

http://www.dcaa.mil/DCAAM_7641.90.pdf;

http://www.farmaster.com/farmaster/data/idx/Dcaam/0509020000.htm.

87.    Additionally, pursuant to the Management Plan – Contract Performance Plan that AECOM submitted to the Army Contracting Command, AECOM was required to use and maintain Standard Army Maintenance Information Systems (STAMIS) for labor reporting. The AWRDS/MWB, SAMS-E/1E module was required to be updated daily and actual labor hours for individual employees were required to be entered into the system daily.

88.    The importance of accurate timekeeping is stated repeatedly in government publications. As the Defense Contract Audit Agency has stated: "Timekeeping procedures and controls on labor charges are areas of utmost concern. Unlike other costs, labor is not supported by external documentation or physical evidence to provide an independent check or balance." DCAA Manual, June 26, 2012, No. 7641.90, p. 14. *See also* DCAA, "Labor costs are usually the most significant costs charged to Government contracts, and usually comprise the base, or the largest element in the base, used for allocating indirect costs. Historical labor costs are often used to estimate labor for follow-on or similar item Government contracts. Unlike other cost items, labor is not supported by third party documentation such as an invoice, purchase order, or receipt. Contractor personnel have complete control over the documents or devices of original entry, whether they consist of timecards, electronic media, or some other means. Responsibility for accuracy is diffused throughout the contractor's organization. Consequently, the risks associated

23

with the accurate recording, distribution, and payment of labor are almost always significant." http://www.farmaster.com/farmaster/data/idx/Dcaam/0509020000.htm.

89.     AECOM's own internal documents and procedures expressly recognize that as well: "Timekeeping Errors … Raise suspicion regarding the validity of labor costs."  AECOM Federal Services Group, Time and Labor Reporting Practices and Procedures. *See also id.* at 5 (noting that AECOM must maintain approved timekeeping, accounting, labor and billing systems and that disapproval of any one system endangers AECOM's ability to bid on future work); *id.* at 2 ("Because there is no independent third-party documentation to verify the accuracy of the contractor's labor charging, government auditors pay close attention to a contractor's timekeeping and labor charging practices").

90.     For ongoing or active government contracts, including the MOSC-A contract, AECOM submitted bi-weekly invoices to the government reflecting, among other things, the number of hours that had been worked on that contract.  These invoices were prepared based on, *inter alia*, the employees' entries on hard copy timesheets.  Although submissions to the government for payment for time worked are done on an aggregate basis, bi-weekly timesheets reflecting individualized daily records of hours are required to be retained and made available to the government for four years after the contract is closed out.

91.     In mid to late 2012, AC First undertook a Timekeeping Review stretching back to 2010, to see whether the company's timekeeping practices were compliant.

92.     AC First's Program Manager Bob Shirron circulated a document to an extensive circulation list instructing recipients to retain all documents relating to the Review, including electronic and hard copy records and email.  The directive specifically identified timesheets, work schedules, timekeeping/ethics protocols/operating procedures and related training materials and

any email, attachments or other correspondence potentially relating to the Timekeeping Review. The relevant time frame was from "the date that Contract W911SE-07-D-0004 commenced on 1 April 2010 until further notice."

93.     Notwithstanding this very clear directive to preserve documents, Relator observed that files were routinely wiped and emails were not stored.

94.     As detailed below, towards the end of the contract, AECOM's internal Finance Manager completed an analysis that estimated that AECOM had over *$140 million* in timesheet error liability during the time period that he analyzed.

95.     Timesheet violations on the MOSC-A contract included failure to have employees sign timesheets; signatures by office-based employees who could not validate that the hours claimed had actually been worked, rather than signatures from actual supervisors who were on-site with the employees; failure to include a printed name of the supervisor's signature, often making it impossible to confirm who had actually signed as the supervisor; missing employee numbers; and signing and submitting timesheets prior to the work actually being performed, by both employees and supervisors. These errors were prevalent during the period from 2010 – late 2013.

96.     Additionally, toward the close-out of the contract, during 2014-2015, AECOM engaged in a "corrections" process, in which impermissible changes were made to try to clean up the errors.

97.     The scale of the timesheet violations is so widespread that there is no basis for reliance on any of this Company's submissions relating to hours worked on the contract at issue.

      **1.**     **Pre-Signing Timesheets**

98.     The two week pay period in effect on this contract ran from a Saturday to the second Friday of the period.  Employees on this contract routinely submitted timesheets for a two week

period on the second Wednesday (or Thursday) of the period.  Obviously, those timesheets violated the "daily time reporting" requirement.  Also, they reported work that had not yet been performed and any supervisors' signature could not have legitimately certified that the work had been performed.

99.     The submission of timesheets in advance of time actually worked was a deliberate company policy.  In an AC-First document entitled "Welcome to Afghanistan – New Hire Orientation" employees were expressly instructed that they needed to turn in their timesheets on "the Thursday prior to the end of the [two week] pay period."   Supervisors were also required to submit their sections' timesheets to HR by close of business on that Thursday.

100.    Similarly, in a document entitled Supervisor's Timesheet Training, there is an acknowledgement that an audit point is that timesheets are not to be completed before the work is completed, but the internal timesheet process states that timesheets should not be completed in advance except for the Wednesday of the week that timesheets are turned in.

101.    It appears that this practice goes back at least to 2011.  An August 28, 2011 email chain between Ramesh Marimuthu, Payroll Supervisor, and Jan E. Zimmerman, at Shank Field Support Maintenance relating to the pay period of August 27 – September 9, refers to a special timesheet submission mandated by the corporate office for each week separately, and for each one week period, the instructions were to have the timesheets turned in on the Wednesday of the respective pay week (Aug 31, for the W/E Sep 2 and Aug 7, for the W/E Aug 9).

102.    By Relator's personal observations, he is aware that timesheets for the two-week period were frequently turned in on the second Wednesday of the period, and there are numerous examples of timesheets that were signed prior to the end of the pay period (as detailed below).

103.    Relator raised this issue a number of times and searched vigorously for any indication that the Army had given permission for this practice.  He asked Dianne Mcrea, Finance Manager, sometime in September, 2013, and also asked Jean Eady, the former compliance manager and director of business management, the group that oversaw payroll.  Nothing was ever provided to justify this clear violation of FAR and DCAA Manual requirements.  Relator's concerns and his attempt to locate authorization are documented in several memos that were sent to various managers, including Daniel Peters, Vance Barron and David Calico.

104.    The practices were known to AECOM project management, even beyond the explicit company directives cited above.  For example, following an internal CAR, there was a Time Sheet Audit Update, 8 AUG 2012, Quality Management.  The update showed that 16 out of 72 employees (~22%) admitted that they had pre-populated hours on timesheets, and 32 out of 110 (~ 30%) admitted to signing timesheets in advance before submitting them.  Another audit reflected in that document listed 6 out of 40 who admitted either pre-populating hours or signing timesheets in advance.  Given AECOM's standard practice of signing timesheets on the Wednesday or Thursday before the end of the pay period, these audit findings referred to pre-signing even earlier during the pay period.

105.    Despite the internal directives to fill in timesheets prior to the end of the pay period, AECOM was aware of the DCMA requirements prohibiting pre-populating timesheets.  In a PowerPoint prepared by Dianna Mcrea, Finance, intended to "ensure that AC FIRST personnel are prepared to accurately answer questions regarding timesheets" AECOM said that the proper response to a question from DCMA whether employees pre-populated hours was as follows: "Hours will not be filled in prior to being completed."  In a set of Finance FAQs, the section on timesheets repeated the standard instructions to have timesheets completed daily.

106.    In a similar PowerPoint titled "Business Management, PWS Training, Timesheet Review", the stated purpose of the presentation included the following:  "to ensure audience is knowledgeable of established timesheet procedures"; and  "to identify the 'correct' answers to auditor questions."

107.    Numerous timesheet training documents include sample "perfect" timesheets appropriately showing signatures on the last day of pay period.

108.    In a routine weekly Project Management briefing dated May 5, 2013, the Business Management segment cited a floor check of the Program Operations group, and listed a number of timesheet errors, including 5 out of 10 timesheets reviewed that had been "[p]re-populated … (Wednesday Pay Cutoff)."

109.    The early signing of timesheets by employees and supervisors occurred throughout the term of the MOSC-A contract.

110.    Direct evidence that AECOM knew the early signing was illegal and attempted to conceal that from government investigators stems from a series of emails in mid-2016:

---------- Original Message ----------
From: "Mazeika, Marissa" <Marissa.Mazeika@aecom.com>
To: "SWA AC FIRST KAF ALL (ACFIRSTKAFALL@afghan.swa.army.mil)"
<ACFIRSTKAFALL@afghan.swa.army.mil>, "SWA BAF ALL DISTRO
(BGRM401stAFSBAECALL@afghan.swa.army.mil)"
<BGRM401stAFSBAECALL@afghan.swa.army.mil>, "PMO_Directorate@ac-first.com"
<PMO_Directorate@ac-first.com>, "PMO_Directorate_Admins@ac-first.com"
<PMO_Directorate_Admins@ac-first.com>, "Santiago, Audra"
<Audra.Santiago@aecom.com>, "Kurti, Ilir" <Ilir.Kurti@aecom.com>,
[DELETED REST OF RECIPIENT LIST TO SAVE SPACE]
Cc: "Cox, Emily" <Emily.Cox@aecom.com>
Date: June 6, 2016 at 10:47 PM
Subject: FW: ***Upcoming DCAA Timesheet Audits at BAF and FOBs***
        Good Morning AC FIRST –

        The DCAA auditor will be on our Bagram footprint this morning!

Please make sure all timesheets are up to date.
He is wanting to interview roughly sixty (60) employees but still I do not have a roster of who and what departments.
Please make sure all timesheets are up to date!
If corrections have been made, please make sure they are annotated properly, to include the initials of the supervisor.

We will try to complete all sixty (60) employee interviews this morning.
However, in the event we can't, we will more than likely have to come back tomorrow morning unless he has time this afternoon.

**Due to this, please do** NOT **plan on submitting your paper timesheets until another update email is sent out.**
**I want to make sure that we have all the audits covered prior to timesheet submission. Again, do** NOT **populate your hours for Wednesday, Thursday and Friday of this week until you receive another updated email.**

If you have any questions, please feel free to contact me.
Thank you.

Respectfully,
Emily Cox

Emily Catherine Cox
Supervisor of Business Services
AC FIRST-Afghanistan
Bagram Airfield
APO, AE 09354
DSN: 318.481.0055
VOIP: 817.704.0131
Roshan Cell: 079.049.8738
Emily.Cox@aecom.com
Emily.Cox@ac-first.com
emily.c.cox.ctr@mail.mil


(emphasis added, but red font in original)
---------- Original Message ----------
From: "Mazeika, Marissa" <Marissa.Mazeika@aecom.com>
To: "SWA AC FIRST KAF ALL (ACFIRSTKAFALL@afghan.swa.army.mil)"
<ACFIRSTKAFALL@afghan.swa.army.mil>, "SWA BAF ALL DISTRO
(BGRM401stAFSBAECALL@afghan.swa.army.mil)"
<BGRM401stAFSBAECALL@afghan.swa.army.mil>, "PMO_Directorate@ac-first.com"
<PMO_Directorate@ac-first.com>, "PMO_Directorate_Admins@ac-first.com"
<PMO_Directorate_Admins@ac-first.com>, "Allen, Terrence"
<Terrence.c.allen@afghan.swa.army.mil>, "Blackwell, Kristina" Cc: "Cox, Emily"
<Emily.Cox@aecom.com>

29

[DELETED REST OF RECIPIENT LIST TO SAVE SPACE
Date: June 21, 2016 at 8:51 AM
Subject: FW: ***GSS Paper Timesheets for PPE 24 June 2016***
    Good Evening AC FIRST –

**We will turn paper timesheets in as normal tomorrow, Wednesday 22 June 2016. However, DCAA will be back TONIGHT to audit the NIGHT SHIFT within Security, so please do NOT prepopulate ANY timesheets for turn in tonight!**

Thank you.

Respectfully,
Emily Cox

Emily Catherine Cox
Supervisor of Business Services
AC FIRST-Afghanistan
Bagram Airfield
APO, AE 09354
DSN: 318.481.0055
VOIP: 817.704.0131
Roshan Cell: 079.049.8738
Emily.Cox@aecom.com
Emily.Cox@ac-first.com
emily.c.cox.ctr@mail.mil

(emphasis added).

### 2.    <u>Other Timesheet Errors</u>

111.    Various internal company documents explicitly discuss timesheet violations, including a memo specifically addressing timesheet errors and an internal document entitled Drawdown – DeMob[ilization], 2014, dated 16 March 2014.

112.    In the Drawdown PowerPoint, under the heading "Historical Risks", there was an entry for "Timesheets (H)" [high risk]:

- Time Period: 2010 to Mid-2013

- Basis of Risk: Entries Do Not Meet DCAA Standards (Error Rates 14.5%, Now .05%)

- Exposure: > $5M

- Mitigation or Defense: Corrective Actions Put into Place Mid-2013

113.   As AECOM was heading toward a wrap up of the contract, at its original anticipated completion date, the internal Finance Manager, Daniel Peters, Relator's supervisor, prepared a memo summarizing the extent of the problems that the Company was aware of. This document was prepared in about January 2014.  This memo estimates that AECOM had *liability* in the amount of **$144,872,000** for the timesheet errors during the period of the MOSC-A contract that was analyzed.  There is even a calculation for an estimated settlement with the government at 30%, or $43 million.[4]

114.   Although many of the errors noted were missing signatures, which raises uncertainty about the reliability of the information but does not necessarily indicate that the information is erroneous, at one point during the analysis 13.69% of timesheets had errors in terms of the number of hours listed.  Remarkably, this analysis did not even take into account the issue of employees and supervisors having prepared and signed the timesheets before the end of the pay period, which would have added substantial amounts to the totals.

115.   The $144 million liability analysis was sent to various people, including the business director and/or the deputy finance director and a corporate finance VP named Blake Simonson.  To the best of Relator's knowledge, the upshot of the discussions regarding these widespread timesheet and reporting violations was that a "close out" team established in Dubai considered whether there could be corrections to remedy or cover-up these billing deficiencies.

---

[4]    Relator's estimate is that there was approximately $80-100 million of false billings, once the considerably lower salaries for the foreign nationals are factored into the equations.  This likely overstatement is acknowledged in the document itself.

3.      **Historical Timesheet Corrections**

116.    A Dubai close-out manager, Audra Santiago, told Relator that the team was engaging in significant corrections to old timesheets in an effort to correct some of the deficiencies.

117.    Multiple company documents refer to an ongoing process of "historical timesheet corrections. For example, one memo refers to the "[d]evelopment of process for correction of historical timesheets through the workflow."

118.    Even internal personnel questioned how this process could be undertaken so long after the fact, as reflected in the May 5, 2013 (and other) MOSC-A PM Weekly Brief: "Correction of timesheets -- OY2 Charges Continue (REALLY?)."  Timesheet corrections continued to be listed as a priority item, however, for example in the July 2013 PM Staff Meeting slides.

119.    In a memo explaining to Business Management personnel the types of reports that get prepared, the following instruction appeared:

> The slide should also contain what BMD is doing that you want Corporate to know about, primarily Bob Shirron.  For example, when Finance and Accounting begins to correct the historical Timesheets, you will want to let Corporate know that it has begun."

120.    Clearly, the overwhelming majority of employees were not reachable at the home office location or the contract close-out office that was established in Dubai, making correction to timesheets inherently suspect since there was no ability to obtain the employees' consent.   See DCAA Contract Audit Manual 5138 October 14, 2015 5-902 ("Effective procedures for timekeeping to reasonably assure that labor hours are accurately recorded and that corrections to timekeeping records are documented, authorized, and approved.")

121.    At some point, Relator heard that the effort to correct the historical timesheets was being halted.  Essentially, the conduct was documented so that the Company would be able to

respond to any issues that the government might raise.  The approach seems to be that the Company will claim that these are "technical errors", but that the underlying time was legitimate and billable.

122.     A formal closeout of this contract with DMA was initially scheduled for the end of 2015 but had been extended.  The $43 million settlement estimate was addressing anticipated costs arising during closeout auditing.

123.     AECOM's violations of timesheet reporting requirements went beyond the serious paperwork issues alleged.  For example, during the fall of 2013, Relator sent an email to Steve Tolley, Director of Business Management, about a group of employees sleeping on the job although still billing full eleven hour days.  He even took photos of them sleeping at the time and showed his bosses, but nothing was done.  The Timesheet Analysis noted earlier found that 13.69% of timesheets had errors in terms of the number of hours listed, at one point during the analysis.

### 4.     **Examples of Falsified Timesheets**

124.     A timesheet for employee Luke Kelley for the pay period 3/26/2011 to 4/8/2011 states that the employee was not available for signature, but does not include any explanation in the "Remarks" section; supervisor's signature is by Ramesh Marimuthu, Payroll, who did not work on location with this employee.   Ramesh Marimuthu was an employee in the Finance Department/Payroll, in Bagram.

125.     A timesheet for employee Brandon Moore for the pay period 3/26/2011 to 4/8/2011 was signed by the supervisor on 4/6/2011, prior to the end of the pay period.

126.     A timesheet for employee Michael Willis for the pay period 3/26/2011 to 4/8/2011 was signed by Ramesh Marimuthu, the payroll supervisor based in Bagram, although Willis was at Salerno.

127.    A timesheet for employee Harles Smith for the pay period 3/26/2011 to 4/8/2011 was signed by Ramesh Marimuthu, the payroll supervisor based in Bagram, although Smith was at Kandahar.

128.    Scores of timesheets for the pay period 2/11/2012 through 2/24/2012 were signed by employees and supervisors on either 2/21 or 2/22/2012, prior to the end of the pay period.

129.    Scores of timesheets for the pay period 4/21/2012 through 5/4/2012 were signed by employees and supervisors on 5/2/2012, prior to the end of the pay period.

130.    The timesheet for employee Kalaivanan Ganesan for the pay period 4/21/2012 through 5/4/2012 was not signed by the employee or an actual supervisor in Kandahar, but was only signed and approved by Ramesh Marimuthu, the payroll supervisor in Bagram.

131.    The timesheets for employee Jayakumar Gangadharan (at Shank site) and employee Jeevan Jose (in Kabul) for the pay period 4/21/2012 through 5/4/2012 were signed by both the employees and their supervisors on 5/1/2012, three days prior to the end of the pay period.

132.    The timesheet for employee Jaya Theegala (at Salerno) for the pay period 4/21/2012 through 5/4/2012 was signed by the employee on 4/30/2012 and the supervisor on 5/1/2012.

133.    A timesheet for employee Ian Becton from 06/30/2012 to 07/13/2012 includes the following timekeeping recording errors: (a) the employee signature is dated 07/12/2012 which is before the end of the pay period; (b) Ramesh Marimuthu, is a payroll supervisor based in Bagram, and therefore should not be providing the approval for an employee stationed at another base.  In this case, the employee was stationed at a forward operating base ("FOB") identified as "SHANK". The timekeeping system requires the signature of a supervisor stationed at the same location as the employee, preferably the employee's immediate supervisor, who can verify the hours worked,

except in unusual circumstances; (c) the "REMARKS" section of the timesheet should be completed to reflect any travel or reasons for "Leave without Pay"; and (d) the employee number is missing.

134.    A timesheet for employee Michael Grafton from 06/30/2012 to 07/13/2012 includes the following timekeeping recording errors: (a) both the employee and the supervisor signatures are dated "11-Jul-12" which is one day prior to the last date of recorded time; (b) the employee was located at the Mazar-E-Sherif FOB, but the supervisor approving the timesheet is Ramesh Marimuthu, a payroll supervisor stationed in Bagram.

135.    A timesheet for employee Daniel Aguayo for the pay period 08/25/2012 to 09/07/2012 includes the following timekeeping recording errors:  (a) the space for the supervisor's printed name is not completed; (b) the supervisor "approval signature" is dated 09/02/2012 but the pay period ends on 09/07/2012 which was five days after the supervisor signature; (c) the employee's signature is dated "09/06" but the last day time was submitted for was 09/07/2012; and (d) the employee number is missing.

136.    Scores of timesheets for the pay period from 10/20/2012 through 11/02/2012 were signed by both employees and supervisors on 10/31/2012.

137.    Scores of timesheets for this pay period 11/17/2012 to 11/30/2012 were signed by employees and supervisors on 11/28/2012 (note this was not Thanksgiving week).

138.    This conduct continued at least into 2013.  Scores of timesheets for the pay period from 2/23/2013 through 3/8/2013 were signed by employees and supervisors on 3/6/2013.

### 5.    Billing for Unqualified and Uncertified Employees

139.    Pursuant to section 5.5.6.5 of the Performance Work Statement ("PWS"), AECOM was required to employ qualified SAMS-1 operators to perform the functions of accounting for materials.  These employees were required to be competent to understand data elements involved

with maintenance requests, perform data backups, perform daily NMO/Work Order File Transfers to government-provided LIS using the established protocol and interfaces, and adjust and inventory bench/shop stock. AECOM's CDRL requirements expressly stated that employees required 3+ years experience and external SAMS-E certification.

140.   At various times during the performance of this contract, however, fewer than five AECOM operators (out of approximately 100) had the required certification and competency.

141.   In an effort to "fudge" its non-compliance, AECOM created and utilized its own "certifications." For example, on November 16, 2012, AC FIRST issued a "Certificate of Training" to Romaldino Tony Masarenhas" as a "SAMS-E Operator, Personal Qualification Standards (PQS).

142.   On information and belief, AC_FIRST was ordered to stop doing that since AECOM was not a certifying authority.

143.   There were ongoing violations of national security policies as well, by allowing unvetted and uncertified Other Country Nationals ("OCNs") access to US Government systems.

144.   Regulations, statutes and policies pertaining to the required security clearances include the following: Access to sensitive information by a non-U.S. citizen who is not a DOD employee will only be permitted in accordance with applicable disclosure policies (for example, National Disclosure Policy 1, DODD 5230.9, DODD 5230.25) and U.S. statutes (for example, the Arms Export Control Act, 22 USC 2551, et. seq.); Standard Army Maintenance System-Enhanced (SAMS-E) v13.01, Security Policy, July 2012 -- 3.1.1 Background Investigations and Personnel Selection (SAMS-E v13.01 users are IT-III positions and Administrators and CSSAMO are IT-I and IT-II depending on their level of access as described below. The following is taken from AR 25-2, Section V, Personnel Security: a. Basic requirements. (1) Personnel requiring access to ISs

to fulfill their duties must possess the required favorable security investigation, security clearance, or formal access approvals, and fulfill any need-to-know requirements. (2) IT I is (a) Defined as personnel in IA positions (for example, SAs/NAs for infrastructure devices, IDSs, VPNs, routers; SAs/NAs for classified systems and devices) with privileged-level access to control, manage, or configure IA tools or devices, individual and networked IS and devices, and enclaves. (b) Favorable completion of a National Agency Check (NAC) (current within 180 days).

145.    In an email dated May 16, 2015, Jonathan Brock, SASMO OIC ("Sustainment Automation Support Management Office, Officer in Charge.") responded to information that had been provided to him about the impermissible users on the Army systems, and copied his incoming replacement, Reginald Hood: "I agree with everything you are discussing here, as the way business is currently conducted prevents any type of ownership in audit logs. I did not obtain the needed support to tackle this project before I leave out, as I am almost out of time right now. This is going to be one of the big items that I stress to Chief Hood, my replacement, that needs to be dealt with in order to gain control of this monster. According to big Army, there is no way around the fact it spells out this is the only way we are to do business. Admin accounts must be separate from user accounts, and the user accounts must be singed [sic] for through the acceptable use policy with awareness training requirements met, period. I already have an AUP typed up with a plan to push this out, but it will have to be my replacement who will knock it out; I am close to working on days left here. All systems connected to any DoD network, including VSAT, must adhere to all DoD regulations, instructions, and policy."  The references to user accounts and acceptable use relate to security clearances and appropriate tracking of who is given access to Army systems.

146.    On May 23, 2015, the LISMX supervisor documented concerns in a Memorandum for Record, which was available to higher level supervisors and Project Management.  The

employee specifically noted that "repeated attempts/demands orally to add un-vetted OCN operators, requests for administrative rights for operators have been vigorously pushed by Senior Management despite the clear documentation and directions from DOD and the 4SSB **[Sustainment Support Battalion]**."

147.   At about the same time, on May 14, 2015, Frank Palafos, AC First IT Manager, wrote to Timothy Walker, L CTR USA 30401st AFSB and Naomi Annino-Luat, N USA CTR 4-401st AFSBn ACF Class IX, raising serious concerns about the impermissible access:

> I believe it is about time we talk about this issue regarding OCN s getting on a NIPR network without going through any vetting process. It is a NIPR network if they need to get vetted on an unclassified network, then working with sensitive (SASC parts) items will require a vetting process as well. Do they at least have SWA access? We already have Expats that may not be certified to work on the system but at least they are vetted.
>
> I have looked the other way for a long time but I believe it is time we start complying with network regulations and legit certifications when it comes to providing OCN s access to any network.
>
> ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪
>
> If we were to have DCMA or any auditor go into your office and verify how an Expat or OCN were able to get access to the network, it would be Me that will get reprimanded, not you or your department. When we have an IA Violation, I am the one responsible to making sure it does not occur again and what training did I perform to prevent an incident in the future. On the last note, is this person a bonafide SAMS-1 operator and not a data clerk?
>
> However, I will provide you the opportunity to prove me wrong, since I have been wrong before. Provide me an Army document that gives us the okay for an OCN to get on a STAMIS system without any vetting process.

148.   This email was also sent to David Reisz, CTR USA 401st AFSBn AC FIRST.

149.   In November 2015, in part in response to concerns raised by various AECOM IT personnel, Reginald Hood (SASMO OIC) sent a memo to James, Ashley J CW2 USARMY USARCENT (US); Deitrich, Robert R CTR (US); Williams, Marcus D CW3 USARMY 4 ESC

(US); Dubose, Steven SFC USA RSSB; and Cervantes, Enedina SGT USA RSSB, asking whether there was any exception in place to AR25-2 that prohibits OCNs from having access to SAMS-E, at least without individual background investigations.

150.    Both James and Williams responded that there were no exceptions, that all users of LIS were subject to that policy, and that the contracts with the OCNs would have to specify if they are allowed access to any US Government systems.

151.    Nonetheless, AECOM continued to allow unauthorized users to access the Army systems, creating national security concerns and exacerbating the property tracking and accounting issues because the people operating the systems were not qualified or competent.

152.    The reliance on unskilled or untrained personnel violated the PWS and resulted in substantial cost overruns to the government through recoverable items not being processed correctly; materials not being accounted for properly; duplicative ordering of parts sometimes already in stock; and lack of proper documentation.

### C.    Violations of Man Hour Utilization Reporting Requirements

153.    The requirement to report Man Hour Utilization stems from AR 750-1, chapter 4-14, which requires Army unit commanders to "monitor the utilization of civilian maintenance personnel and establishes a standard of 85 percent utilization with a goal of 90 percent. Utilization rates are calculated on the actual direct labor hours (recorded on DA Form 2407, "Maintenance Request") divided by the direct labor hours that were available to perform maintenance."

154.    Evidence demonstrating that AECOM did not comply with the MHU reporting requirement includes: 1) the highly critical Corrective Action Report ("CAR") during the period in question, disputing AECOM's reported MHU rate and finding an accurate rate of only 26% in that particular instance; 2) internal documents identifying a MHU rate less than 85%; and 3) AECOM's use of hand-made reports rather than reports generated from real data in SAMS-E. The

lack of integrity in the timesheets overall, as well as the multiple wasted hours that Relator Foreman personally observed, also contributed to inaccurate MHU reporting.

### 1.  <u>Actual MHU below 85%</u>

155.   The MOSC-A contract had a standard Army clause that required the contractor to show that the workforce on the contract was productively busy for at least 85% of the total work hours available during a given time period. If the utilization rate was not meeting that contractual metric, then the Army could look to cut the workforce for which it was paying the contractor.

156.   When proper reporting requirements are met, the Army can "review and verify utilization data for tactical vehicle field maintenance services and determine whether further reductions in contractor personnel should be taken in accordance with Army Regulation 750-1." See Inspector General, U.S. Department of Defense, Contracting for Tactical Vehicle Field Maintenance at Joint Base Balad, Iraq (Report No. D-2010-046, March 3, 2010) (hereafter referred to as OIG Report).  More specifically, "[m]onitoring the utilization rates for tactical vehicle field maintenance services purchased under the LOGCAP III contract is a required control that must be in place to ensure DOD is paying for services it actually needs.  The Army should verify utilization rate data provided by contractors and use that data to make timely adjustments in the level of contractor-provided tactical vehicle maintenance services."

157.   Man-hour utilization was required to be reported as a Man-Hour Utilization rate ("MHU"). The reports themselves are sometimes referred to as Man-Hour Utilization Reports ("MURs"). Pursuant to Performance Work Statements ("PWS") starting no later than January 2012, AECOM was required to report MHU[5] on a monthly basis to the 401st. The January 21,

---

[5]     A reconciliation draft of the PWS dated November 1, 2011 refers to MHU reporting, November 2011 Reconciliation Draft PWS ("Man hour utilization rate shall be $\geq$ 85% IAW the Department of the Army goal via a government approved monthly report to the 401st brigade

2012 PWS read as follows: "Man hour utilization rate shall be > 85% IAW the Department of the Army goal via a Government approved monthly report to the 401st Brigade commander or delegate." The same provision appeared in subsequent PWS's.

158.    In 2012 in particular, AECOM spent considerable effort renegotiating what were termed Critical Metrics in the MOSC-A contract, including the MHU requirement.

159.    AECOM was cited for inaccurate man hour accounting in the second quarter 2012 Program Management Review. 2Q 2012, July 20, 2012, MOSC-A Program Management Review.

160.    AECOM's failure to report reliable Man Hour Utilization data on the MOSC-A contract "resulted in DOD incurring costs for services that were not required." See OIG Report at p 7. The 401st did, indeed, mandate lower staffing levels when it became aware of low utilization rates, confirming that there would have been financial consequences had proper numbers been reported.

161.    [I]f personnel, work order, and man-hour data are input correctly into the Standard Army Maintenance System – Enhanced [SAMS-E], the system will calculate the man-hour utilization electronically." OIG Report at p11.

### 2.    The Corrective Action Report

162.    In July 23, 2012 Corrective Action Plan (CAP) Status for Program-level CARs, AECOM's nonconformance was described as follows: "Accurate Man Hour utilization is not being maintained in SAMS theater wide. This issue is the most recent in a trend of deficiencies related to the required use of Logistics Information Systems." *Id.* at p 15. There was also specific mention of the "failure to enter labor hours data into SAMS," albeit pegged to only one site. (p15) In what

---

commander or delegate") at p 34, but that might not have been formalized until the January, 2012 PWS.

appears to be AECOM's internal discussion of how to address the numerous CARs about LIS,
there is also a reference to an Internal CAR concerning MHR, with the minutes raising the
following questions:

> What we have already done for the Internal SAMS Utilization
> Internal CAR, which contains the specific actions items that will resolve the
> man hour reporting

> Address the requirements cited (why aren't we operating LMP or
> PBUSE for instance, or CDRL 001 re: man hours projected/expanded
> (nothing to do with LIS)?

*Id.* at p 16.

163.    AECOM received a CAR relating to inflated MUR reports in October 2012.
October 29, 2012 DCMA Corrective Action Request.  The report stated that AECOM was "well
under the required Utilization Rate of 85%; Utilization Rate for 1-30Sep12 was 26%. A random
sampling consisting of 70 "Daily Man Hour Sheet" source documents was used in determining
September's monthly Utilization Rate average of 26%."

164.    The CAR referenced the requirement in PWS 2.13.1 Optimization:

> The Contractor shall provide, manage, and administer a continuing
> workforce optimization plan for Contractor staffing for repair and maintenance
> requirements. The plan shall show how the Contractor plans to optimize and
> streamline operations when downturns and upturns in workload, manning
> shortfalls, and increases in Operational Tempo (OPTEMPO), project priority
> changes, and changing levels of complexity for both scheduled and unscheduled
> requirements cause an imbalance in the projected staffing level compared to the
> projected workload.

*Id.* at p 1

165.    AECOM engaged in discussions or negotiations with the Army about the manner
and timing of Man Hour Utilization reporting in 2012, as reflected in a draft of a Performance
Work Statement. There appeared to be agreement that the man-hour utilization rate formula was a
"percent of direct labor man-hours: total recorded man-hours on DA Forms 2407 / number of

available personnel hours *100." Also discussed was AECOM's position that they could not necessarily meet the targeted MHU because of problems procuring parts: "Parts availability is also a major factor in not reaching the MHU goal of 85%."

166.    A meeting was held on November 23, 2012 with 401st Brigade and AC FIRST to discuss the methodology for calculating the MHU, reporting periods daily versus monthly, UIC issues, and a number of other issues. The draft states that it "was agreed that the method of reporting MHU would be the SAMS 036 report, which will be reported monthly." It appears that AECOM wanted the standard revised to say that the MHU goal would be subject to adjustment not only based on workload fluctuation, but also on parts availability and that MHU at Maintenance Support Teams [MSTs] would be evaluated on a case by case basis.

167.    The PWS was modified no later than April 2013 to explicitly require that "[m]an hour utilization shall be calculated IAW AR 750 -1 and SAMS data. This will be reported monthly to the 401 Brigade Commander or delegate."  April 4 2013 PWS Maintenance & Operational Support for the 401st Army Field Support Brigade – Afghanistan, at pp 34, 36.

168.    It appears that the contractual requirement of 85% was maintained since the May 5, 2013 Weekly PM Brief reports that AECOM is "working to obtain 85% MHU" and "monitoring MHU at all locations", at p. 6 and p. 8. Additionally, the PWS dated October 23, 2013 repeats the ≥85% standard, without reference to parts availability.

### 3.    Internal Identification of MHU below 85% and Work Force Adjustments

169.    AECOM was responsible for managing the contract with a view toward appropriate manpower levels and the 401st mandated manpower reduction at times when MHU was low.  For example, the April 4, 2013 Performance Work Statement, at p 16, included a detailed description of the requirements:

**2.13.1** Optimizing Workforce.

**2.13.2** Optimization. The Contractor shall provide, manage, and administer a continuing workforce optimization plan for Contractor staffing for repair and maintenance requirements. The plan shall show how the Contractor plans to optimize and streamline operations when downturns and upturns in workload, manning shortfalls, and increases in Operational Tempo (OPTEMPO), project priority changes, and changing levels of complexity for both scheduled and unscheduled requirements cause an imbalance in the projected staffing level compared to the projected workload. Include identification of risk and risk mitigation techniques to show what risk might arise from the proposed optimization strategy. The Contractor shall develop appropriate metrics to measure the effectiveness of ongoing optimization actions. This plan shall include the existing and proposed organization structure and identify proposed staffing changes at the labor category level. This plan shall be submitted IAWCDRL 010 DI-MGMT-  80004A to the PCO/ACO.

**2.13.3 Standard**. The Contractor shall provide a business process plan which identifies how the Contractor plans to efficiently align workforce to workload in order to optimize efficiency, reduce cost, maintain schedule, and performance during downturns and upturns in workload, manning shortfalls, increases in op-tempo, projects priority changes levels of complexity, for both scheduled and unscheduled requirements. Workforce adjustments include, but are not limited to: changing the number of shifts, changing the number of sites and possible merging workload, or simply taking away what doesn't work.  At a minimum, 20% of the workforce, under the individual operations outlined in this PWS, shall be cross-trained to aid in optimizing the workforce.   The Contractor shall provide as required, a Contractor Productivity Report in accordance with CDRL 057 DI-MGMT-80004A.

170.    There is abundant evidence that AECOM was aware that proper and timely reporting of man-hour utilization could result in a reduction in authorized manpower levels on the MOSC-A contract.  For example,

    a)     In a December 12, 2012 AC FIRST Maintenance Drawdown Plan, AECOM refers to a reduction in force needed and AECOM cutting manpower. The document itself notes that it was "submitted for approval or discussion."

    b)     In a July 26, 2013 MOSC-A OY3 Definitized Budget Review, AECOM discussed an initial reduction in Feb/Mar 2013 to meet the 85% MHU as per the PWS. *Id.* at p 45. AECOM also acknowledged that more reductions

were possible if the 85% MHU could not be maintained:  the document states that "if the SARC cannot maintain 85% MHU they will be closed early." *Id.*

c)  In a Report: CPR Format 5 Cost Performance Report Format 5 Explanations and Problem Analysis, dated May 24, 2013, AECOM referred to a labor underrun (less than what was initially planned) of $1 mil due to "customer [401st] directed man hour utilization reductions"  June 19, 2013 Project: AFGHAN Option 3 Integrated Program Management Report.

d)  Later in 2013, in its OY4 [Option Year 4] Requirements Planning Brief, November 23, 2013, there is a lengthy discussion of the challenges of keeping the right size work force, along with a clear recognition that this is part of AECOM's responsibility. Among the assumptions listed are that AECOM will reduce Maintenance personnel as density of vehicle/equipment work orders decrease and AECOM will continue to monitor and make the necessary adjustments to the work force to maintain the 85% MHU through the drawdown. *Id.* p. 10.

171.    Numerous internal AECOM documents indicate that the 85% standard was missed on a frequent basis, often by a significant amount.  November 17, 2012 AC FIRST Monthly Performance Review, pp 21, 22 (S/W Project, 64.23%; range from 20.49% to 92%; N/E Project, 64.96%; range 22.00 to 98.8%); AC First Monthly Performance Review, Feb 23, 2013, at p 13 (significant drops in MHU, -- Nov, Dec, Jan – range from 61 – 72%); July 20, 2013 Monthly Performance Review (note that DCMA was in attendance; problems with MHU -- N/E meeting 85%, but S/W has issues with KAF at 60%); August 17, 2013 AC FIRST Monthly Performance Review, pp 19-20 (shows many months below 85%, not reaching that level until May of 2013).

## 4.    AECOM Devised its Own Reporting Format, Rather than Using SAMS, As Required

172.    AECOM did not report MHU straight from SAMS-E, although that system is designed to allow that function to be reported directly.

173.    Instead, AECOM compiled a non-standard report. In an internal document regarding contract metrics, for example, in a reference to Utilization (meaning MHU, since it refers

45

to section 5.6 of PWS which is the MHU section), the Utilization metric is identified as being done manually, but with a note that it will be (should be?) done through SAMS.  Management Review PWS Portal Metrics Status ("in place, manual – see to be on SAMS").

174.    The requirement to report from SAMS was known to Project Management, as discussed in the internal Program Management Review, 2nd Quarter 2012.  July 20, 2012 MOSC-A Program Management Review.  In reviewing the Maintenance area, specifically focusing on process issues, there is discussion of Manpower Utilization as a required objective, with a reference to the metric or monitoring method being "[m]onthly from SAMS" and the target being >85%.  *Id.* at p 64.  In a column called "Actual," however, describing what was actually being done, the change to a non-SAMS spreadsheet was plainly referenced: "New spreadsheet started 1 July."  *Id.*  The deviation was reaffirmed under the "Action" section of the memo, where it refers to "Utilization metric from SAMS," but the status column states "[s]ubmitting own form."  *Id.*

175.    Various charts appear to distinguish between "Personnel in SAMS" and "Current Manning," suggesting that more individuals were included in SAMS (and billed to the government) than were actually deployed.  *E.g.*, October 30, 2013 401st AFSBs Combined Maintenance Overview.

176.    By reporting outside the system in this fashion, AECOM avoided having a direct tie to actual hours in the system, allowing essentially made-up labor to be counted where, for example, the parts only work orders didn't tie to actual work orders, with actual vehicles or actual work.  This also facilitated manipulating MHU by misapplying "indirect hours" not connected to a specific assignment to "direct hours" of work performed.

177.    Unlike the dispute with the 401st about which hours could be legitimately counted, it does not appear that the Army ever caught on to this skirting of the SAMS-E system.

178.     AECOM was incentivized to overstate MHU because it allowed the company to keep its workforce high, increasing profits on this cost-plus contract. As AECOM explicitly stated in one of its Weekly PM Briefs, for example, the "priority is OY3 [Option Year 3] defendable numbers – keep 4593 [headcount] as long as possible." See January 6, 2013 MOSC-A Weekly PM Brief, at p 32.

**D.     Improper Salary Increases Connected to Bluefish Global Payroll Solutions Cards**

179.     Among the issues that AECOM dealt with in Afghanistan was how to pay various foreign nationals, in terms of currency used, deductions, and ability of funds to be wired or transferred to the workers' home countries.  Until approximately Fall 2013, payment to other country nationals ("OCNs") or foreign nationals was handled through Wells Fargo, which provided a service that allowed transfers for OCNs to their home countries. Essentially, some system was necessary to allow foreign workers to deal with their AECOM paychecks and transmit funds to their home accounts or directly to family members at home.

180.     Sometime in the spring or early summer of 2013, Mr. Jonathan Nagel ("Nagel"), President & General Manager AECOM / GSS LTD, decided to switch payroll services from Wells Fargo to Bluefish Global Payroll Solutions ("Bluefish") under the guise that Wells Fargo no longer offered the payroll wire services.  Once the switch started to get implemented, complaints arose almost immediately about the high transaction fees that Bluefish assessed.

181.     In an effort to justify the switch to Bluefish, Nagel claimed that Wells Fargo no longer provided the services needed.

182.     Bluefish is owned and operated by Mark Atkins ("Atkins"), who is the Bluefish CEO.  Atkins and Nagel have a prior business relationship from dealings at Minacs, a global outsourcing and business solutions company.

47

183.    According to other defense contractor personnel contacted by Relator, the representation that Wells Fargo no longer provided the needed services was false. There was no competitive bid process for this contract and, upon information and belief, AECOM was Bluefish's only customer for these services.  At one point, when Nagel was questioned about the reason for the switch to Bluefish, he got angry and refused to answer.

184.    In addition to other fees and costs associated with transferring employees' salaries, often as much as $50, Bluefish imposed a $19.99 transaction fee for each money transfer that it processed.  In an internal Financial Planning & Analysis ("FP&P") memo, dated Dec. 7, 2013, which identified Vance Barron as the AECOM employee with responsibility for this function, AECOM characterized the issue as "Excessive Fees associated to wire transfers."  At another point, Barron again listed the fees under "Issues/Concerns."

185.    Various foreign nationals, including specifically those from Kosovar, said that the Bluefish fees made it too expensive to send their pay home on a bi-weekly basis, as it was received. Many started to only have the funds wired at the end of every second pay period, creating hardships for families at home.

186.    In response to these complaints, AECOM decided to increase the hourly pay charged to the government for these employees, by 2.6%.  The memo suggests that there had been some salary increase for the Kosovar employees earlier also.

187.    The salary increases were not appropriate since they were simply paying for unnecessary fees on a crony contract with Bluefish.  AECOM's estimate was that this led to a .2% increase in monthly labor billings to the government.

188.    Various foreign nationals were targeted for the Bluefish cards, including Kosovar and Indian employees.

189.    In addition to the salary increases that were passed on to the Army, the unnecessary and tainted switch to Bluefish entailed a significant amount of time and effort that was also billed to the government.  In November 2013, at least 20 "Bluefish trainers" were assigned to spend two full days assisting with distribution and activation of the cards as well as account holder questions.  An email from the Financial Analyst who was deeply involved in the project notes that multiple employees had "all done an amazing job getting Bagram and all of the North East FOBs [forward operating bases] enrolled in BLUEfish"  and that they were "now shifting into the second phase of BLUEfish; Card delivery."

190.    These efforts were still underway into 2014.  For example, a Business Management report from April 2014, stated that the financial services group conducted promotion and training associated with the Bluefish Supplementary (Family) card sale.

191.    In addition to the high fees, the Bluefish system did not function well.  In an internal document entitled Drawdown – DeMob[ilization], dated 16 March 2014, one of the items listed under "Desired/Needed" was to have an alternative to Bluefish implemented.  At another point, in a document titled "Pending Actions," there was a reference to the Blue Fish pay card "glitch."

192.    Although AECOM stopped using Bluefish at some point in 2015, Relator believes that they have started using that company again fairly recently.

## IV.    Retaliation

193.    In or about June 2015, Relator raised concerns with AECOM management related to fraudulent AECOM employee air travel ("June 2015 Travel Fraud").  At this time, Relator, in his capacity as Payroll Supervisor, was responsible for various aspects of booking and handling payment for air travel, as well as other payroll related functions.

194.    Relator discovered that the AECOM Travel Coordinator, Mr. Rethinam Rajendran, fraudulently booked a special air travel request for his co-worker and roommate, Mr. Mahesh

Parakandy Thattiyot, an AECOM Senior Financial Analyst. Both Mr. Rajendran and Mr. Parakandy reported directly to Relator.

195. Special air travel requests such as a preferred flight are a violation of FAR 31 205-46 and similar provisions in the Joint Travel Regulations, as this type of travel is not the lowest cost ticket as specified in the regulations.

196. Relator was concerned that this travel violation was not an isolated incident because Mr. Rajendran was the AECOM employee who booked travel for other employees and Relator felt this type of violation might have been a recurring issue with respect to other friends of Mr. Rajendran, particularly for other Indian Nationals. Relator's concern about these matters was based, in part, on the prior travel fraud issues involving Indian Nationals that he had uncovered and reported within AECOM and that had led to significant repayment to the government.

197. At approximately the same time in or about June 2015, Relator, in accordance with company policy, reported to AECOM management an additional travel related issue concerning an AECOM Payroll Specialist named Saravanan Sankaiah, who also worked in Relator's department and reported directly to Relator.

198. Mr. Sankaiah did not return from his Paid Leave as scheduled. When Sankaiah did finally return to his post, Sankaiah did not "report in" to Relator as required by AECOM policy and did not report to duty (work) on the day he returned. All of these actions were violations of AECOM policy.

199. In accordance with AECOM policy, both travel related issues were reported in June 2015 to Relator's manager, John Conrad (AECOM Finance Manager). After an internal investigation, AECOM decided not to take any disciplinary action regarding these travel issues.

200.    AECOM Finance Manager Conrad had previously decorated all three of the above referenced employees with promotions and employee of the month awards (which included monetary awards).

201.    Relator believed that AECOM Finance Manager Conrad's affinity for the employees clouded his managerial judgement and therefore, Relator notified Conrad, that he would take both issues up with the AECOM human resources department.  Shortly thereafter, Relator reported the above referenced travel policy violations to John Dearth, AECOM Manager, Employee Relations.

202.    Although Relator was absent on emergency leave from approximately June 4, 2015 through June 18, 2015, he was told that an investigation was conducted.

203.    After his return from leave, on or about June 28, 2015, Relator communicated with John Dearth regarding the status of the reported violations.  Relator was notified on or about June 29, 2015 that no disciplinary action would be taken in response to the violations.  He indicated to AECOM management that his next step would be to report the issue outside the Company.

204.    At about the same time or shortly thereafter, Relator heard rumors that he had been "selected" to be laid off and that his position with AECOM would be eliminated.

205.    On or about July 5, 2015, Relator was terminated, with no advance notice from AECOM.  He was treated "like a criminal," not allowed to return to his office or gather his personal belongings, and booked on the next plane out of Dubai, UAE.

206.    Relator believes he was retaliated against and terminated for raising the travel violations.  The reported air travel violation involving Mr. Rethinam Rajendran and Mr. Mahesh Parakandy Thattiyot resulted in fraudulent billing to the government. Although the late return issue

did not directly implicate billing, Relator was concerned that the ongoing pattern of violations in timekeeping undermined the ability of AECOM to record and report time accurately.

207.   Immediately prior to reporting the two June 2015 travel violations, Relator had received a positive performance review and was offered a contract extension.   However, after reporting the June 2015 travel issues and indicating that he was not going to let the violations just be swept under the rug, Relator was terminated.

## COUNT I
## FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A)[2020]

208.   Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

209.   Throughout the period of performance on the MOSC-A contract (starting in April 2010) and continuing at least through AECOM's work on the incrementally funded bridge contract that began on or about January 2015, Defendants knowingly submitted claims for payment on the MOSC-A contract,  bridge contract and subsequent related contracts that included the following: a) claims for property that was wrongfully purchased or wrongfully not returned to the Army; b) labor costs billed out of a grossly inadequate timekeeping system, in violation of FAR and DCMA Manual provisions; c) labor costs at hourly rates that were wrongly inflated on account of a crony contract with a payroll processing company; and d) labor costs for unnecessary hours expended to implement the crony payroll contract.

210.   Through these acts, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A)[2010].

211.   By virtue of the false or fraudulent claims that Defendants presented or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT II
## FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. §3729(a)(1)(B)[2010]

212.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

213.    Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government in violation of 31 U.S.C. §3729(a)(1)(B)[2010].

214.    By virtue of the false or fraudulent records or statements that Defendants presented or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and civil penalties.

## COUNT III
## FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. §3729(a)(1)(D)[2010]

215.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

216.    Throughout the period of performance on the MOSC-A contract (starting in April 2010) and continuing through AECOM's work on the incrementally funded bridge contract that began on or about January 2015, Defendants had possession, custody or control of property to be used by or on behalf of the United States and knowingly delivered or caused to be delivered less than the proper amount of such property, in violation of 31 U.S.C. § 3729(a)(1)(D)[2010].

217.    By virtue of Defendants' false or fraudulent failure to deliver that property, the United States has suffered actual damages and is entitled to recover treble damages and civil penalties.

## COUNT IV
## FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(1)(G)[2010]

218.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

219.    Throughout the period of performance on the MOSC-A contract (starting in April 2010) and continuing through AECOM's work on the incrementally funded bridge contract that began on or about January 2015, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit  property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G)[2010].

220.    By virtue of Defendants' false or fraudulent conduct, the United States has suffered actual damages and is entitled to recover treble damages and civil penalties.

## COUNT V
## FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3730(h)

221.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

222.    Relator's activities, as described above, and particularly his efforts to stop one or more violations of the False Claims Act, constituted protected and lawful activities under the FCA. Defendants had knowledge that Relator engaged in such protected activities and, in response, discharged him under false pretenses.

223.    Through these acts, the Defendant threatened, harassed and in other manners discriminated against Relator in the terms and conditions of his employment, in violation of

Section 3729(a)(1)(B) of the Federal False Claims Act.  Such claims caused actual damages to Relator.

## **REQUESTS FOR RELIEF**

1.     WHEREFORE, Relator, on behalf of the United States, demands that judgment be entered in their favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.  This includes three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim, record or statement, and any other recoveries or relief provided for under the Federal False Claims Act.

2.     Relator also demands judgment in his favor against Defendants or any of them for the maximum amount of damages arising from his retaliatory discharge.

3.     Further, Relator requests that he receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

Dated:  October 13, 2017                    By: _____

Russell D. Paul (NY Attorney ID #2361939)
Susan Schneider Thomas (PA Attorney ID #32799)
Jonathan D. Berger (PA Attorney ID #44323)
Arthur Stock (PA Attorney ID #64336)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
rpaul@bm.net
sthomas@bm.net
jdberger@bm.net
astock@bm.net

**Glossary of Abbreviations**

| | |
|---|---|
| APS-5 | Army Prepositioned Stock |
| AWRDS | Army War Reserve Deployment System/ |
| BAF | Bagram Air Field |
| BMD | Business Management Division |
| CAP | Corrective Action Plan |
| CAR | Corrective Action Request |
| CDRL | Contract Data Requirements List |
| CPR | Contract Performance Report |
| CSSAMO | Combat Service Support Automation Management Office |
| CWO | Contract Work Order |
| DCAA | Defense Contract Audit Agency |
| DCMA | Defense Contract Management Agency |
| DODAC | Department of Defense Address Code |
| DODIG | Department of Defense Inspector General |
| EUM | End User Manual |
| FAR | Federal Acquisition Regulations |
| FIRST | Field and Installation Readiness Support Team |
| FOB | Forward Operating Base |
| FSS | Federal Supply Schedule |
| GTN | Global Transportation Network (?) |
| ICAR | Internal Corrective Action Report |
| IMS | Integrated Master Schedule |
| IS | Information System |
| KAF | Kandahar Air Field |
| LAMS | Large Area Maintenance Shelter |
| LIS | Logistics Information System |

| LISMX | Logistics Information System - Maintenance |
| --- | --- |
| LIW | Logistics Information Warehouse |
| LOGGA | Logistics Support Activity |
| LOTO | Letter of Technical Direction |
| LRC | Logistics Readiness Center |
| MHU | Man Hour Utilization |
| MOSC-A | Maintenance and Operational Support Contract |
| MUR | Man-Hour Utilization Reports |
| NSN | National Stock Number |
| OCN | Other Country Nationals |
| OIC | Officer in Charge |
| PBUSE | Property Book Unit Supply Enhanced |
| PM | Project Management |
| POWO | Parts Only Work Order |
| PQS | Personal Qualification Standards |
| PWS | Performance Work Statement |
| RPAT | Redistribution Property Assistance Team |
| SAMS | Standard Army Maintenance System |
| SAMS-E | Standard Army Maintenance System - Enhanced |
| SARSS-1 | Standard Army Retail Supply System |
| SASMO | Sustainment Automatic Support Management Office |
| SIGIR | Special Inspector General for Iraq Reconstruction |
| SSB | Sustainment Support Battalion |
| STAMIS | Standard Army Maintenance Information System |
| SWA | Secure Work Area |
| TPE | Theater Provided Equipment |
| UIC | Unit Identification Code |

| WO | Work Order |
|----|-----------|