# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL ACTION NO. 16-cv-1960(LSS) |
| EX REL. HASSAN FOREMAN, | ) | |
| | ) | AMENDED COMPLAINT |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AECOM; AECOM GOVERNMENT | ) | |
| SERVICES, INC.; AC FIRST, LLC; | ) | |
| AECOM/GSS LTD, d/b/a GLOBAL | ) | |
| SOURCING SOLUTIONS, INC. | ) | |
| | ) | |
| Defendants. | ) | **JURY TRIAL DEMANDED** |

## RELATOR'S SECOND AMENDED COMPLAINT

**Table of Contents**

I.    SUMMARY OF THE CASE .................................................................. 1

      A.    Fraudulent Government Contractor Activity in Afghanistan and Relator's
            Assertion of the False Claims Act. ............................................ 1

      B.    Overview of AECOM's Fraud. .................................................. 3

II.   THE PARTIES ................................................................................. 8

III.  FACTUAL BACKGROUND ............................................................. 10

      A.    The Department of the Army's Contracts with AECOM for Work in Afghanistan.
            ............................................................................................. 10

      B.    Fraud and Other Malfeasance by AECOM. ............................... 13

      C.    The Current MOSC-A Contract and AECOM's Non-Compliance. ..... 15

IV.   OVERVIEW OF FALSE CLAIMS SUBMITTED BY AECOM ............... 16

      A.    There Are Four Categories of False Claims in this Case. ............... 16

      B.    False Claims, Reverse False Claims, and False Records Related to Billing for
            Labor. .................................................................................... 17

            1.    Pre-Signing Timesheets ................................................ 26

            2.    Other Timesheet Fraud ................................................ 36

            3.    Historical Timesheet Corrections ................................. 41

            4.    Examples of Falsified Timesheets ................................. 46

            5.    Fraudulent Billing for Unqualified and Uncertified Employees. ..... 52

            6.    Additional False Claims and False Records Related to Labor Charges..... 60

      C.    Fraudulent Claims and False Records Related to Man-Hour Utilization Reporting.
            ............................................................................................. 65

            1.    Actual MHU Was Consistently Below 85% ...................... 66

            2.    The Corrective Action Report Related to MHU ............... 68

            3.    Internal Identification of MHU below 85% and Work Force Adjustments 70

            4.    AECOM Devised Its Own Reporting Format, Rather Than Using SAMS,
                  as Required. ............................................................... 72

      D.    Property Claims: False Claims and Reverse False Claims Relating to Parts-Only
            Work Orders, Double-Purchasing, and Failure to Track and Turn-In Recoverable
            Items....................................................................................... 76

            1.    "Parts Only" Work Orders ............................................ 85

            2.    Double Purchasing of Parts. ......................................... 94

            3.    Failure to Track or Turn in Recoverables ....................... 98

            4.    Use of Unqualified and Uncertified Employees, Including Many Who Lack
                  Security Clearance....................................................... 108

i

    E.     Improper Salary Increases Connected to Bluefish Global Payroll Solutions Cards. ........................................................................................................................ 111

V.    RETALIATION ................................................................................................................. 115

VI.    CAUSES OF ACTION ..................................................................................................... 119

VII.    REQUESTS FOR RELIEF ............................................................................................... 125

## RELATOR'S SECOND AMENDED COMPLAINT

*Qui tam* Plaintiff/Relator Hassan Foreman ("Relator" or "Foreman") files this Second Amended Complaint on behalf and in the name of the United States of America, under the procedures established by the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–32, against AECOM, AECOM Government Services, Inc., AC FIRST, LLC, and AECOM/GSS Ltd., (collectively, "AECOM") to recover all damages, penalties, incentives, and other remedies available to the United States and Relator[1] under the FCA, and in support would show the following:

## I.      SUMMARY OF THE CASE

**A.      Fraudulent Government Contractor Activity in Afghanistan and Relator's Assertion of the False Claims Act.**

1.      Enacted in 1863, the False Claims Act "was originally aimed principally at stopping the massive frauds perpetrated by large contractors during the Civil War." *United States v. Bornstein,* 423 U.S. 303, 309 (1976). "[A] series of sensational congressional investigations" prompted hearings where witnesses "painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war." *United States v. McNinch,* 356 U.S. 595, 599 (1958). Congress responded by imposing civil and criminal liability for 10 types of fraud on the Government, subjecting violators to double damages, forfeiture, and up to five years'

---

[1] To be clear and avoid confusion regarding Relator's "individual" standing, this action is brought on behalf of and in the name of the United States, and on Relator's behalf, with standing as the Government's partial assignee pursuant to the qui tam provisions of the FCA. Upon successful resolution by trial or settlement, Relator and his attorneys, as his assignees, will seek to recover from AECOM pursuant to the FCA his attorneys' fees, costs, and expenses incurred in bringing this action on behalf of the Government. Relator seeks to be awarded a relator's share of any recovery obtained on behalf of the Government, as provided by the FCA.

imprisonment. Act of Mar. 2, 1863, ch. 67, 12 Stat. 696; *United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

2.     And while the False Claims Act has been repeatedly amended and modified over time, Government contractors continue to defraud the United States Government over 150 years after enactment of the statute. This case concerns wide-ranging fraudulent claims by a major defense contractor working for the United States Government in Afghanistan.

3.     On July 17, 2018, the Office of the Special Inspector General for Afghanistan Reconstruction ("SIGAR") issued a report noting "[i]n sum, SIGAR has identified up to $15.5 billion in waste, fraud, and abuse, and failed whole-of-Government reconstruction efforts (or 29 percent of the $52.7 billion we examined)." Notwithstanding the substantial waste, fraud, and abuse that had been found, SIGAR also pointed out "[h]owever, this letter only contains the results of our review of SIGAR's published products and closed cases. SIGAR is only one of several agencies with purview over U.S. funds spent in Afghanistan, and our products have likely uncovered only a portion of the total waste, fraud, abuse, and failed efforts." *Id.*

4.     This action arises under the FCA, 31 U.S.C. §§ 3729–32, seeking damages, civil penalties, and other statutory relief on behalf of the United States and Relator because of AECOM's violations of the FCA. The FCA allows any person having knowledge of a violation of the FCA to bring an action in Federal District Court for himself and for the United States Government, and to share in any recovery as authorized by 31 U.S.C. § 3730(d). Relator claims entitlement to a fair and reasonable portion of any recovery obtained by the United States as he is, to his knowledge, the first to file regarding these claims, and disclosed such information to the United States prior to filing this suit.

5.      Based on these provisions, Relator seeks to recover damages, civil penalties, and other statutory relief for the Government's damages arising from AECOM's fraudulent course of conduct, which included presenting or causing to be presented false claims for approval or payment, making or using or causing to be made or used false statements, records, and certifications, and/or committing reverse false claims by making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; all rendered false by its fraudulent scheme including, but not limited to, the fraudulent inflation of labor costs, the fraudulent failure to disclose material overcharges and/or overpayments of labor costs, the fraudulent submission of charges for labor that was not done and/or unnecessary and/or improperly accounted for, the overcharging and overpayments for employees who were not certified and/or qualified, false claims and false records related to recoverables and parts purchases, false claims and false records related to intentionally overstating the Man Hour Utilization rates, and the false claims and false records related to BlueFish transactions, all violations of the MOSC-A Contract and related agreements (defined and detailed below). AECOM has been grossly, unfairly, and unlawfully enriched by this course of conduct, while the United States has suffered significant actual damages because of the AECOM's knowing false and fraudulent claims and its use of false records or statements material to the Government's decision as to whether to pay claims.

**B.      <u>Overview of AECOM's Fraud.</u>**

6.      This case concerns extensive fraudulent claims by a major defense contractor, AECOM, on a billion dollar-plus, multi-year contract for the 401st Army Field Support Brigade,

Afghanistan, under the U.S. Army's Field and Installation Readiness Support Team (FIRST)[2] contract vehicle. The first relevant contract (technically a Task Order under the FIRST contract vehicle) is called the Maintenance & Operational Support Contract (the "MOSC-A Contract").

7.     AECOM is no stranger to other FCA violations. At the time AECOM acquired URS Corp. and URS Energy & Construction, Inc. (collectively "URS"), URS was involved in an ongoing legal battle related to the FCA, which dated back to February 2013. The FCA case against URS was premised on allegations that it charged the Government for materials and services from vendors that did not meet the requisite quality standards and did not have compliant quality programs, among other things. *United States ex rel. Brunson, Busche, & Tamosaitis v. Bechtel National, Inc., Bechtel Corp., URS Corp., & URS Energy & Construction, Inc*., Case No. 2:13-cv-05013-EFS (E.D. Wash.). AECOM (as a result of an acquisition) along with its co-defendants, Bechtel National Inc. and Bechtel Corp., agreed to pay $125 million to settle that case.

8.     Further, in an unrelated defense contract awarded to AECOM in Iraq, the Special Inspector General for Iraq Reconstruction ("SIGIR") reported "questionable costs billed by AECOM Government Services. The questionable costs relate to invoices submitted on one of the larger Iraq Security Forces Fund contracts, a Department of Defense contract to provide maintenance and supply services to the Iraqi Army." Iraq Security Forces Fund: Weak Contract Oversight Allowed Potential Overcharges by AECOM to Go Undetected, SIGIR 10-005, October 30, 2009 ("SIGIR Report"). For example, according to the SIGIR Report, "the contractor billed $210.00 each for inner-tubes that SIGIR identified on the open market priced at $19.70 each."

---

[2] Abbreviations in this Second Amended Complaint are defined in Appendix 1, the Glossary of Abbreviations.

9.      The SIGIR Report further concluded as follows: "During the contract bidding process, AECOM submitted proposals stating how and at what price it intended to perform specific tasks. According to the contract, these proposals and prices were included as a part of the agreement with the Government. Two such proposals provided to SIGIR by the contractor included prices for certain vehicle parts. SIGIR identified instances where AECOM billed above these agreed prices. For example, AECOM billed $29.60 each for oil filters that had an agreed price of $14.80 each — 100% over the allowable rate. When multiplied by the total units purchased on the four invoices, that one item resulted in over $43,000 in potential overbillings. Moreover, due to a lack of detailed invoice and proposal data, SIGIR could not match some invoice billings to the contractually agreed-to rates."[3]

10.     In this case, the MOSC-A Contract between AECOM and the U.S. Army is a "cost plus fixed fee" agreement. A cost-plus-fixed-fee contract is a cost-reimbursement contract that provides for payment to the contractor of a negotiated fee that is fixed at the inception of the contract.[4] The fixed fee does not vary with actual cost, but may be adjusted as a result of changes in the work to be performed under the contract. Pursuant to the Performance Work Statements ("PWS") which are incorporated by reference to the MOSC-A Contract, the parties anticipated Contract Line Item Numbers ("CLINS") for fixed price items and for cost reimbursement, time and material or labor hour contract costs. PWS § 3.1.2. Then, based on the costs, AECOM obtained a 5% fixed fee on top of the costs charged. For example, the original MOSC-A Contract provided

---

[3] AECOM challenged many of the findings and conclusions of that report.

[4] AECOM's 2018 SEC Form 10-K provides that "[u]nder cost-plus fixed fee contracts, we charge clients for our costs, including both direct and indirect costs, plus a fixed negotiated fee. The total estimated cost plus the fixed negotiated fee represents the total contract value. We recognize revenue based on the actual labor and other direct costs incurred, plus the portion of the fixed fee earned to date."

for $57,000,741.21 in costs along with a 5% profit of $2,522,066.12 for a total of $59,522,807.33. As a result, AECOM was directly incentivized to maintain — and raise — the level of costs to the Government, which, in turn, increased the value of the 5% fixed fee.

11.     From 2010 through 2018, the MOSC-A Contract was amended, modified, or extended a myriad of times with the vast majority of the amendments and modifications being directed to increasing funding. Specifically, the MOSC-A Contract was either modified or extended thirteen times in 2010 (Mods 001-013), thirty-one times in 2011 (Mods 014-044), thirty-eight times in 2012 (Mods 045-082), nineteen times in 2013 (Mods 083-099 and B1-B2), fifteen times in 2014 (Mods B1-B9 and BA-BH), seventeen times in 2015 (Mods BJ-BN, BP-BZ, C1), five times in 2016 (Mods C2-C6), two times in 2017 (Mods C7-C8), and four times in 2018 (Mods C9, CA-CC).

12.     Provisions in the MOSC-A Contract, applicable Federal Acquisition Regulations ("FAR"),[5] Performance Work Statements ("PWS"), and related/applicable contractual and legal obligations, not unlike other defense contracts, required AECOM to accurately and honestly report their labor time and utilize strict procedures for property control and accountability, among other things. These requirements essentially mandated a complete, current, and auditable trail for all

---

[5] AECOM's 2018 SEC Form 10-K admits:

Our federal government … contracts are subject to, among other regulations, regulations issued under the Federal Acquisition Regulations (FAR). These regulations can limit the recovery of certain specified indirect costs on contracts and subject us to ongoing multiple audits by government agencies such as the Defense Contract Audit Agency (DCAA).… Audits by the DCAA and other agencies consist of reviews of our overhead rates, operating systems and cost proposals to ensure that we account for such costs in accordance with the Cost Accounting Standards of the FAR (CAS). If the DCAA determines we have not accounted for such costs consistent with CAS, the DCAA may disallow these costs. There can be no assurance that audits by the DCAA or other governmental agencies will not result in material cost disallowances in the future.

property. For example, the labor component of the contract — a substantial percentage of total cost (more than 85% of the original MOSC-A) — was required to be tracked and billed using a timekeeping system that met strict Department of Defense standards, among other requirements. And for good reason. As the Defense Contract Audit Agency (DCAA) has stated: "Timekeeping procedures and controls on labor charges are areas of utmost concern. Unlike other costs, labor is not supported by external documentation or physical evidence to provide an independent check or balance." Additionally, AECOM was required to maintain legitimate, accountable, and genuine systems for tracking property, labor, and other assets and/or property of the Government. Furthermore, AECOM was required to confirm that certain employees met certification and qualification standards, as well as specified levels of security review.

13.     On a broad, global level, as described in multiple documents, including AECOM's Management Plan – Contract Performance Plan (Sept. 2013), which was submitted to and approved by the Government as part of the MOSC-A Contract, AECOM, through its contracting agent, AC FIRST, was to provide "efficient utilization of facilities, personnel, equipment, and time" and to allocate "proper resources to accomplish the [requested] work in the most prudent and cost effective manner possible." As stated by the Government in awarding the MOSC-A Contract to AC FIRST, "[d]ue to the mission critical nature of many services to be provided under this task order and AC FIRST's proposed performance resulting in this award, it is the expectation of the parties that AC FIRST will strive to maintain (and improve) a high level of responsibility, management, and quality of performance throughout the life of this task order."

14.     These controls and checks and balances regarding labor, spending, and acquisition in the vast range of enormous and complex contracts and operations in Afghanistan were deemed especially important during the volatile and chaotic period when this contract was being

7

performed. Prices paid to defense contractors were calculated on the basis that controls would be provided by the contractors to minimize waste, mismanagement, fraud, and corruption.

15.     In practice, AECOM repeatedly (and knowingly) violated the applicable contracts, making various false claims (express and implied) to the Government in connection with submitting invoices for payment. And it was done so with the purpose and intent to fraudulently induce the Government to continually extend the contract. Each aspect of fraud identified herein involves either specific false claims for payment that were submitted to the Government or obligations to pay money to the Government that were concealed or knowingly and improperly avoided or decreased.

## II.     THE PARTIES

16.     Defendant AECOM is a publicly traded company on the New York Stock Exchange (NYSE: ACM). AECOM is headquartered in California and has its main U.S. offices in Los Angeles, California and New York, New York.

17.     Defendant AECOM Government Services, Inc. ("AGSI") is the named partner on behalf of AECOM in the joint venture (AC FIRST) that was awarded the MOSC-A Contract. AGSI is a subsidiary of AECOM.

18.     AC FIRST, LLC, is a joint venture, limited liability company between AGSI, a subsidiary of AECOM, and CACI Technologies Inc. AC FIRST is the contracting party with the US Army on the MOSC-A Contract.

19.     AECOM is the majority owner of AC FIRST and controls its operations. CACI reported that its share of the net income of AC FIRST was $1.5 million and $2.6 million, respectively, for the years ended June 30, 2014 and 2013, when AC FIRST was billing up to $400 million per year on the MOSC-A Contract.

20.     AECOM/GSS Ltd., also known as and doing business as Global Sourcing Solutions, Inc. ("GSS"), is a wholly-owned subsidiary of AGSI.

21.     Each of defendants AECOM, AGSI, AC FIRST, and GSS was, relative to the acts herein alleged, the agent of the other, and each was acting within the scope, purpose, and authority of that agency and with the knowledge, permission, and consent of the other. In addition, internal documentation confirms that each of the defendants are referenced interchangeably, employees were technically employed by one entity, but paid by another, and other documentation confirms that the defendants were considered a single entity.

22.     As majority shareholder of AC FIRST, defendant AECOM has the right and ability to control the acts of AGSI, AC FIRST, and GSS as alleged herein and received a direct financial benefit from the alleged acts of AGSI, AC FIRST, and GSS. For example, the consolidated financial statements reported in AECOM's 2018 SEC Form 10-K includes revenue from all majority-owned subsidiaries and joint ventures in which AECOM is the primary beneficiary (e.g., AGSI, AC FIRST, and GSS). Further, AECOM recognized in its 2018 SEC Form 10-K that its consolidated subsidiaries have contracts with Government agencies that are subject to audit, which could result in adjustments to reimbursable contract costs or, if its consolidated subsidiaries are charged with wrongdoing, possible temporary or permanent suspension from participating in Government programs:

> Our books and records are subject to audit by the various governmental agencies we serve and their representatives. These audits can result in adjustments to the amount of contract costs we believe are reimbursable by the agencies and the amount of our overhead costs allocated to the agencies. If such matters are not resolved in our favor, they could have a material adverse effect on our business. In addition, if one of our subsidiaries is charged with wrongdoing as a result of an audit, that subsidiary, and possible our company as a whole, could be temporarily suspended or could be prohibited from bidding on and receiving future government contracts for a period of time. Furthermore, as a government contractor, we are subject to an increased risk of investigations, criminal prosecution, civil fraud

actions, whistleblower lawsuits and other legal actions and liabilities to which purely private sector companies are not, the results of which could materially impact our business. For example, a qui tam lawsuit related to our affiliate, URS Energy and Construction, was unsealed in 2016. Qui tam lawsuits typically allege that we have made false statements or certifications in connection with claims for payment, or improperly retained overpayments, from the government….

23.    There has existed such a unity of interest between AECOM, AGSI, AC FIRST, and GSS that any individuality and separateness of defendants has ceased, and that each is the agent and alter-ego of the other in the acts hereinafter alleged.

24.    Any and all acts hereinafter ascribed to AECOM, AGSI, AC FIRST, or GSS were done with the permission, consent, knowledge, and active inducement on the part of the other Defendants which together acted as co-conspirators and/or agents in the performance of the acts hereinafter more particularly described.

25.    Claims are brought on behalf of the Government, specifically the Army.

26.    Relator is a resident of Florida. Relator is a former employee of AECOM, having been employed by AECOM from August 2013 until July 2015. Relator was hired as a Finance Analyst in August 2013 and was promoted to Finance Supervisor in May 2014. Relator was terminated by AECOM in July 2015, shortly after he brought up various compliance issues with AECOM.

### III.    FACTUAL BACKGROUND

**A.    The Department of the Army's Contracts with AECOM for Work in Afghanistan.**

27.    In 2010, AECOM's contracting agent, AC FIRST, was awarded the MOSC-A Contract under the U.S. Army's FIRST contract vehicle. The MOSC-A Contract was a cost-plus fixed fee contract, Contract No. W911SE-07-D-0004-BA01, with a period of performance for one base year (January 28, 2010 to January 27, 2011) plus four option years, which could extend the MOSC-A Contract until January 27, 2015. The Army elected to extend the contract through the

four option years. The MOSC-A Contract would have expired on January 27, 2015, but a modification extended it for six months on January 16, 2015 until July 27, 2015 with a plan for a further incrementally funded bridge contract. Each option year constituted a new MOSC-A Contract between AECOM and the Army. On information and belief, the MOSC-A Contract was modified as late as June 5, 2018 and is still being performed. Army Contracting Command, Rock Island Arsenal, Illinois, is the contracting activity.

28.     AC FIRST also entered into another contract with Rock Island on September 25, 2015, No. W52P1J-12-G-0048/0001, under the Enhanced Army Global Logistics Enterprise to provide logistics support services (the "EAGLE Contract"), which it terminated for convenience on November 12, 2015. On information and belief, the EAGLE Contract is no longer terminated and still being performed.

29.     Under the MOSC-A Contract, AECOM provided maintenance and management support services for the Army Prepositioned Stock (APS-5) program in Afghanistan. AECOM's obligations under the MOSC-A Contract included tactical vehicle and equipment maintenance, facilities management and maintenance, supply and inventory management, and transportation services in support of the 401st Army Field Support Brigade at multiple locations across Afghanistan, including, for example, Bagram and Kandahar.

30.     The MOSC-A Contract expressly stated that "the services shall be performed in accordance with the Performance Work Statement dated 29 July 2009, attachment 0001 of this task order. Any deviations or changes to the services outlined in the PWS require approval from the Procuring Contracting Officer (PCO)." MOSC-A Contract, 2010 Task Order at 5. In addition, the MOSC-A Contract states:

> Reference is made to AC FIRST's proposal, dated 29 December 2009. While the
> specific provisions of AC FIRST's proposal are not fully incorporated herein, this

> award is based upon the representations of resources and quality of performance proposed. Significant or material anticipated deviations should be brought to the attention of the PCO. If in the opinion of the PCO such changes in method of performance would substantially impact the quality of performance from that represented in AC FIRST's proposal, such changes shall not be undertaken without the prior approval of the PCO.

*Id*. Finally, and critically, "[d]ue to the mission critical nature of many services to be provided [by AC First], it is the expectation of the parties that AC First will strive to maintain (and improve) a high level of responsibility, management, and quality of performance throughout the life of this task order." *Id*.

31.     The MOSC-A Contract included a base year, 2010, that was fully funded in the amount of $59,522,807.33 associated with Contract Line Item Numbers ("CLINS"): 01AA, 02AA, 03AA, 04AA, 08AA, 08BA, 08CA, 08DA, 09AA, 10AA, 11AA, 12AA, 13AA, 14AA, 15AA, 101AA, 102AA, 103AA, 108AA, 108BA, 108CA, 108DA, 109AA, 109BA, 110AA, 111AA, 112AA, 113AA, 114AA, 115AA. The MOSC-A Contract further included a provision for option years one through four that also set forth associated CLINS, but without pricing. Further, it stated, "Option Years 1-4: In determining whether to award the option years, the Government will take into account the contractor's previous performance on this task order." Based on the structure of the MOSC-A Contract as a task order containing one base year and four one-year options, there was a new award determination made for each of the option years. For example, Option Year 4 had an award date of January 27, 2017 and a period of performance as January 28, 2014 – January 27, 2015.

32.     Although the initial MOSC-A Contract with its optional extensions was listed for $378 million, that amount escalated rapidly during the course of the performance, and an Amendment of Solicitation/Modification of Contract in mid-2018 listed the total dollar amount as at least $1,369,667,076.79. AECOM was billing as much as $400 million annually on the MOSC-

12

A Contract from 2010 and throughout Relator's time of employment, with as many as 4,800 employees. During this period, AECOM was one of the largest defense contractors working in Afghanistan and was the largest managed by the 401st Army Field Support Brigade. To date, on information and belief, the total amount paid to AECOM on this contract is approximately $1.9 billion.

33.     The MOSC-A Contract continued work that had been performed by AECOM for nearly five years previously under the Army's global maintenance support and service (GMASS) II contract, from approximately 2005 until early 2010. As explained by AECOM in a statement before the Commission on Wartime Contracts:

> The most significant contingency contract for AECOM was competitively awarded in 2005 and again on recompete in 2010. This contract has surged with the increase in U.S. forces and AECOM was recently awarded a follow-on competitively awarded contract that now numbers in excess of 2,000 personnel, including expats, TCNs and local nationals with main operations at Bagram and Kandahar and 27 forward operating bases."

Statement by Jay Ward, Chief Operating Officer, AECOM Government Services, "The Use Of Service Contracts In Support Of Wartime Operations And Other Contingencies" before The Commission On Wartime Contracting, April 19, 2010.

**B.      Fraud and Other Malfeasance by AECOM.**

34.     There have been many other issues raised about AECOM's administrative, management, and record-keeping problems on defense contracts, including the MOSC-A Contract and others.

35.     In November 2013, the Defense Contract Management Agency, Cost and Pricing Center, notified AECOM of "significant deficiencies" on the MOSC-A Contract in its Contractor Business Systems and Earned Value Management Systems, which are systems mandated by the Government. Numerous problems were highlighted, including insufficient budget documentation,

inadequate estimates of funding and effort to complete tasks, lack of cost and schedule system integration, systemic deficiencies related to baseline change documentation, and Contract Performance Reports that failed to comply with contract data requirements.

36.     This was followed up in February 2014 with a Final Determination of Disapproved Earned Value Management System. The systemic deficiencies included the absence of required management procedures "that provide for generation of timely, reliable, and verifiable information for the Contract Performance Report (CPR) and the Integrated Master Schedule (IMS)" that were required under the MOSC-A Contract.

37.     Starting no later than 2014, the Department of Defense Inspector General ("DODIG") began chronicling serious problems with AECOM's role in the Army's Redistribution Property Assistance Team ("RPAT") under the MOSC-A Contract.

38.     The RPAT was established to handle excess Army property in theater, redistribute equipment to fill storages, and retrograde excess equipment to the United States. Essentially, RPATs in Afghanistan relieve redeploying Army units of their Theater Provided Equipment (TPE) and clear TPE from the units' property books. After the units are relieved of accountability, the RPATs either process TPE for retrograde or hold the equipment at the RPAT yards for incoming personnel.

39.     The DODIG conclusions regarding AECOM's tracking and accounting systems for TPE demonstrate that this is not the first time AECOM has been cited for serious property acquisition and tracking issues. The DODIG report found that "during 2014 there were several months when AC First could not account for several hundred pieces of equipment…. [In] monthly … audits, they documented the loss of accountability of several hundred pieces of equipment. For

example, in February 2014, AC FIRST could not account for 426 pieces of equipment at the KAF [Kandahar] RPAT yard."

C.     **The Current MOSC-A Contract and AECOM's Non-Compliance.**

40.     AECOM was well aware of its obligations under the MOSC-A. In fact, AECOM provided a detailed description of its understanding of its obligations under the MOSC-A Contract each and every time it provided the Government with a PWS, which were incorporated by reference to the MOSC-A Contract.

41.     AECOM affirmatively represented that "[t]he AC First organization and staffing are designed to ensure our work performance meets or exceeds PWS standards" and that "[w]e use the AWRDS/MWB, SAMS-E/IE to track the daily individual labor and maintenance status with related updates, order parts, perform work loading, manage shop and bench stocks, produce management reports to meet AFSB's requirements, and facilitate internal maintenance operations" throughout the course of performance under the MOSC-A Contract. However, AECOM's internal records acknowledge and document that AECOM was not in compliance with those standards and that AECOM was not using the AWRDS/MWB, SAMS-E/IE. For example, in a spreadsheet titled "Management Review/PWS/Portal Metrics Status," which tracked AECOM's obligations under the PWS on a section by section basis, AECOM documented its non-compliance and internally assessed whether its non-compliance was "PWS Critical."

42.     Due to the Government's prior intervention in FCA claims against AECOM as well as specific issues noted with respect to the contract at issue, AECOM was well aware, or should have been aware, that the types of false claims at issue in this case were material to the Government. Further, AECOM knew, or should have known, that the false claims at issue in this case were in fact occurring; hence, AECOM's false claims were not mere oversights or mistakes.

# IV.   OVERVIEW OF FALSE CLAIMS SUBMITTED BY AECOM

**A.   There Are Four Categories of False Claims in this Case.**

43.   There are four types of false claims at issue:

a.   **False Labor Claims, False Records Claims, and Reverse False Claims Related to Labor Charges to the Government.** The labor billing claims address AECOM's timesheet/labor violations and billing for unqualified, uncertified personnel contrary to contract requirements.

b.   **False Claims and False Records Claims Related to Man-Hour Utilization Issues.** The man-hour utilization ("MHU") claims address AECOM's improper and inflated reporting of Man-Hour Utilization.

c.   **False Claims, False Records Claims, and Reverse False Claims Related to Government Property.** The property claims relate to AECOM's failure to properly track and account for government property under the MOSC-A Contract, including AECOM's double purchasing of goods, "parts only" work orders, where parts were purchased with no recordation of their purpose or expected use, and failure to track and turn in recoverable items.

d.   **False Claims and False Records Claims Related to Fraudulent Billing of a Subcontractor.** The Bluefish claims concern AECOM's inflated billing to the Government to offset charges arising from an improper crony contract with Bluefish, a payroll processing company.

44.   The false claims were submitted pursuant to the MOSC-A Contract, W911-SE-07-D-0004-BA01, which was renewed on a regular basis. Performance under the MOSC-A Contract continues to this day.

45.   A more recent task order award to AECOM under the Army's FIRST contract vehicle is a $62,683,121 cost-plus-fixed-fee incrementally funded bridge contract, which began on

or about January 29, 2015, with an initial estimated completion date of December 27, 2015. Army Contracting Command, Rock Island Arsenal, Illinois, is the contracting activity (W52P1J-15-C-0040). Many of the violations and false claims alleged by Relator have continued on that task order as well as on further "add-on" contracts continuing the work previously contracted under the MOSC-A Contract.

**B.     False Claims, Reverse False Claims, and False Records Related to Billing for Labor.**

46.     The MOSC-A Contract is substantially premised on AECOM providing labor, employees, and manpower to the U.S. Army's efforts in Afghanistan. As a result, and as indicated earlier, it is imperative, and a key contractual requirement, that AECOM have in place accurate, legitimate, and stringent controls, systems, and processes for confirming that its employees are working the hours they are supposed to work, that they are working on projects that they are supposed to be working on, that the employees are properly supervised, and that AECOM is accountable to the U.S. Army for the labor being charged. For example, PWS § 5.1.9 requires that AECOM "use the AWRDS/LMP/MWB or SAMS-E/SAMS-IE" for "labor reporting." AECOM was required to "update the AWRDS/MWB/LMP or SAMS-E/SAMS-IE, module daily." "Actual labor hours, both direct and indirect, to include personnel and man hour availability by section, and APC for individual employees shall be entered into AWRDS/MWB/LMP or SAMS-E/SAMS-IE, daily." In addition, the proper and accurate tracking of the labor is highly relevant to a related, but separate material contractual requirement: the Man-Hour Utilization requirement, which is required under PWS § 5.0.

47.     Pursuant to the Management Plan – Contract Performance Plan that AECOM submitted to the Army Contracting Command, AECOM was required to use and maintain Standard Army Maintenance Information Systems (STAMIS) for labor reporting. And pursuant to the PWS,

including PWS § 5.1.8, the AWRDS/MWB, SAMS-E/1E module was required to be updated daily and actual labor hours for individual employees were required to be entered into the system daily.

48.     Reporting of hours worked on a government contract is governed by the Federal Acquisition Regulations (FAR).[6] Specifically, pursuant to FAR § 31.201-2(d) (2012), a government "contractor is responsible for accounting for costs appropriately and for maintaining records, including supporting documentation, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with applicable cost principles in this subpart and agency supplements." According to FAR § 31.205-6 (2012), "[c]ompensation for personal services is allowable subject to the following general criteria and additional requirements contained in other parts of this cost principle":

> (1) Compensation for personal services must be for work performed by the employee in the current year and must not represent a retroactive adjustment of prior years' salaries or wages ….

> (2) The total compensation for individual employees or job classes of employees must be reasonable for the work performed; however, specific restrictions on individual compensation elements apply when prescribed.

> (3) The compensation must be based upon and conform to the terms and conditions of the contractor's established compensation plan or practice followed so consistently as to imply, in effect, an agreement to make the payment….

FAR 31.205-6(a) (2012). For compensation that is not covered by labor-management agreements,

> Compensation for each employee or job class of employees must be reasonable for the work performed. Compensation is reasonable if the aggregate of each measurable and allowable element sums to a reasonable total. In determining the reasonableness of total compensation, consider only allowable individual elements of compensation. In addition to the provisions of 31.201-3, in testing the

---

[6] FAR is codified at 48 C.F.R. chap. 1. Although particular versions of the FAR regulations are cited herein, other versions may have also applied during the performance of the MOSC-A Contract. Nevertheless, Relator does not believe these other versions are materially different from the versions cited herein.

reasonableness of compensation for particular employees or job classes of employees, consider factors determined to be relevant by the contracting officer. Factors that may be relevant include, but are not limited to, conformity with compensation practices of other firms

(i) Of the same size;

(ii) In the same industry;

(iii) In the same geographic area; and

(iv) Engaged in similar non-Government work under comparable circumstances.

FAR § 31.205-6(b)(2) (2012); *see also* FAR § 31.201-3(a)–(b) (2012) ("A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. Reasonableness of specific costs must be examined with particular care in connection with firms or their separate divisions that may not be subject to effective competitive restraints.… What is reasonable depends upon a variety of considerations and circumstances, including— (1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance; (2) Generally accepted sound business practices, arm's length bargaining, and Federal and State laws and regulations; (3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and (4) Any significant deviations from the contractor's established practices.").

49.     The specific delineation of what is required in connection with claims for labor payments is found in the DCAA Contractor Audit Manual, No. 7641.90 (2011)[7] (the "DCAA Contractor's Manual") and Standard Form SF-1408. The provisions for a timekeeping system

---

[7] Other versions of the DCAA Manual may have also applied during the performance of the MOSC-A Contract. Nevertheless, Relator does not believe these other versions are materially different from the versions cited herein.

(DCAA Auditor's Manual, No. 7640.1 (2015) (the "DCAA Auditor's Manual") §§ 5-908–5-909), and DCAA Contractor's Manual, Enclosure 3 at 20, require, in relevant part, the following:

- All hours worked for all employees are recorded
- Daily recording of time worked by the employee
- An audit trail for any and all changes
- Employee review and approval of the time recorded
- Supervisor review and approval of the employee's time recorded
- Certifying the hours on the timesheet reflect the hours worked and the appropriate cost objective at the end of each work period.

For manual timekeeping systems, the contractor's procedures "should provide for the accurate and complete recording of labor hours, as well as appropriate controls to ensure corrections to labor records are accurate and authorized." DCAA Auditor's Manual § 5-909.1. This includes procedures pertaining to:

a. Supervisory observation of employee arrival and departure to prevent improper clock-in/clock-out.

b. Employee possession of timecard/timesheet.

c. Employees prepare their timecards in ink, as work is performed.

d. Only one card/sheet is prepared per employee per period; card/sheets are preprinted with employee name and identification number; and card/sheets are turned in to the designated timekeeping office or collected by an authorized person.

e. Precoded data is printed on the job cards for identification purposes.

f. Direct labor employees record their time no less often than daily. Sufficient formal subsidiary records are maintained, if necessary, to assure accurate time recording and allocating of labor costs to intermediate and final cost objectives when multiple jobs are worked in a day.

g. Corrections are made in ink, initialed by the employee, properly authorized, and provide a sufficient and relevant explanation for the correction.

h. Employees and supervisors sign the timecards/timesheets in accordance with procedures, verifying the accuracy of the recorded effort.

*Id.*

50.     The importance of accurate timekeeping is stated repeatedly in government publications. The DCAA Auditor's Manual, which "applies to all contractors interacting with DCAA auditors, as a result of doing business with the U.S Government" (DCAA Auditor's Manual at 1), specifically demonstrates the significance and materiality of having the appropriate controls and systems in place, as well as having accurate timekeeping. *See e.g.*, *id.*, Enclosure 2 at 13-16. As the Defense Contract Audit Agency has stated: "Timekeeping procedures and controls on labor charges are areas of utmost concern. Unlike other costs, labor is not supported by external documentation or physical evidence to provide an independent check or balance." *Id.*, Enclosure 2 at 15; *see also id.* § 5-902(a) ("Labor costs are usually the most significant costs charged to Government contracts, and usually comprise the base, or the largest element in the base, used for allocating indirect costs. Historical labor costs are often used to estimate labor for follow-on or similar item Government contracts. Unlike other cost items, labor is not supported by third party documentation such as an invoice, purchase order, or receipt. Contractor personnel have complete control over the documents or devices of original entry, whether they consist of timecards, electronic media, or some other means. Responsibility for accuracy is diffused throughout the contractor's organization. Consequently, the risks associated with the accurate recording, distribution, and payment of labor are almost always significant.").

51.     AECOM's own internal documents and procedures expressly recognize the high significance, and materiality, of properly recording labor. For example, "[t]imekeeping errors … [r]aise suspicion regarding the validity of labor costs." AECOM Federal Services Group, Time and Labor Reporting Practices and Procedures, at 6; *see also id.* at 5 (noting that AECOM must maintain approved timekeeping, accounting, labor and billing systems and that disapproval of any one system endangers AECOM's ability to bid on future work); *id.* at 2 ("Because there is no

independent third-party documentation to verify the accuracy of the contractor's labor charging, government auditors pay close attention to a contractor's timekeeping and labor charging practices"). Significantly, AECOM's own internal documentation admits that the failure to accurately track labor can result in AECOM being unable to compete in the defense contracting space.

52.     The PWS also stresses the importance of proper labor accounting. For example, PWS § 5.1.9 required "[a]ctual labor hours, both direct and indirect, to include personnel and man hour availability by section, and APC for individual employees [to] be entered into AWRDS/MWB/LMP or SAMS-E/SAMS-IE, daily." Additionally, PWS § 5.6.6.1 provides that "The Contractor shall account weekly from a work order level of detail for labor man hours and parts funds expended." PWS § 1.9 further requires that AECOM "shall also provide as required, a detailed Production Progress Report to the PCO/ACO weekly that shall include, but not be limited to: Work Orders Opened, Completed and ln Process, Number of Personnel, Man Hours Projected, and Man Hours expended." Together, these provisions show the importance that the Government placed on properly accounting for labor hours and that proper accounting for labor hours was material to the Government's decision to pay claims under the contract.

53.     And as discussed below, internal emails and documents from AECOM further demonstrate the high significance, and materiality, of the timesheet issues.

54.     For ongoing or active government contracts, including the MOSC-A Contract, AECOM submitted bi-weekly invoices to the Government reflecting, among other things, the number of hours that had been worked on that contract. These invoices were prepared based on, *inter alia*, the employees' entries on hard copy timesheets. Although submissions to the Government for payment for time worked are done on an aggregate basis, bi-weekly timesheets

reflecting individualized daily records of hours are required to be retained and made available to the Government for four years after the contract is closed out. The MOSC-A Contract has not yet been closed out.

55.     In mid to late 2012, AECOM undertook an internal timekeeping review stretching back to 2010, to see whether its timekeeping practices were compliant.

56.     AECOM's Program Manager Bob Shirron circulated a document to an extensive circulation list instructing recipients to retain all documents relating to the review, including electronic and hard copy records and email. The directive specifically identified timesheets, work schedules, timekeeping/ethics protocols/operating procedures and related training materials and any email, attachments or other correspondence potentially relating to the timekeeping review. The relevant time frame was from "the date that Contract W911SE-07-D-0004 commenced on 1 April 2010 until further notice."

57.     In addition to Bob Shirron's directive, AECOM had an ongoing, contractual requirement to maintain and preserve these records for three years *after* the MOSC-A Contract was closed out under FAR § 52.215-2(f) (1999), a provision that was incorporated into MOSC-A.

58.     The results of the internal investigation were staggering. As detailed below, AECOM's internal Finance Manager completed an analysis that estimated that AECOM had over *$140 million* in timesheet error liability during the time period that he analyzed as it relates to the overpayments by the Army to AECOM related to labor. And while the actual amounts of the overpayments may need to be adjusted, the overpayment that AECOM received, and has not paid back to the Government, is material, and substantial.

59.     Timesheet fraud on the MOSC-A Contract included: signatures by office-based employees who could not validate that the hours claimed had actually been worked, rather than

23

signatures from actual supervisors who were on-site with the employees; failure to include a printed name of the supervisor's signature, often making it impossible to confirm who had actually signed as the supervisor; missing employee numbers; actual overcharges; and signing and submitting timesheets prior to the work actually being performed, by both employees and supervisors. These errors were prevalent during the period from 2010 to late 2013.

60.    Additionally, toward the anticipated close-out of the contract, during 2014–2015, AECOM engaged in a "corrections" process, in which AECOM attempted to prepare a defense for these false records. However, AECOM's attempt to correct the false records, years later, evidences additional false claims — violating the agreements in attempts to cover-up overpaid labor charges is in itself fraudulent.

61.    Moreover, Relator additionally has evidence of false labor claims related to intentional, duplicate false charges. For example, on March 11, 2016, an internal AC FIRST Work Order Detail demonstrates the intentional use of a dummy part no. 999999999, and six AC FIRST employees fraudulently billing the United States Army several hours for allegedly replacing and/or repairing a single tire. Further, the Work Order Detail is not tied to a specific piece of authorized equipment. And additional internal AC FIRST documentation confirms this problem was significant, demonstrates that AC FIRST would not be able to explain this to auditors, and shows that the problems were material (i.e., link labor charges to charges for parts, and account for such charges to the Army). *See, e.g.*, WO6HN26C700006 and internal AC FIRST documents (e.g., "Were is the authorization to use the system in a non-standard fashion? Where is the guidance to operate like this at all coming from? Why was it not caught by multiple levels within AC FIRST? Quality. Maintenance, S&S or member of the 401st? When discovered what was done and who was notified? How far does this practice go? How are the various POWO expenses and parts being

accounted for? What were the causes for this practice to take root? What are some solutions? How to account for incorrect work previously done and find a clear path moving forward?").

62.     In addition and/or in the alternative to the false claims and false records related to the timesheet fraud, reverse false claims are also present in connection with the timesheet fraud. For example, AECOM calculated that it received over $144 million in overpayments from the Government related to labor charges in which there was an obligation to repay and/or remit such funds in various applicable regulatory and contractual provisions in force between AECOM and the Army. *See, e.g.*, FAR § 52.203-13 (2010); FAR § 52.215-10 (1997); FAR § 52.215-11 (1997); FAR § 52.232-1 (1984); FAR § 52.232-7 (2007); FAR § 52.232-25 (2003); FAR § 52.242-3 (2001). Internal AC FIRST documents confirm that the foregoing FAR regulations are incorporated into the MOSC-A Contract, as well as several hundred other applicable regulations.

63.     Finally, a recent, highly relevant settlement in the FCA arena confirms the significance, materiality, and liability for defense contractors who engage in false billing/labor acts; notably, the fraudulent labor practices by AECOM took place on military bases in the Middle East. Northrop Grumman Systems Corporation ("NGSC"), a subsidiary of the Northrop Grumman Corporation, with offices in San Diego, California, agreed to pay a total of $31.65 million to settle civil and criminal investigations into fraud arising out of its Battlefield Airborne Communications Node ("BACN") and Dynamic Re-tasking Capability ("DRC") contracts with the United States Air Force. NGSC agreed to pay $27.45 million to settle civil allegations that it violated the False Claims Act by overstating the number of hours its employees worked on the BACN and DRC contracts with the United States Air Force. Additionally, NGSC agreed to forfeit $4.2 million in a separate agreement to resolve a criminal investigation into fraudulent billing on the BACN contract. In exchange for admitting its employees' misconduct, making full restitution, and

agreeing to cooperate in the ongoing criminal investigation, no criminal charges will be filed against NGSC. In the agreement resolving the criminal investigation of NGSC, the company admitted that its employees deployed to an air base in the Middle East defrauded the Air Force by overbilling time charged to the BACN contract. Specifically, from January 2011 to October 2013, NGSC employees charged exactly 12 or 13.5 hours per day, seven days a week, despite the fact that the employees were not working those hours. NGSC admitted that its employees billed time to the BACN contract when its employees were not working and engaged in leisure activities, such as golfing, skiing, visiting local amusement parks, going out to eat or drink, shopping, and enjoying various amenities at the five-star hotels where the employees were housed. By inflating their time, the employees working on the BACN contract personally profited and were paid thousands of dollars that they did not earn. In an email, one NGSC employee summed up the billing practices by saying that they "work[ed] about 6-8 hours and charge[d] 13." NGSC admitted that its employees working on the BACN contract overbilled the United States by more than $5 million at one site alone. "Federal contracts are not a license to steal from the U.S. Treasury," said U.S. Attorney Adam Braverman. "DOJ is firmly committed to vigilantly weeding out abuse and will swiftly pursue all available remedies when egregious fraud occurs."

64.     The scale and scope of the timesheet fraud is so widespread that there is no basis for reliance on any of the AECOM's submissions relating to hours worked on the contract at issue.

### 1.     Pre-Signing Timesheets

65.     The two week pay period in effect on this contract ran from a Saturday to the second Friday of the period. Employees on this contract routinely submitted timesheets for a two week period on the second Wednesday (or Thursday) of the period. Obviously, those timesheets violated the "daily time reporting" requirement. Also, they reported work that had not yet been performed

and any supervisors' signature could not have legitimately certified that the work had been performed.

66.     The submission of timesheets in advance of time actually worked was a deliberate company policy, in violation of the MOSC-A Contract and relevant regulations. In an AC FIRST document entitled "Welcome to Afghanistan – New Hire Orientation" employees were expressly instructed that they needed to turn in their timesheets on "the Thursday prior to the end of the [two week] pay period." Supervisors were also required to submit their sections' timesheets to HR by close of business on that Thursday.

67.     Further, AECOM's policy was to bill 154 hours per each two-week period regardless of actual hours worked. Per evidence gathered by Relator Hassan, on February 2, 2012, Robert McFarland emailed Ramesh Marimuthu, "what is the deal with the timesheets? Are we supposed to be putting 11.5 with one 4.5 hour day…Or is that wrong now? Just trying to get clarification." To which, on February 6, 2012, Mr. Marimuthu responded, "On downrange personnel should have to record 11 hrs per days, The total should be 154 hrs." In response Mr. McFarland emailed "When did this change? I have not received anything regarding this issue. Last we were informed it was supposed to be 11.5 per day with one 4.5 hour day to add to a total of 154 hours. I even talked to Ron and he said the same thing…that is how we have been filling them out so if there has been a change we need confirmation." On information and belief, the Government was never aware that AECOM's policy was to bill 154 hours for each two-week period and to prepopulate and pre-sign time sheets and AECOM intentionally covered up this practice.

68.     Similarly, in a document entitled Supervisor's Timesheet Training, an audit point is that timesheets are not to be completed before the work is completed; however, the internal

27

timesheet process states that timesheets should not be completed in advance except for the Wednesday of the week that timesheets are turned in.

69.     It appears that this practice goes back at least to 2011. An August 28, 2011 email chain between Ramesh Marimuthu, Payroll Supervisor, and Jan E. Zimmerman, at Shank Field Support Maintenance relating to the pay period of August 27 – September 9, refers to a special timesheet submission mandated by the corporate office for each week separately, and for each one week period, the instructions were to have the timesheets turned in on the Wednesday of the respective pay week (Aug 31, for the W/E Sep 2 and Aug 7, for the W/E Aug 9).

70.     By Relator's personal observations, he is aware that timesheets for the two-week period were frequently turned in on the second Wednesday of the period, and there are numerous specific examples of timesheets that Relator is aware of that were signed prior to the end of the pay period (as detailed below).

71.     Relator raised this issue a number of times and searched vigorously for any indication that the Army had given permission for this practice. He asked Dianne Mcrea, Finance Manager, sometime in September, 2013, and also asked Jean Eady, the former compliance manager and director of business management, the group that oversaw payroll. Nothing was ever provided to justify this clear violation of FAR and DCAA Manual requirements. Relator's concerns and his attempt to locate authorization are documented in several memos that were sent to various managers, including Daniel Peters, Vance Barron and David Calico.

72.     The practices were known to AECOM project management, even beyond the explicit company directives cited above. For example, following an internal Corrective Action Report ("ICAR"), there was a Time Sheet Audit Update, 8 AUG 2012, Quality Management. The update showed that 16 out of 72 employees (~22%) admitted that they had pre-populated hours on

28

timesheets, and 32 out of 110 (~ 30%) admitted to signing timesheets in advance before submitting them. Another audit reflected in that document listed 6 out of 40 who admitted either pre-populating hours or signing timesheets in advance. Given AECOM's standard practice of signing timesheets on the Wednesday or Thursday before the end of the pay period, these audit findings referred to pre-signing even earlier during the pay period. Despite the internal directives to fill in timesheets prior to the end of the pay period, AECOM was aware of the DCMA requirements prohibiting pre-populating timesheets. In a PowerPoint prepared by Dianna Mcrea, Finance, intended to "ensure that AC FIRST personnel are prepared to accurately answer questions regarding timesheets" AECOM said that the proper response to a question from DCMA whether employees pre-populated hours was as follows: "Hours will not be filled in prior to being completed." In a set of Finance FAQs, the section on timesheets repeated the standard instructions to have timesheets completed daily.

73.     In a similar PowerPoint titled "Business Management, PWS Training, Timesheet Review," the stated purpose of the presentation included the following: "to ensure audience is knowledgeable of established timesheet procedures"; and "to identify the 'correct' answers to auditor questions."

74.     Numerous timesheet training documents include sample "perfect" timesheets appropriately showing signatures on the last day of pay period.

75.     In a routine weekly Project Management briefing dated May 5, 2013, the Business Management segment cited a floor check of the Program Operations group, and listed a number of timesheet errors, including 5 out of 10 timesheets reviewed that had been "[p]re-populated … (Wednesday Pay Cutoff)."

76.     The early signing of timesheets by employees and supervisors occurred throughout the term of the MOSC-A Contract.

77.     Direct evidence that AECOM knew the early signing was illegal and attempted to conceal that from Government investigators stems from a series of emails in mid-2016:

---------- Original Message ----------
From: "Mazeika, Marissa" <Marissa.Mazeika@aecom.com>
To: "SWA AC FIRST KAF ALL (ACFIRSTKAFALL@afghan.swa.army.mil)"
<ACFIRSTKAFALL@afghan.swa.army.mil>, "SWA BAF ALL DISTRO
(BGRM401stAFSBAECALL@afghan.swa.army.mil)"
<BGRM401stAFSBAECALL@afghan.swa.army.mil>, "PMO_Directorate@ac-first.com" <PMO_Directorate@ac-first.com>, "PMO_Directorate_Admins@ac-first.com" <PMO_Directorate_Admins@ac-first.com>, "Santiago, Audra"
<Audra.Santiago@aecom.com>, "Kurti, Ilir" <Ilir.Kurti@aecom.com>,
        [DELETED REST OF RECIPIENT LIST TO SAVE SPACE]
Cc: "Cox, Emily" <Emily.Cox@aecom.com>
Date: June 6, 2016 at 10:47 PM
Subject: FW: ***Upcoming DCAA Timesheet Audits at BAF and FOBs***
        Good Morning AC FIRST –

        The DCAA auditor will be on our Bagram footprint this morning!

        Please make sure all timesheets are up to date.
        He is wanting to interview roughly sixty (60) employees but still I do not have a roster of who and what departments.
        Please make sure all timesheets are up to date!
        If corrections have been made, please make sure they are annotated properly, to include the initials of the supervisor.

        We will try to complete all sixty (60) employee interviews this morning.
        However, in the event we can't, we will more than likely have to come back tomorrow morning unless he has time this afternoon.

        Due to this, please do **NOT** plan on submitting your paper timesheets until another update email is sent out.
        I want to make sure that we have all the audits covered prior to timesheet submission.
        Again, do **NOT** populate your hours for Wednesday, Thursday and Friday of this week until you receive another updated email.

        If you have any questions, please feel free to contact me.
        Thank you.

30

Respectfully,
Emily Cox

Emily Catherine Cox
Supervisor of Business Services
AC FIRST-Afghanistan
Bagram Airfield
APO, AE 09354
DSN: 318.481.0055
VOIP: 817.704.0131
Roshan Cell: 079.049.8738
Emily.Cox@aecom.com
Emily.Cox@ac-first.com
emily.c.cox.ctr@mail.mil

(emphasis added, but red font in original)
---------- Original Message ----------
From: "Mazeika, Marissa" <Marissa.Mazeika@aecom.com>
To: "SWA AC FIRST KAF ALL (ACFIRSTKAFALL@afghan.swa.army.mil)"
<ACFIRSTKAFALL@afghan.swa.army.mil>, "SWA BAF ALL DISTRO
(BGRM401stAFSBAECALL@afghan.swa.army.mil)"
<BGRM401stAFSBAECALL@afghan.swa.army.mil>, "PMO_Directorate@ac-
first.com" <PMO_Directorate@ac-first.com>, "PMO_Directorate_Admins@ac-
first.com" <PMO_Directorate_Admins@ac-first.com>, "Allen, Terrence"
<Terrence.c.allen@afghan.swa.army.mil>, "Blackwell, Kristina" Cc: "Cox,
Emily" <Emily.Cox@aecom.com>
    [DELETED REST OF RECIPIENT LIST TO SAVE SPACE
Date: June 21, 2016 at 8:51 AM
Subject: FW: ***GSS Paper Timesheets for PPE 24 June 2016***
    Good Evening AC FIRST –

    **We will turn paper timesheets in as normal tomorrow, Wednesday 22
June 2016.**
    **However, DCAA will be back TONIGHT to audit the NIGHT SHIFT
within Security, so please do NOT prepopulate ANY timesheets for turn
in tonight!**

    Thank you.

    Respectfully,
Emily Cox

Emily Catherine Cox
Supervisor of Business Services
AC FIRST-Afghanistan

Bagram Airfield
APO, AE 09354
DSN: 318.481.0055
VOIP: 817.704.0131
Roshan Cell: 079.049.8738
Emily.Cox@aecom.com
        Emily.Cox@ac-first.com
        emily.c.cox.ctr@mail.mil

(emphasis added).

78.     Upon information and belief,[8] as substantiated by the allegations above, AECOM

knowingly presented, or caused to be presented, false or fraudulent claims to the Government by

submitting invoices for labor based on pre-signed timesheets and expressly or impliedly certifying

in each invoice that it complied with material applicable legal and contractual requirements,

including, but not limited to, FAR §§ 31.201-2, 31.201-3, 31.205-6 (2012), PWS § 5, and DCAA

Auditor's Manual § 5, when it did not in fact comply with those material requirements, concealed

that fact from the Government, and thus rendered AECOM's certifications misleading. The

information that would permit further identification of AECOM's false claims (*e.g.*, AECOM's

particular invoices) are peculiarly within AECOM's knowledge and control and unavailable to the

Relator. Because the operation of AECOM's cost-plus-fixed fee contract is to secure

reimbursement from the Government, there is a strong inference that specific false claims for those

reimbursements were submitted to the Government. AECOM's compliance with applicable legal

---

[8] *See United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81–82 (2d Cir. 2017) ("'Despite the generally rigid requirement [of Rule 9(b)], allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge.' *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990). 'Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject.' 5C C. Wright, *et al.*, Fed. Prac. & Proc. § 1224 (3d ed. April 2017 Update). 'Where pleading is permitted on information and belief' in a complaint that alleges fraud (and is therefore subject to Rule 9(b)), we require that the complaint 'adduce specific facts supporting a strong inference of fraud.' *Wexner*, 902 F.2d at 172.").

and contractual requirements was material to the Government's payment decision because (a) the Government required AECOM to comply with these requirements in order to invoice its labor costs, and emphasized the importance of such requirements in the DCAA Auditor's Manual; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation, (d) internal AECOM documents and AECOM's public filings admit that such violations are material to the Government, and (e) in light of the substantial size of AECOM's invoices for labor based on pre-signed timesheets, the materiality is self-evident. Indeed, AECOM conceded in its own documents that compliance with the applicable legal and contractual requirements regarding timesheets was material to the Government's payment decision, including, for example, in AECOM Federal Services Group, Time and Labor Reporting Practices and Procedures and PWSs. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements suggests that AECOM believed that they were material to the Government's payment decision.

79.     In addition, AECOM knowingly made, used, or caused to be made or used, false records or statements material to the false or fraudulent claims alleged in the paragraph above, including, but not limited to, its Management Plan – Contract Performance Plan, the PWS, and pre-signed timesheets. These records and statements were material to the false or fraudulent claims alleged in the prior paragraph because (a) they led the Government to believe that AECOM

33

intended to comply, and was complying, with applicable legal and contractual requirements; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation, (d) internal AECOM documents, and AECOM's public filings admit that such violations are material to the Government, and (e) in light of the substantial size of AECOM's invoices for labor based on pre-signed timesheets, the materiality is self-evident. Indeed, AECOM conceded in its own documents that compliance with the applicable legal and contractual requirements regarding timesheets was material to the Government's payment decision, including, for example, in AECOM Federal Services Group, Time and Labor Reporting Practices and Procedures and PWSs. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements suggests that AECOM believed that they were material to the Government's payment decision.

80.     Further, AECOM knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government by submitting invoices based on pre-signed time sheets that were not properly documented in accordance with the requirements of the MOSC-A Contract. This resulted in an overpayment by the Government for AECOM's purported labor hours, which AECOM was obligated to pay back under DCAA Auditor's Manual § 5-1107.11 ("The contractor should have policies and procedures … readily identify contract over/underpayments."), as well as other applicable contractual, and regulatory

provisions, discussed herein. AECOM's systematic pattern of not properly monitoring its employees or work orders demonstrates that its concealment of the Government's overpayment was done knowingly.

81.     AECOM also knowingly made, used, or caused to be made or used, a false record or statement material to this obligation to pay or transmit money or property to the Government, including, but not limited to, its Management Plan – Contract Performance Plan, the PWS, and pre-signed timesheets. Upon information and belief, these records and statements were material to this obligation to pay or transmit money or property to the Government because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation; (d) internal AECOM documents, and AECOM's public filings admit that such violations are material to the Government, and (e) in light of the substantial size of AECOM's invoices for labor based on pre-signed timesheets, the materiality is self-evident. Indeed, AECOM conceded in its own documents that compliance with the applicable legal and contractual requirements regarding timesheets was material to the Government's payment decision, including, for example, in AECOM Federal Services Group, Time and Labor Reporting Practices and Procedures and PWSs. Further, AECOM's attempt to cover-up its failure to comply with the

applicable legal and contractual requirements suggests that AECOM believed that they were material to the Government's payment decision.

### 2. Other Timesheet Fraud

82. Various internal AECOM documents explicitly discuss timesheet violations, including a memo specifically addressing timesheet errors and an internal document entitled Drawdown – DeMob[ilization], 2014, dated 16 March 2014.

83. In the Drawdown PowerPoint, under the heading "Historical Risks", there was an entry for "Timesheets (H)" [high risk]:

- Time Period: 2010 to Mid-2013

- Basis of Risk: Entries Do Not Meet DCAA Standards (Error Rates 14.5%, Now .05%)

- Exposure: > $5M

- Mitigation or Defense: Corrective Actions Put into Place Mid-2013

84. As AECOM was heading toward a wrap up of the contract, at its original anticipated completion date, the internal Finance Manager, Daniel Peters, Relator's supervisor, prepared a memo summarizing the extent of the problems of which AECOM was aware. This document was prepared in about January 2014. This memo estimates that AECOM had *liability* in the amount of **$144,872,000** for the timesheet fraud during the period of the MOSC-A Contract that was analyzed. There is even a calculation for an estimated settlement with the Government at 30%, or $43 million.[9] The memo further noted that the timesheet errors including signature errors, incorrect hour totals, and even multiple timesheets for the same person.

---

[9] Relator's estimate is that there was approximately $80 to 100 million of false billings, once the considerably lower salaries for the foreign nationals are factored into the equations. This likely overstatement is acknowledged in the document itself.

85.     Although many of the errors noted were missing signatures, which raises systemic issues about the reliability of the information, at one point during the analysis 13.69% of timesheets had errors in terms of the number of hours listed. Remarkably, this analysis did not even take into account the issue of employees and supervisors having prepared and signed the timesheets before the end of the pay period, fraudulently pre-populated the timesheets with labor charges, charged labor for parts-only and other fraudulent billing practices, such as having several employees charge the Government for changing the same tire (which allegedly took several hours), all of which would have added substantial amounts to the total overpayments to AECOM.

86.     The $144 million liability analysis was sent to various people, including the business director and/or the deputy finance director and a corporate finance VP named Blake Simonson. To the best of Relator's knowledge, the upshot of the discussions regarding these widespread timesheet and reporting violations was that a "close out" team established in Dubai considered whether there could be corrections to remedy or cover-up these billing deficiencies. In addition, a letter was drafted by Daniel Peters addressed to the Department of the Army's contracting officer in Illinois related to the timesheet overpayments made by the Government and notifying them of same. On information and belief, that letter was never sent to the Department of the Army.

87.     Upon information and belief, AECOM knowingly presented, or caused to be presented, false or fraudulent claims to the Government by submitting invoices for labor based on erroneous timesheets and expressly or impliedly certifying in each invoice that it complied with material applicable legal and contractual requirements, including, but not limited to, FAR §§ 31.201-2, 31.201-3, 31.205-6 (2012), PWS § 5, and DCAA Auditor's Manual § 5, when it did not in fact comply with those material requirements, concealed that fact from the Government, and

thus rendered AECOM's certification misleading. The information that would permit further identification of AECOM's false claims (*e.g.*, AECOM's particular invoices) are peculiarly within the AECOM's knowledge and unknown to the Relator. Because the function of AECOM's cost-plus-fee contract is to secure reimbursement from the Government, there is a strong inference that specific false claims for those reimbursements were submitted to the Government. AECOM's compliance with applicable legal and contractual requirements was material to the Government's payment decision because (a) the Government required AECOM to comply with these requirements in order to invoice its labor costs, and emphasized the importance of such requirements in the DCAA Auditor's Manual; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation; (d) internal AECOM documents and AECOM's public filings admit that such violations are material to the Government, and (e) in light of the substantial size of AECOM's invoices for labor based on erroneous timesheets, the materiality is self-evident. Indeed, AECOM conceded in its own documents that compliance with the applicable legal and contractual requirements regarding timesheets was material to the Government's payment decision, including, for example, in AECOM Federal Services Group, Time and Labor Reporting Practices and Procedures and PWSs. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements suggests that AECOM believed that they were material to the Government's payment decision.

88.     In addition, AECOM knowingly made, used, or caused to be made or used, false records or statements material to the false or fraudulent claims alleged in the paragraph above, including, but not limited to, its Management Plan – Contract Performance Plan, the PWS, and erroneous timesheets. These records and statements were material to the false or fraudulent claims alleged in the prior paragraph because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation; (d) internal AECOM documents and AECOM's public filings admit that such violations are material to the Government, and (e) in light of the substantial size of AECOM's invoices for labor that was documented in erroneous timesheets. Indeed, AECOM conceded in its own documents that compliance with the applicable legal and contractual requirements regarding timesheets was material to the Government's payment decision, including, for example, in AECOM Federal Services Group, Time and Labor Reporting Practices and Procedures and PWSs. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements suggests that AECOM believed that they were material to the Government's payment decision.

89.     Further, AECOM knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government by submitting

invoices based on erroneous timesheets that were not properly documented in accordance with the requirements of the MOSC-A Contract. This resulted in an overpayment by the Government for AECOM's purported labor hours, which AECOM was obligated to pay back under DCAA Auditor's Manual § 5-1107.11 ("The contractor should have policies and procedures … readily identify contract over/underpayments."), in addition to other applicable contractual provisions, and regulatory requirements, as provided herein. AECOM's systematic pattern of not properly monitoring its employees or work orders demonstrates that its concealment of the Government's overpayment was done knowingly.

90.     AECOM also knowingly made, used, or caused to be made or used, a false record or statement material to this obligation to pay or transmit money or property to the Government, including, but not limited to, its Management Plan – Contract Performance Plan, the PWS, and erroneous timesheets. These records and statements were material to this obligation to pay or transmit money or property to the Government because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation; (d) internal AECOM documents and AECOM's public filings admit that such violations are material to the Government, and (e) in light of the substantial size of AECOM's invoices for labor based on erroneous timesheets, the materiality is self-evident. Indeed, AECOM conceded in its own

documents that compliance with the applicable legal and contractual requirements regarding timesheets was material to the Government's payment decision, including, for example, in AECOM Federal Services Group, Time and Labor Reporting Practices and Procedures and PWSs. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements suggests that AECOM believed that they were material to the Government's payment decision.

### 3.    Historical Timesheet Corrections

91.    A Dubai close-out manager, Audra Santiago, told Relator that the team was engaging in significant corrections to old timesheets in an effort to correct some of the deficiencies.

92.    Multiple company documents refer to an ongoing process of "historical timesheet corrections. For example, one memo refers to the "[d]evelopment of process for correction of historical timesheets through the workflow."

93.    Even internal personnel questioned how this process could be undertaken so long after the fact, as reflected in the May 5, 2013 (and other) MOSC-A PM Weekly Brief: "Correction of timesheets -- OY2 Charges Continue (REALLY?)." In that same document, under "Upcoming Priorities," in bolded red font it states "DCAA Timesheet Floor Check," and in a bullet point below it states, "Compliance and Quality will escort DCAA Auditors." Further in that document it notes "Pre-Populated Timesheet" as an example of a problem with timesheets based on an internal investigation, as well as other issues that arose.

94.    In a memo explaining to Business Management personnel the types of reports that get prepared, the following instruction appeared: "The slide should also contain what BMD [Business Management Division] is doing that you want Corporate to know about, primarily Bob Shirron. For example, when Finance and Accounting begins to correct the historical Timesheets, you will want to let Corporate know that it has begun."

95. Clearly, the overwhelming majority of employees were not reachable at the home office location or the contract close-out office that was established in Dubai, making correction to timesheets inherently suspect since there was no ability to obtain the employees' consent. *See, e.g.*, DCAA Auditor's Manual § 5-902 ("Effective procedures for timekeeping to reasonably assure that labor hours are accurately recorded and that corrections to timekeeping records are documented, authorized, and approved.").

96. At some point, the effort to correct the historical timesheets was halted. Essentially, the conduct was documented so that AECOM would be able to respond to any issues that the Government might raise. The approach seems to be that AECOM will claim that these are "technical errors," but that the underlying time was legitimate and billable, although AECOM has no way of justifying or documenting such a statement given the scope, breadth, and nature of the timesheet fraud.

97. A formal closeout of this contract with DMA was initially scheduled for the end of 2015, but had been extended. The $144 million overpayment (and internally suggested $43M settlement estimate) was addressing anticipated costs arising during closeout auditing, which supports that the labor overpayments were both material, and required to be repaid by AECOM to the Army.

98. Upon information and belief, AECOM knowingly presented, or caused to be presented, false or fraudulent claims to the Government by submitting invoices for labor based on historically corrected timesheets and expressly or impliedly certifying in each invoice that it complied with material applicable legal and contractual requirements, including, but not limited to, FAR §§ 31.201-2, 31.201-3, 31.205-6 (2012), PWS § 5, and DCAA Auditor's Manual § 5, when it did not in fact comply with those material requirements, concealed that fact from the

Government, and thus rendered AECOM's certification misleading. The information that would permit further identification of AECOM's false claims (*e.g.*, AECOM's particular invoices) are peculiarly within the AECOM's knowledge and unknown to the Relator. Because the function of AECOM's cost-plus-fee contract is to secure reimbursement from the Government, there is a strong inference that specific false claims for those reimbursements were submitted to the Government. AECOM's compliance with applicable legal and contractual requirements was material to the Government's payment decision because (a) the Government required AECOM to comply with these requirements in order to invoice its labor costs, and emphasized the importance of such requirements in the DCAA Auditor's Manual; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation; (d) internal AECOM documents and AECOM's public filings admit that such violations are material to the Government, and (e) in light of the substantial size of AECOM's invoices for labor based on historically corrected timesheets, the materiality is self-evident. Indeed, AECOM conceded in its own documents that compliance with the applicable legal and contractual requirements regarding timesheets was material to the Government's payment decision, including, for example, in AECOM Federal Services Group, Time and Labor Reporting Practices and Procedures and PWSs. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements suggests that AECOM believed that they were material to the Government's payment decision.

99.     In addition, AECOM knowingly made, used, or caused to be made or used, false records or statements material to the false or fraudulent claims alleged in the paragraph above, including, but not limited to, its Management Plan – Contract Performance Plan, the PWS, and historically corrected timesheets. These records and statements were material to the false or fraudulent claims alleged in the prior paragraph because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation; (d) internal AECOM documents, and AECOM's public filings admit that such violations are material to the Government, and (e) in light of the substantial size of AECOM's invoices for labor based on historically corrected timesheets. Indeed, AECOM conceded in its own documents that compliance with the applicable legal and contractual requirements regarding timesheets was material to the Government's payment decision, including, for example, in AECOM Federal Services Group, Time and Labor Reporting Practices and Procedures and PWSs. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements suggests that AECOM believed that they were material to the Government's payment decision.

100.    Further, AECOM knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government by submitting

invoices based on historically corrected timesheets that were not properly documented in accordance with the requirements of the MOSC-A Contract. This resulted in an overpayment by the Government for AECOM's purported labor hours, which AECOM was obligated to pay back under DCAA Auditor's Manual § 5-1107.11 ("The contractor should have policies and procedures … readily identify contract over/underpayments."), as well as other applicable contract provisions, and regulatory requirements, as provided for herein. AECOM's systematic pattern of not properly monitoring its employees or work orders demonstrates that its concealment of the Government's overpayment was done knowingly.

101.     AECOM also knowingly made, used, or caused to be made or used, a false record or statement material to this obligation to pay or transmit money or property to the Government, including, but not limited to, its Management Plan – Contract Performance Plan, the PWS, and historically corrected timesheets. These records and statements were material to this obligation to pay or transmit money or property to the Government because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation; (d) internal AECOM documents and AECOM's public filings admit that such violations are material to the Government, and (e) in light of the substantial size of AECOM's invoices for labor based on historically corrected timesheets, the materiality is self-evident. Indeed,

AECOM conceded in its own documents that compliance with the applicable legal and contractual requirements regarding timesheets was material to the Government's payment decision, including, for example, in AECOM Federal Services Group, Time and Labor Reporting Practices and Procedures and PWSs. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements suggests that AECOM believed that they were material to the Government's payment decision.

### 4.    Examples of Falsified Timesheets

102.    A timesheet for employee Luke Kelley for the pay period 3/26/2011 to 4/8/2011 states that the employee was not available for signature, but does not include any explanation in the "Remarks" section; supervisor's signature is by Ramesh Marimuthu, Payroll, who did not work on location with this employee. Ramesh Marimuthu was an employee in the Finance Department/Payroll, in Bagram.

103.    A timesheet for employee Brandon Moore for the pay period 3/26/2011 to 4/8/2011 was signed by the supervisor on 4/6/2011, prior to the end of the pay period.

104.    A timesheet for employee Michael Willis for the pay period 3/26/2011 to 4/8/2011 was signed by Ramesh Marimuthu, the payroll supervisor based in Bagram, although Willis was at Salerno.

105.    A timesheet for employee Harles Smith for the pay period 3/26/2011 to 4/8/2011 was signed by Ramesh Marimuthu, the payroll supervisor based in Bagram, although Smith was at Kandahar.

106.    Scores of timesheets for the pay period 2/11/2012 through 2/24/2012 were signed by employees and supervisors on either 2/21 or 2/22/2012, prior to the end of the pay period.

107.    Scores of timesheets for the pay period 4/21/2012 through 5/4/2012 were signed by employees and supervisors on 5/2/2012, prior to the end of the pay period.

46

108.    The timesheet for employee Kalaivanan Ganesan for the pay period 4/21/2012 through 5/4/2012 was not signed by the employee or an actual supervisor in Kandahar, but was only signed and approved by Ramesh Marimuthu, the payroll supervisor in Bagram.

109.    The timesheets for employee Jayakumar Gangadharan (at Shank site) and employee Jeevan Jose (in Kabul) for the pay period 4/21/2012 through 5/4/2012 were signed by both the employees and their supervisors on 5/1/2012, three days prior to the end of the pay period.

110.    The timesheet for employee Jaya Theegala (at Salerno) for the pay period 4/21/2012 through 5/4/2012 was signed by the employee on 4/30/2012 and the supervisor on 5/1/2012.

111.    A timesheet for employee Ian Becton from 06/30/2012 to 07/13/2012 includes the following timekeeping recording errors: (a) the employee signature is dated 07/12/2012 which is before the end of the pay period; (b) Ramesh Marimuthu, is a payroll supervisor based in Bagram, and therefore should not be providing the approval for an employee stationed at another base. In this case, the employee was stationed at a forward operating base ("FOB") identified as "SHANK." The timekeeping system requires the signature of a supervisor stationed at the same location as the employee, preferably the employee's immediate supervisor, who can verify the hours worked, except in unusual circumstances; (c) the "REMARKS" section of the timesheet should be completed to reflect any travel or reasons for "Leave without Pay"; and (d) the employee number is missing.

112.    A timesheet for employee Michael Grafton from 06/30/2012 to 07/13/2012 includes the following timekeeping recording errors: (a) both the employee and the supervisor signatures are dated "11-Jul-12" which is one day prior to the last date of recorded time; (b) the

employee was located at the Mazar-E-Sherif FOB, but the supervisor approving the timesheet is Ramesh Marimuthu, a payroll supervisor stationed in Bagram.

113.    A timesheet for employee Daniel Aguayo for the pay period 08/25/2012 to 09/07/2012 includes the following timekeeping recording errors: (a) the space for the supervisor's printed name is not completed; (b) the supervisor "approval signature" is dated 09/02/2012 but the pay period ends on 09/07/2012 which was five days after the supervisor signature; (c) the employee's signature is dated "09/06" but the last day time was submitted for was 09/07/2012; and (d) the employee number is missing.

114.    Scores of timesheets for the pay period from 10/20/2012 through 11/02/2012 were signed by both employees and supervisors on 10/31/2012.

115.    Scores of timesheets for this pay period 11/17/2012 to 11/30/2012 were signed by employees and supervisors on 11/28/2012 (note this was not Thanksgiving week).

116.    This conduct continued at least into 2013. Scores of timesheets for the pay period from 2/23/2013 through 3/8/2013 were signed by employees and supervisors on 3/6/2013.

117.    Relator was able to obtain eight paystubs for a two-week pay period ending on January 27, 2012. Three of these records reflected the employees' total hours as 154. More egregiously, three of these records listed employees (designated as mechanics) with total hours of 308 for two consecutive pay periods. For this to be true, and for each of these men to actually have worked for the 616 hours that they billed, each of those three men would have worked on average 22 hours a day for 28 consecutive days.

118.    Upon information and belief, AECOM knowingly presented, or caused to be presented, false or fraudulent claims to the Government by submitting invoices based on factually false timesheets and expressly or impliedly certifying in each invoice that it was in compliance

with material requirements, such as including, but not limited to, FAR §§ 31.201-2, 31.201-3, 31.205-6 (2012), PWS § 5, and DCAA Auditor's Manual § 5, when it did not in fact comply with those material requirements, and concealed that fact from the Government, and thus rendered AECOM's certification misleading. For example, upon information and belief, AECOM submitted invoices based on pre-signed and prepopulated timesheets, which, at the time of signing or population, could not have been factually accurate. Many of these timesheets also in fact contained the wrong amount of hours worked for given employees. Upon information and belief, AECOM submitted these knowingly false claims for payment to the Government. The information that would permit further identification of AECOM's false claims (*e.g.*, AECOM's particular invoices) are peculiarly within the AECOM's knowledge and unknown to the Relator. Because the function of AECOM's fixed-cost-plus-fee contract is to secure reimbursement from the Government, there is a strong inference that specific false claims for those reimbursements were submitted to the Government. AECOM's compliance with applicable legal and contractual requirements was material to the Government's payment decision because (a) the Government required AECOM to comply with these requirements in order to invoice its labor costs, and emphasized the importance of such requirements in the DCAA Auditor's Manual; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation; (d) internal AECOM documents and AECOM's public filings admit that such violations are material to the Government, and (e) in light of the substantial

49

size of AECOM's invoices based on falsified timesheets, materiality is self-evident. Indeed, AECOM conceded in its own documents that compliance with the applicable legal and contractual requirements regarding timesheets was material to the Government's payment decision, including, for example, in AECOM Federal Services Group, Time and Labor Reporting Practices and Procedures and PWSs. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements suggests that AECOM believed that they were material to the Government's payment decision.

119.    In addition, upon information and belief AECOM knowingly made, used, or caused to be made or used, false records or statements material to the false or fraudulent claims alleged in the paragraph above, including, but not limited to, its Management Plan – Contract Performance Plan, the PWS, and falsified timesheets. Further, the pre-signed and prepopulated timesheets themselves were false records or statements which were created in order to send false claims for payment to the Government. These records and statements were material to the false or fraudulent claims alleged in the prior paragraph because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation; (d) internal AECOM documents and AECOM's public filings admit that such violations are material to the Government, and (e) in light of the substantial size of AECOM's invoices based on falsified

timesheets, materiality is self-evident. Indeed, AECOM conceded in its own documents that compliance with the applicable legal and contractual requirements regarding timesheets was material to the Government's payment decision, including, for example, in AECOM Federal Services Group, Time and Labor Reporting Practices and Procedures and PWSs. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements suggests that AECOM believed that they were material to the Government's payment decision.

120.    Further, upon information and belief, AECOM knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government by failing to properly track its employee's hours under PWS § 5.1.8. This resulted in an overpayment by the Government for AECOM's purported labor hours, which AECOM was obligated to pay back under DCAA Auditor's Manual § 5-1107.11 ("The contractor should have policies and procedures [to] … readily identify contract over/underpayments."), as well as other contractual requirements, and applicable regulatory provisions, as provided for herein. AECOM's systematic pattern of pre-signing and prepopulating timesheets demonstrates that its concealment of the Government's overpayment was done knowingly.

121.    AECOM also knowingly made, used, or caused to be made or used, a false record or statement material to this obligation to pay or transmit money or property to the Government, including, but not limited to, its Management Plan – Contract Performance Plan, the PWS, and falsified timesheets. These records and statements were material to this obligation to pay or transmit money or property to the Government because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements; (b) during the entirety of the time that Relator was working for AECOM he observed

nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation; (d) internal AECOM documents and AECOM's public filings admit that such violations are material to the Government, and (e) in light of the substantial size of AECOM's invoices based on falsified timesheets, the materiality is self-evident. Indeed, AECOM conceded in its own documents that compliance with the applicable legal and contractual requirements regarding timesheets was material to the Government's payment decision, including, for example, in AECOM Federal Services Group, Time and Labor Reporting Practices and Procedures and PWSs. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements suggests that AECOM believed that they were material to the Government's payment decision.

### 5. Fraudulent Billing for Unqualified and Uncertified Employees.

122.    Pursuant to PWS § 5.5.6.5, which set forth the contractual requirements under the MOSC-A, AECOM was required to employ qualified SAMS-1 operators to perform the functions of accounting for materials. These employees were required to be competent to understand data elements involved with maintenance requests, perform data backups, perform daily NMO/Work Order File Transfers to Government-provided LIS using the established protocol and interfaces, and adjust and inventory bench/shop stock. AECOM's CDRL requirements expressly stated that employees required 3+ years' experience and external SAMS-E certification.

123.    At various times during the performance of this contract, however, fewer than five AECOM operators (out of approximately 100) had the required certification and competency.

124.    In an effort to obfuscate its non-compliance, AECOM created and utilized its own "certifications." For example, on November 16, 2012, AC FIRST issued a "Certificate of Training" to Romaldino Tony Masarenhas" as a "SAMS-E Operator, Personal Qualification Standards (PQS).

125.    There were ongoing violations of national security policies as well, by allowing un-vetted and uncertified Other Country Nationals ("OCNs") access to US Government systems.

126.    Regulations, statutes and policies pertaining to the required security clearances include the following: Access to sensitive information by a non-U.S. citizen who is not a DOD employee will only be permitted in accordance with applicable disclosure policies (for example, National Disclosure Policy 1, DODD 5230.9, DODD 5230.25) and U.S. statutes (for example, the Arms Export Control Act, 22 USC 2551, et. seq.); Standard Army Maintenance System-Enhanced (SAMS-E) v13.01, Security Policy, July 2012 -- 3.1.1 Background Investigations and Personnel Selection (SAMS-E v13.01 users are IT-III positions and Administrators and CSSAMO are IT-I and IT-II depending on their level of access as described below. The following is taken from AR 25-2, Section V, Personnel Security: a. Basic requirements. (1) Personnel requiring access to ISs to fulfill their duties must possess the required favorable security investigation, security clearance, or formal access approvals, and fulfill any need-to-know requirements. (2) IT I is (a) Defined as personnel in IA positions (for example, SAs/NAs for infrastructure devices, IDSs, VPNs, routers; SAs/NAs for classified systems and devices) with privileged-level access to control, manage, or configure IA tools or devices, individual and networked IS and devices, and enclaves. (b) Favorable completion of a National Agency Check (NAC) (current within 180 days).

127.    In an email dated May 16, 2015, Jonathan Brock, SASMO OIC ("Sustainment Automation Support Management Office, Officer in Charge") responded to information that had

been provided to him about the impermissible users on the Army systems, and copied his incoming

replacement, Reginald Hood: "I agree with everything you are discussing here, as the way business

is currently conducted prevents any type of ownership in audit logs. I did not obtain the needed

support to tackle this project before I leave out, as I am almost out of time right now. This is going

to be one of the big items that I stress to Chief Hood, my replacement, that needs to be dealt with

in order to gain control of this monster. According to big Army, there is no way around the fact it

spells out this is the only way we are to do business. Admin accounts must be separate from user

accounts, and the user accounts must be singed [sic] for through the acceptable use policy with

awareness training requirements met, period. I already have an AUP typed up with a plan to push

this out, but it will have to be my replacement who will knock it out; I am close to working on

days left here. All systems connected to any DoD network, including VSAT, must adhere to all

DoD regulations, instructions, and policy." The references to user accounts and acceptable use

relate to security clearances and appropriate tracking of who is given access to Army systems.

128.    On May 23, 2015, an AECOM Logistics Information System – Maintenance

("LISMX") supervisor documented concerns in a Memorandum for Record, which was available

to higher level supervisors and Project Management. The employee specifically noted that

"repeated attempts/demands orally to add un-vetted OCN [other country nationals] operators,

requests for administrative rights for operators have been vigorously pushed by Senior

Management despite the clear documentation and directions from DOD and the 4SSB

**[Sustainment Support Battalion]**." (emphasis in original).

129.    At about the same time, on May 14, 2015, Frank Palafos, AC FIRST IT Manager,

wrote to Timothy Walker, L CTR USA 30401st AFSB and Naomi Annino-Luat, N USA CTR 4-

401st AFSBn ACF Class IX, raising serious concerns about the impermissible access:

I believe it is about time we talk about this issue regarding OCN s getting on a NIPR network without going through any vetting process. It is a NIPR network if they need to get vetted on an unclassified network, then working with sensitive (SASC parts) items will require a vetting process as well. Do they at least have SWA access? We already have Expats that may not be certified to work on the system but at least they are vetted.

I have looked the other way for a long time but I believe it is time we start complying with network regulations and legit certifications when it comes to providing OCN s access to any network.

▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬

If we were to have DCMA or any auditor go into your office and verify how an Expat or OCN were able to get access to the network, it would be Me that will get reprimanded, not you or your department. When we have an IA Violation, I am the one responsible to making sure it does not occur again and what training did I perform to prevent an incident in the future. On the last note, is this person a bonafide SAMS-1 operator and not a data clerk?

However, I will provide you the opportunity to prove me wrong, since I have been wrong before. Provide me an Army document that gives us the okay for an OCN to get on a STAMIS system without any vetting process.

130.    This email was also sent to David Reisz, CTR USA 401st AFSB AC FIRST.

131.    In November 2015, in part in response to concerns raised by various AECOM IT personnel, Reginald Hood (SASMO OIC) sent a memo to James, Ashley J CW2 USARMY USARCENT (US); Deitrich, Robert R CTR (US); Williams, Marcus D CW3 USARMY 4 ESC (US); Dubose, Steven SFC USA RSSB; and Cervantes, Enedina SGT USA RSSB, asking whether there was any exception in place to AR25-2 that prohibits OCNs from having access to SAMS-E, at least without individual background investigations.

132.    Both James and Williams responded that there were no exceptions, that all users of LIS were subject to that policy, and that the contracts with the OCNs would have to specify if they are allowed access to any US Government systems. On information and belief, the Army was never

told of AECOM's failures that had been admitted internally related to the use of unqualified and/or uncertified employees.

133.     This was again reiterated by the Army to AECOM within a November 13, 2015 email from Robert Malton of the 401st "if OCN can't access that equipment, the equipment while unclassified is consider[ed] sensitive and the user must be IA level III certify [sic]. What that means [is that] they would [need to] have a US Background check (BAC), if your company wants to go to that expense, [it] is your call. Without the BAC they cannot be granted access."

134.     Nonetheless, AECOM continued to allow unauthorized users to access the Army systems, creating national security concerns and exacerbating the property tracking and accounting issues because the people operating the systems were not qualified or competent.

135.     The reliance on unskilled or untrained personnel violated the PWS and resulted in substantial cost overruns to the Government through recoverable items not being processed correctly; materials not being accounted for properly; duplicative ordering of parts sometimes already in stock; and lack of proper documentation.

136.     Additional evidence supports Relator's claims. For example, in a May 12, 2013 internal AC First briefing, it is noted that 100% of the Total AA&E personnel who have regular, unrestricted access to weapons have not completed their compliant AA&E personal screening. AC First MOSC-A Weekly PM Brief, May 12, 2013. Incredibly, the 100% deficiency in obtaining the required screening comes over three years into the term of the MOSC-A Contract.

137.     Upon information and belief, AECOM knowingly presented, or caused to be presented, false or fraudulent claims to the Government by submitting invoices for labor performed by unqualified workers and expressly or impliedly certifying in each request for reimbursement that it complied with material applicable legal and contractual requirements, including, but not

limited to, FAR §§ 31.201-2, 31.201-3, 31.205-6 (2012), PWS § 5, and DCAA Auditor's Manual § 5, when it did not in fact comply with those material requirements, concealed that fact from the Government, and thus rendered AECOM's certification misleading. The information that would permit further identification of AECOM's false claims (*e.g.*, AECOM's particular invoices) are peculiarly within the AECOM's knowledge and unknown to the Relator. Because the function of AECOM's cost-plus-fee contract is to secure reimbursement from the Government, there is a strong inference that specific false claims for those reimbursements were submitted to the Government. AECOM's failure to disclose its non-compliance with applicable legal and contractual requirements, including, but not limited to, PWS § 5.5.6.5, was material to the Government's payment decision because (a) the Government required AECOM to comply with these requirements in order to seek reimbursement, and emphasized the importance of such requirements in the DCAA Auditor's Manual (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation; (d) internal AECOM documents and AECOM's public filings admit that such violations are material to the Government, and (e) in light of the substantial size of AECOM's invoices for labor performed by unqualified workers, the materiality is self-evident. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements regarding worker qualifications suggests that AECOM believed that they were material to the Government's payment decision. Further, AECOM's attempt to cover-up its

failure to comply with the applicable legal and contractual requirements regarding worker qualifications suggests that AECOM believed that they were material to the Government's payment decision.

138.    In addition, AECOM knowingly made, used, or caused to be made or used, false records or statements material to the false or fraudulent claims alleged in the paragraph above, including, but not limited to, its Management Plan – Contract Performance Plan and the PWS 5.5.6.5. These records and statements were material to the false or fraudulent claims alleged in the prior paragraph because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation; (d) internal AECOM documents and AECOM's public filings admit that such violations are material to the Government, and (e) in light of the substantial size of AECOM's invoices for labor performed by unqualified workers, materiality is self-evident. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements regarding worker qualifications suggests that AECOM believed that they were material to the Government's payment decision. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements regarding worker qualifications suggests that AECOM believed that they were material to the Government's payment decision.

139.    Further, upon information and belief, AECOM knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government by failing to return the money that it had billed for unqualified workers. This resulted in an overpayment by the Government for AECOM's purported labor hours, which AECOM was obligated to pay back under DCAA Auditor's Manual § 5-1107.11 ("The contractor should have policies and procedures … readily identify contract over/underpayments."), as well as other applicable contractual requirements, and regulations, as provided for herein. AECOM's systematic pattern of using unqualified workers demonstrates that its concealment of the Government's overpayment was done knowingly.

140.    AECOM also knowingly made, used, or caused to be made or used, a false record or statement material to this obligation to pay or transmit money or property to the Government, including, but not limited to, its Management Plan – Contract Performance Plan and the PWS 5.5.6.5. These records and statements were material to this obligation to pay or transmit money or property to the Government because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation; (d) internal AECOM documents, and AECOM's public filings admit that such violations are material to the Government, and (e) in light of the substantial size of AECOM's invoices for labor

59

performed by unqualified workers, the materiality is self-evident. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements regarding worker qualifications suggests that AECOM believed that they were material to the Government's payment decision. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements regarding worker qualifications suggests that AECOM believed that they were material to the Government's payment decision.

### 6.    Additional False Claims and False Records Related to Labor Charges.

141.    AECOM's violations of timesheet reporting requirements went beyond the serious paperwork issues alleged. For example, during the fall of 2013, Relator sent an email to Steve Tolley, Director of Business Management, about a group of employees sleeping on the job although still billing full eleven-hour days. He even took photos of them sleeping at the time and showed his bosses, but nothing was done. The Timesheet Analysis noted earlier found that 13.69% of timesheets had errors in terms of the number of hours listed, at one point during the analysis.

142.    In addition to the allegations here, it was common for the night shift in various locations to never show up for work, instead choosing to bill the Army for labor while engaging in leisure activities.

143.    Relator additionally has evidence of false labor claims related to intentional, duplicate false charges. For example, on March 11, 2016, an internal AC FIRST Work Order Detail demonstrates the intentional use of a dummy part no. 999999999, and six AC FIRST employees fraudulently billing the United States Army several hours for allegedly replacing and/or repairing a single tire. Further, the Work Order Detail is not tied to a specific piece of authorized equipment. And additional internal AC FIRST documentation confirms this problem was significant, details that AC FIRST would not be able to explain this to auditors, and that the problems were material (i.e., link labor charges to charges for parts, and account for such charges to the Army). *See e.g.,*

WO6HN26C700006 and internal AC FIRST documents (e.g., "Were is the authorization to use the system in a non-standard fashion? Where is the guidance to operate like this at all coming from? Why was it not caught by multiple levels within AC FIRST? Quality. Maintenance, S&S or member of the 401st? When discovered what was done and who was notified? How far does this practice go? How are the various POWO expenses and parts being accounted for? What were the causes for this practice to take root? What are some solutions? How to account for incorrect work previously done and find a clear path moving forward?").

144.    Upon information and belief, AECOM knowingly presented, or caused to be presented, false or fraudulent claims to the Government by submitting invoices based on factually false timesheets and expressly or impliedly certifying in each request for reimbursement of the timesheets that it was in compliance with material requirements, including, but not limited to, FAR §§ 31.201-2, 31.201-3, 31.205-6 (2012), PWS § 5, and DCAA Auditor's Manual § 5, when it did not in fact comply with those material requirements, and concealed that fact from the Government, and thus rendered AECOM's certification misleading. For example, upon information and belief, AECOM submitted timesheets containing duplicative labor hours and for hours not actually worked. Upon information and belief, AECOM submitted these knowingly false claims for payment to the Government. The information that would permit further identification of AECOM's false claims (*e.g.*, AECOM's particular invoices) are peculiarly within the AECOM's knowledge and unknown to the Relator. Because the function of AECOM's cost-plus-fee contract is to secure reimbursement from the Government, there is a strong inference that specific false claims for those reimbursements were submitted to the Government. AECOM's failure to disclose its non-compliance with applicable legal and contractual requirements was material to the Government's payment decision because (a) the Government required AECOM to comply with

these requirements in order to invoice its labor costs, and emphasized the importance of such requirements in the DCAA Auditor's Manual; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation; (d) internal AECOM documents, and AECOM's public filings admit that such violations are material to the Government, and (e) in light of the substantial size of AECOM's invoices based on factually false timesheets, the materiality is self-evident. Indeed, AECOM conceded in its own documents that compliance with the applicable legal and contractual requirements regarding timesheets was material to the Government's payment decision, including, for example, in AECOM Federal Services Group, Time and Labor Reporting Practices and Procedures and PWSs. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements regarding worker qualifications suggests that AECOM believed that they were material to the Government's payment decision.

145.    In addition, upon information and belief AECOM knowingly made, used, or caused to be made or used, false records or statements material to the false or fraudulent claims alleged in the paragraph above, including, but not limited to, its Management Plan – Contract Performance Plan and Section 5.1.8 of the PWS. Further, timesheets with duplicative labor hours as well as for hours not worked were themselves false records or statements which were created in order to send false claims for payment to the Government. Additionally, the use of a dummy part number on a work order is a false record created in order to send false claims for payment to the Government.

These records and statements were material to the false or fraudulent claims alleged in the prior paragraph because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper requests for reimbursement; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation; (d) internal AECOM documents, and AECOM's public filings admit that such violations are material to the Government, and (e) in light of the substantial size of AECOM's invoices based on factually false timesheets, materiality is self-evident. Indeed, AECOM conceded in its own documents that compliance with the applicable legal and contractual requirements regarding timesheets was material to the Government's payment decision, including, for example, in AECOM Federal Services Group, Time and Labor Reporting Practices and Procedures and PWSs. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements regarding worker qualifications suggests that AECOM believed that they were material to the Government's payment decision.

146.    Further, upon information and belief, AECOM knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government by failing to properly track its employees' hours under PWS § 5.1.8 and by allowing for false work orders to be opened. This resulted in an overpayment by the Government for AECOM's purported labor hours, which AECOM was obligated to pay back under DCAA

Auditor's Manual § 5-1107.11 ("The contractor should have policies and procedures … readily identify contract over/underpayments."), as well other applicable contractual requirements, and regulations, as provided for herein. AECOM's systematic pattern of not properly monitoring its employees or work orders demonstrates that its concealment of the Government's overpayment was done knowingly.

147.    AECOM also knowingly made, used, or caused to be made or used, a false record or statement material to this obligation to pay or transmit money or property to the Government, including, but not limited to, its Management Plan – Contract Performance Plan and Section 5.1.8 of the PWS. Further, timesheets with duplicative labor hours as well as for worked not worked were themselves false records or statements which were created in order to send false claims for payment to the Government. Additionally, the use of a dummy part number on a work order is a false record created in order to send false claims for payment to the Government. These records and statements were material to this obligation to pay or transmit money or property to the Government because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) the Government has previously sought to enforce timesheet requirements in other lawsuits and investigations, including, for example, against Northrop Grumman Systems Corporation; (d) internal AECOM documents, and AECOM's public filings admit that such violations are material to the Government; and (e) in light of the substantial size of AECOM's invoices based on factually false timesheets, materiality is

64

self-evident. Indeed, AECOM conceded in its own documents that compliance with the applicable legal and contractual requirements regarding timesheets was material to the Government's payment decision, including, for example, in AECOM Federal Services Group, Time and Labor Reporting Practices and Procedures and PWSs. Further, AECOM's attempt to cover-up its failure to comply with the applicable legal and contractual requirements regarding worker qualifications suggests that AECOM believed that they were material to the Government's payment decision.

C.      **Fraudulent Claims and False Records Related to Man-Hour Utilization Reporting.**

148.    The requirement to report Man-Hour Utilization stems from AR 750-1, chapter 4-14, which requires Army unit commanders to "monitor the utilization of civilian maintenance personnel and establishes a standard of 85 percent utilization with a goal of 90 percent. Utilization rates are calculated on the actual direct labor hours (recorded on DA Form 2407, "Maintenance Request") divided by the direct labor hours that were available to perform maintenance." This requirement is specifically incorporated into the MOSC-A through PWS § 5.0 "Critical Metrics": "Utilization Rate. Man hour utilization rate shall be >=85% IAW the Department of the Army goal via a government approved monthly report to the 401st brigade commander or delegate."

149.    Evidence demonstrating that AECOM did not comply with the MHU reporting requirement includes: (1) the highly critical Corrective Action Report ("CAR") during the period in question, disputing AECOM's reported MHU rate and finding an accurate rate of only 26% in that particular instance; (2) internal documents identifying a MHU rate less than 85%; and (3) AECOM's use of hand-made reports rather than reports automatically generated from data in SAMS-E. CAR dated October 19, 2012. The lack of integrity in the timesheets overall, as well as the multiple wasted hours that Relator personally observed, also contributed to inaccurate MHU reporting.

150.    Internal documentation confirms the importance, and materiality of the MHU reporting. For example, an internal spreadsheet created by Paul Gambino notes that MHU is "critical" to the PWS, cites to PWS § 5.6 for support, and notes that it is being done manually, instead of on SAMs, and that this is not on the portal shared with the Army. AC First Spreadsheet, originally created in 2012.

151.    Further, a CAR referenced the requirement in PWS 2.13.1 Optimization:

> The Contractor shall provide, manage, and administer a continuing workforce optimization plan for Contractor staffing for repair and maintenance requirements. The plan shall show how the Contractor plans to optimize and streamline operations when downturns and upturns in workload, manning shortfalls, and increases in Operational Tempo (OPTEMPO), project priority changes, and changing levels of complexity for both scheduled and unscheduled requirements cause an imbalance in the projected staffing level compared to the projected workload.

**1.      Actual MHU Was Consistently Below 85%**

152.    The MOSC-A Contract, as explained in PWS § 5.0, had a standard Army clause that required the contractor to show on a monthly basis that the workforce on the contract was productively busy for at least 85% of the total work hours available during a given time period. If the utilization rate was not meeting that contractual metric, then the Army could look to cut the workforce for which it was paying the contractor as explained within PWS § 2.13.1.

153.    This is a material issue for the Army as disclosed in other theaters. When proper reporting requirements are met, the Army can "review and verify utilization data for tactical vehicle field maintenance services and determine whether further reductions in contractor personnel should be taken in accordance with Army Regulation 750-1." *See* Inspector General, U.S. Department of Defense, Contracting for Tactical Vehicle Field Maintenance at Joint Base Balad, Iraq (Report No. D-2010-046, March 3, 2010) (hereafter referred to as OIG Report). More specifically, "[m]onitoring the utilization rates for tactical vehicle field maintenance services purchased under the LOGCAP III contract is a required control that must be in place to ensure

DOD is paying for services it actually needs. The Army should verify utilization rate data provided by contractors and use that data to make timely adjustments in the level of contractor-provided tactical vehicle maintenance services."

154.   Man-hour utilization was required to be reported as a Man-Hour Utilization rate ("MHU"). The reports themselves are sometimes referred to as Man-Hour Utilization Reports ("MURs"). Pursuant to PWS starting no later than January 2012, AECOM was required to report MHU[10] on a monthly basis to the 401st. The January 21, 2012 PWS read as follows: "Man hour utilization rate shall be > 85% IAW the Department of the Army goal via a Government approved monthly report to the 401st Brigade commander or delegate." The same provision appeared in subsequent PWSs.

155.   The importance of MHU utilization to the Army is directly reflected within a November 1, 2011 draft version of the PWS, which reflects a reconciliation of the Army's amendments to the PWS for Option Year 2. Specifically, this document reflects the language for the introduction of "Critical Metrics": "This PWS is structured with "Critical Metrics'" as distinguished by the 401st AFSB through a collaborative effort for Option Year 2 of this contract. These metrics serve, in general, two key functions: first, it allows a simplified grading criteria to evaluate contractor success in various PWS functions quickly and effectively; second, it focuses contract effort to locales that provide crucial value to the 401st AFSB. This is not to say that the rest of the PWS is not important or the contractor will not be held accountable for all other areas within this document; *this is merely to focus the contractor on the highest valued priorities of the*

---

[10]     A reconciliation draft of the PWS dated November 1, 2011 refers to MHU reporting, November 2011 Reconciliation Draft PWS ("Man hour utilization rate shall be $\geq$ 85% IAW the Department of the Army goal via a government approved monthly report to the 401st brigade commander or delegate") at p 34**,** but that might not have been formalized until the January, 2012 PWS.

*401st mission* and how to measure that success. Critical Metrics are identified at the beginning of each respective section of this PWS with the exception of sections 1.0 General and 2.0 Workforce Management. Nov. 2011 Draft PWS at 8. Further, this document shows the incorporation of the MHU requirement being added to the PWS as a Critical Metric. *Id*. at 35.

156.     AECOM was cited for inaccurate man hour accounting in the second quarter 2012 Program Management Review. 2Q 2012, July 20, 2012, MOSC-A Program Management Review.

157.     AECOM's failure to report reliable Man Hour Utilization data on the MOSC-A Contract "resulted in DOD incurring costs for services that were not required." *See* OIG Report at 7. The 401st did, indeed, mandate lower staffing levels when it became aware of low utilization rates, confirming that there would have been financial consequences had proper numbers been reported.

158.     [I]f personnel, work order, and man-hour data are input correctly into the Standard Army Maintenance System – Enhanced [SAMS-E], the system will calculate the man-hour utilization electronically." OIG Report at 11.

### 2.     The Corrective Action Report Related to MHU

159.     On July 23, 2012 Corrective Action Plan (CAP) Status for Program-level CARs, AECOM's nonconformance was described as follows: "Accurate Man Hour utilization is not being maintained in SAMS theater wide. This issue is the most recent in a trend of deficiencies related to the required use of Logistics Information Systems." *Id*. at 15. There was also specific mention of the "failure to enter labor hours data into SAMS," albeit pegged to only one site. *Id.* In what appears to be AECOM's internal discussion of how to address the numerous CARs about LIS, there is also a reference to an Internal CAR concerning MHR, with the minutes raising the following questions:

What we have already done for the Internal SAMS Utilization Internal CAR, which

68

contains the specific actions items that will resolve the man hour reporting

Address the requirements cited (why aren't we operating LMP or PBUSE for instance, or CDRL 001 re: man hours projected/expanded (nothing to do with LIS)?

*Id.* at 16.

160.    AECOM received a CAR relating to inflated MUR reports in October 2012. October 29, 2012 DCMA Corrective Action Request. The report stated that AECOM was "well under the required Utilization Rate of 85%; Utilization Rate for 1-30Sep12 was 26%. A random sampling consisting of 70 "Daily Man Hour Sheet" source documents was used in determining September's monthly Utilization Rate average of 26%."

161.    AECOM engaged in discussions or negotiations with the Army about the manner and timing of Man Hour Utilization reporting in 2012, as reflected in a draft of a PWS. There appeared to be agreement that the man-hour utilization rate formula was a "percent of direct labor man-hours: total recorded man-hours on DA Forms 2407/number of available personnel hours *100." Also discussed was AECOM's position that they could not necessarily meet the targeted MHU because of problems procuring parts: "Parts availability is also a major factor in not reaching the MHU goal of 85%."

162.    A meeting was held on November 23, 2012 with 401st Brigade and AC FIRST to discuss the methodology for calculating the MHU, reporting periods daily versus monthly, UIC issues, and a number of other issues. The draft states that it "was agreed that the method of reporting MHU would be the SAMS 036 report, which will be reported monthly." It appears that AECOM wanted the standard revised to say that the MHU goal would be subject to adjustment not only based on workload fluctuation, but also on parts availability and that MHU at Maintenance Support Teams [MSTs] would be evaluated on a case by case basis.

163.     The PWS was explicitly requires that "[m]an hour utilization shall be calculated IAW AR 750-1 and SAMS data. PWS April, 2013. This will be reported monthly to the 401 Brigade Commander or delegate." April 4 2013 PWS Maintenance & Operational Support for the 401st Army Field Support Brigade – Afghanistan, at 34, 36.

164.     On information and belief, the contractual requirement of 85% was maintained since the May 5, 2013 Weekly PM Brief reports that AECOM is "working to obtain 85% MHU" and "monitoring MHU at all locations." *Id.* at 6, 8. Additionally, the PWS dated October 23, 2013 repeats the >85% standard, without reference to parts availability.

**3.     Internal Identification of MHU below 85% and Work Force Adjustments**

165.     AECOM was responsible for managing the contract with a view toward appropriate manpower levels and the 401st mandated manpower reduction at times when MHU was low. For example, the April 4, 2013 Performance Work Statement, at 16, included a detailed description of the requirements:

**2.13.1**   Optimizing Workforce.

**2.13.2**   Optimization. The Contractor shall provide, manage, and administer a continuing workforce optimization plan for Contractor staffing for repair and maintenance requirements. The plan shall show how the Contractor plans to optimize and streamline operations when downturns and upturns in workload, manning shortfalls, and increases in Operational Tempo (OPTEMPO), project priority changes, and changing levels of complexity for both scheduled and unscheduled requirements cause an imbalance in the projected staffing level compared to the projected workload. Include identification of risk and risk mitigation techniques to show what risk might arise from the proposed optimization strategy. The Contractor shall develop appropriate metrics to measure the effectiveness of ongoing optimization actions. This plan shall include the existing and proposed organization structure and identify proposed staffing changes at the labor category level. This plan shall be submitted IAWCDRL 010 DI-MGMT-80004A to the PCO/ACO.

**2.13.3**   **Standard**. The Contractor shall provide a business process plan which identifies how the Contractor plans to efficiently align workforce to workload in order to optimize efficiency, reduce cost, maintain schedule, and performance

during downturns and upturns in workload, manning shortfalls, increases in op-tempo, projects priority changes levels of complexity, for both scheduled and unscheduled requirements. Workforce adjustments include, but are not limited to: changing the number of shifts, changing the number of sites and possible merging workload, or simply taking away what doesn't work. At a minimum, 20% of the workforce, under the individual operations outlined in this PWS, shall be cross-trained to aid in optimizing the workforce. The Contractor shall provide as required, a Contractor Productivity Report in accordance with CDRL 057 DI-MGMT-80004A.

166.     There is abundant evidence that AECOM was aware that proper and timely reporting of man-hour utilization could result in a reduction in authorized manpower levels on the MOSC-A Contract. For example,

a)     In a December 12, 2012 AC FIRST Maintenance Drawdown Plan, AECOM refers to a reduction in force needed and AECOM cutting manpower. The document itself notes that it was "submitted for approval or discussion."

b)     In a July 26, 2013 MOSC-A OY3 Definitized Budget Review, AECOM discussed an initial reduction in Feb/Mar 2013 to meet the 85% MHU as per the PWS. *Id.* at p 45. *AECOM also acknowledged that more reductions were possible if the 85% MHU could not be maintained: the document states that "if the SARC cannot maintain 85% MHU they will be closed early." Id.* (emphasis added)

c)     In a Report: CPR Format 5 Cost Performance Report Format 5 Explanations and Problem Analysis, dated May 24, 2013, AECOM referred to a labor underrun (less than what was initially planned) of $1 mil due to "customer [401st] directed man hour utilization reductions" June 19, 2013 Project: AFGHAN Option 3 Integrated Program Management Report.

d)     Later in 2013, in its OY4 [Option Year 4] Requirements Planning Brief, November 23, 2013, there is a lengthy discussion of the challenges of keeping the right size work force, along with a clear recognition that this is part of AECOM's responsibility. Among the assumptions listed are that AECOM will reduce Maintenance personnel as density of vehicle/equipment work orders decrease and AECOM will continue to monitor and make the necessary adjustments to the work force to maintain the 85% MHU through the drawdown. *Id.* p. 10.

167.     Numerous internal AECOM documents indicate that the 85% standard was missed on a frequent basis, often by a significant amount. November 17, 2012 AC FIRST Monthly Performance Review, at 21, 22 (S/W Project, 64.23%; range from 20.49% to 92%; N/E Project,

64.96%; range 22.00 to 98.8%); AC FIRST Monthly Performance Review, Feb 23, 2013, at 13 (significant drops in MHU, -- Nov, Dec, Jan – range from 61 – 72%); July 20, 2013 Monthly Performance Review (note that DCMA was in attendance; problems with MHU -- N/E meeting 85%, but S/W has issues with KAF at 60%); August 17, 2013 AC FIRST Monthly Performance Review, at 19-20 (shows many months below 85%, not reaching that level until May 2013).

168.    Similarly, in an internal presentation titled "OY4 Requirements Planning Brief 23 November 2013 Jack Cline, PM" AC First stated that it was assuming that "[n]o 'surge' or overtime [would be] available due to 77 work hours out of 154 hour week."

169.    And AECOM continued to miss MHU requirements. For example, an *internal* AECOM MHU report states that from January 2016 to May 2016, the MHU for various areas was as follows: (1) Work Center: AECOM/I – Jan/2016 0%; Feb/2016 89.3%; March/2016 85%; April/2016 0%; May 2016 0% [Total over that period 39.3%]; (2) Work Center AECOM/H: Jan/2016 0%; Feb/2016 72%; March/2016 88.5%; April/2016 58.4%; May 2016 0% [Total over that period 50.6%]; (3) Work Center AECOM/W: Jan/2016 0%; Feb/2016 65.6%; March/2016 84%; April/2016 54%; May 2016 0% [Total over that period 45.1%]; (4) Work Center MHE/M: Jan/2016 3.2%; Feb/2016 77.3%; March/2016 79.8%; April/2016 49.8%; May 2016 0% [Total over that period 47.1%]; (5) Work Center SASC/A: Jan/2016 0%; Feb/2016 59.6%; March/2016 61%; April/2016 34.8%; May 2016 0% [Total over that period 32.9%]. Man Hour Utilization History, dated May 11, 2016.

**4.      AECOM Devised Its Own Reporting Format, Rather Than Using SAMS, as Required.**

170.    AECOM did not report MHU straight from SAMS-E, although that system is designed to allow that function to be reported directly.

171.    Instead, AECOM compiled a non-standard report. In an internal document regarding contract metrics, for example, in a reference to Utilization (meaning MHU, since it refers to PWS § 5.6, which is the MHU section), the Utilization metric is identified as being done manually, but with a note that it should be done through SAMS. Management Review PWS Portal Metrics Status ("in place, manual – see to be on SAMS").

172.    The requirement to report from SAMS was known to Project Management, as discussed in the internal Program Management Review, 2nd Quarter 2012. July 20, 2012 MOSC-A Program Management Review. In reviewing the Maintenance area, specifically focusing on process issues, there is discussion of Manpower Utilization as a required objective, with a reference to the metric or monitoring method being "[m]onthly from SAMS" and the target being >85%. *Id.* at p 64. In a column called "Actual," however, describing what was actually being done, the change to a non-SAMS spreadsheet was plainly referenced: "New spreadsheet started 1 July." *Id.* The deviation was reaffirmed under the "Action" section of the memo, where it refers to "Utilization metric from SAMS," but the status column states "[s]ubmitting own form." *Id.*

173.    Various charts appear to distinguish between "Personnel in SAMS" and "Current Manning," suggesting that more individuals were included in SAMS (and billed to the Government) than were actually deployed. *See, e.g.*, October 30, 2013 401st AFSBs Combined Maintenance Overview.

174.    By reporting outside the system in this fashion, AECOM avoided having a direct tie to actual hours in the system, allowing essentially made-up labor to be counted where, for example, the parts only work orders didn't tie to actual work orders, with actual vehicles or actual work. This also facilitated manipulating MHU by misapplying "indirect hours" not connected to a specific assignment to "direct hours" of work performed.

73

175.    Unlike the dispute with the 401st about which hours could be legitimately counted, it does not appear that the Army discovered that AECOM was not "us[ing], SAMS-E/IE/1E to track the daily individual labor and maintenance status with related updates, order parts, perform work loading, manage shop, and bench stocks, produce management reports to meet AFSC's requirements, and facilitate internal maintenance operations." Management Plan-Contract Performance Plan § 4.4.

176.    AECOM was incentivized to overstate MHU because this allowed it to keep its workforce high, increasing costs and corresponding profits on this cost-plus contract. As AECOM explicitly stated in one of its Weekly PM Briefs, for example, the "priority is OY3 [Option Year 3] defendable numbers – keep 4593 [headcount] as long as possible." *See* January 6, 2013 MOSC-A Weekly PM Brief, at 32.

177.    Upon information and belief, AECOM knowingly presented, or caused to be presented, false or fraudulent claims to the Government by submitting claims for reimbursement of labor hours and expressly or impliedly certifying in each request for reimbursement of labor hours that it was in compliance with material requirements, such as PWS § 5.0, when it did not in fact comply with those material requirements, and concealed that fact from the Government, and thus rendered AECOM's certification misleading. For example, upon information and belief, AECOM knowingly missed the MHU requirement, and yet continued to bill for all employee work hours. Had AECOM properly informed the Government of its MHU issues, then the Government could have cut its workforce, which would result in less billing for labor hours than AECOM actually submitted. This resulted in the Government incurring costs for services that were not required. AECOM also knowingly violated PWS § 5.0 by not reporting MHU data directly from SAMS-E, which would have automatically calculated the MHU. AECOM did so to avoid having

74

the system properly account for indirect hours. AECOM did so in order to keep its workforce numbers high, which increased its costs and therefore profits from the cost-plus MOSC-A. Upon information and belief, AECOM submitted knowingly false claims for payment to the Government. The information that would permit further identification of AECOM's false claims (*e.g.*, AECOM's particular invoices or reimbursements) are peculiarly within the AECOM's knowledge and unknown to the Relator. Because the function of AECOM's cost-plus-fee contract is to secure reimbursement from the Government, there is a strong inference that specific false claims for those reimbursements were submitted to the Government. AECOM's compliance with applicable legal and contractual requirements was material to the Government's payment decision because (a) the Government required AECOM to comply with these requirements in order to invoice its labor costs and issued one or more corrective actions regarding AECOM's failure to meet these requirements; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper invoices; (c) internal AECOM documents, and AECOM's public filings admit that such violations are material to the Government, and (d) in light of the substantial size of AECOM's invoices for labor hours, the materiality is self-evident. Indeed, AECOM conceded in its internal documents that the applicable legal and contractual requirements were material by labeling them as critical.

178.     In addition, upon information and belief AECOM knowingly made, used, or caused to be made or used, false records or statements material to the false or fraudulent claims alleged in the paragraph above, including, but not limited to, PWS § 5.0. Further, AECOM knowingly falsified the accounting for direct and indirect labor hours in order to give the appearance that it

was meeting the MHU requirements. These records and statements were material to the false or fraudulent claims alleged in the prior paragraph because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper requests for reimbursement; and (e) internal AECOM documents, and AECOM's public filings admit that such violations are material to the Government, and (d) in light of the substantial size of AECOM's invoices for labor hours, the materiality is self-evident. Indeed, AECOM conceded in its internal documents that the applicable legal and contractual requirements were material by labeling them as critical.

**D.     Property Claims: False Claims and Reverse False Claims Relating to Parts-Only Work Orders, Double-Purchasing, and Failure to Track and Turn-In Recoverable Items.**

179.     The MOSC-A Contract required AECOM to comply with FAR § 52.245-1 (2007) for all "Government property."[11] *See* PWS (Aug. 4, 2011) §§ 3.1 ("FAR 45 shall determine the definitions, clauses, policies, and procedures for Government Property (GP), unless otherwise specified in this PWS."), 3.1.3 ("The Contractor shall have a system to manage GP in its possession for the accounting and requisitioning of Government Furnished Property (GFP) and Government Furnished Property Equipment (GFE) IAW FAR 52.245-1."). FAR § 52.245-1 provides:

---

[11] "*Government property* means all property owned or leased by the Government" and "includes both Government-furnished and Contractor-acquired property." FAR § 52.245-1(a) (2007).

> The Contractor shall have a system to manage (control, use, preserve, protect, repair, and maintain) Government property in its possession. The system shall be adequate to satisfy the requirements of this clause. In doing so, the Contractor shall initiate and maintain the processes, systems, procedures, records, and methodologies necessary for effective and efficient control of Government property, consistent with voluntary consensus standards and/or industry-leading practices and standards for Government property management except where inconsistent with law or regulation. During the period of performance, the Contractor shall disclose any significant changes to their property management system to the Property Administrator prior to implementation.

FAR § 52.245-1(b)(1) (2007). AECOM's responsibility "extend[ed] from the initial acquisition and receipt of property, through stewardship, custody, and use until formally relieved of responsibility by authorized means, including delivery, consumption, expending, disposition, or via a completed investigation, evaluation, and final determination of lost, damaged, destroyed, or stolen property" and "appli[ed] to all Government property under the Contractor's accountability, stewardship, possession or control, including its vendors or subcontractors (see paragraph (f)(1)(v) of this cluase [sic.])." FAR § 52.245-1(b)(2) (2007).

180.  Further, FAR § 52.245-1(f)(1) required AECOM to "establish and implement property management plans, systems, and procedures at the contract, program, site or entity level to enable the following outcomes":

> (i) *Acquisition of Property.* The Contractor shall document that all property was acquired consistent with its engineering, production planning, and property control operations.

> (ii) *Receipt of Government Property.* The Contractor shall receive Government property (document the receipt), record the information necessary to meet the record requirements of paragraph (f)(1)(iii)(A)(1) through (5) of this clause, identify as Government owned in a manner appropriate to the type of property (*e.g.*, stamp, tag, mark, or other identification), and manage any discrepancies incident to shipment.

> > (A) *Government-furnished property.* The Contractor shall furnish a written statement to the Property Administrator containing all relevant facts, such as cause or condition and a recommended course(s) of action, if overages, shortages, or damages and/or other discrepancies are discovered upon receipt of Government-furnished property.

(B) *Contractor-acquired property.* The Contractor shall take all actions necessary to adjust for overages, shortages, damage and/or other discrepancies discovered upon receipt, in shipment of Contractor-acquired property from a vendor or supplier, so as to ensure the proper allocability and allowability of associated costs.

(iii) *Records of Government property.* The Contractor shall create and maintain records of all Government property accountable to the contract, including Government-furnished and Contractor-acquired property.

(A) Property records shall enable a complete, current, auditable record of all transactions and shall, unless otherwise approved by the Property Administrator, contain the following:

*(1)* The name, part number and description, manufacturer, model number, and National Stock Number (if needed for additional item identification tracking and/or disposition).

*(2)* Quantity received (or fabricated), issued, and balance-on-hand.

*(3)* Unit acquisition cost.

*(4)* Unique-item identifier or equivalent (if available and necessary for individual item tracking).

*(5)* Unit of measure.

*(6)* Accountable contract number or equivalent code designation.

*(7)* Location.

*(8)* Disposition.

*(9)* Posting reference and date of transaction.

*(10)* Date placed in service.

….

(vi) *Reports.* The Contractor shall have a process to create and provide reports of discrepancies; loss, damage, destruction, or theft; physical inventory results; audits and self-assessments; corrective actions; and other property related reports as directed by the Contracting Officer.

(A) Loss, damage, destruction, or theft. Unless otherwise directed by the Property Administrator, the Contractor shall investigate and promptly furnish a written narrative of all incidents of loss, damage, destruction, or theft to the property administrator as soon as the facts become known or when requested

78

by the Government….

(viii) *Utilizing Government property.*

(A) The Contractor shall utilize, consume, move, and store Government Property only as authorized under this contract. The Contractor shall promptly disclose and report Government property in its possession that is excess to contract performance.

(B) Unless otherwise authorized in this contract or by the Property Administrator the Contractor shall not commingle Government property with property not owned by the Government.

(ix) *Maintenance.* The Contractor shall properly maintain Government property. The Contractor's maintenance program shall enable the identification, disclosure, and performance of normal and routine preventative maintenance and repair….

FAR § 52.245-1(f)(1) (2007) .

181.     The DCAA Contractor Information for Contractors requires Manual, No. 7641.90 (2011) (the "DCAA Contractor's Manual") further sets forth "[t]he criteria for the allowability of costs on government contracts is discussed in FAR 31.201-2. In accordance with FAR 31.201-2(d)… 'A contractor is responsible for accounting for…*maintaining records, including supporting documentation*, adequate to demonstrate that costs claimed have been incurred, are allocable to the contract, and comply with the applicable cost principles in this subpart and agency supplements." DCAA Contractor's Manual, Enclosure 6 at 68 (emphasis in original).

182.     Further, the DCAA Contractor's Manual provides that "Contractors should make every effort to identify all costs that are direct, and by default, what remains is indirect." DCAA Contractor's Manual, Enclosure 6 at 70.

183.     Similarly, under PWS § 3.1.3, AECOM was required to "submit Defense Department (DD) Form 1662, or equivalent, annually to the PA for all GFP in its possession. The system shall be adequate to satisfy the requirements of this clause. In doing so, the Contractor shall initiate and maintain the processes, systems, procedures, records, and methodologies necessary for

79

effective control of GP, consistent with voluntary consensus standards and/or industry leading practices and standards for GP management. During the period of performance, the Contractor shall disclose any significant changes to their property management system to the PA prior to implementation."

184.    Under PWS § 3.1.4, "Government property and material shall be acquired through the Government supply system as a first source of supply. Commercial sources of supply will be used in the event the Government supply system cannot meet mission requirements. Repair parts (for repair of GFP/GFM) shall be requisitioned and stocked to ensure materiel is on-hand to perform required repairs for each maintenance cycle, while not tying up excessive funds in parts inventory."

185.    In addition, PWS § 4.1.1.1 required that "[t]he Contractor shall receive, inspect, inventory, preserve, pack, account for, configure, reconfigure, modify, handoff, and issue equipment and components IAW AR 710-1 and AR 710-2. This also includes minimum COSIS if/when storage time is necessary." And PWS § 4.1.1.2 provides as follows:

> The Contractor shall operate and maintain the formal Government accountable records under the direction of the Government Accountable Officer (AO)/ Property Book Officer (PBO). for Government assets and shall maintain asset accountability and asset visibility of assets utilizing LMP, AW RDS/MW B, SARSS, PB USE, SAMS-E/SAMS-IE, IAW AR 710-1, AR 710-2, DA Pam 710-2-2, DA Pam 710-2-1. Inventory will be by serial number, condition code, location, and gross count to facilitate reconciling of AWRDS/MWB, LMP, SAMS-E/SAMS-IE.

186.    Under PWS § 4.1.1.2.1, AECOM was required to "report to the AO/PBO, receipt and processing of all stocks through SARSS, LMP, and AWRDS/MWB within twenty-four (24) hours after arrival IAW CDRL 012 DI-QCIC-81187." PWS § 4.3.1.4 required AECOM to "be responsible for maintaining bench stocks at each maintenance shop IAW AR 710-2 and DA PAM 710-2-2." PWS § 4.3.1.5 required AECOM to "be responsible for maintaining shop stocks IAW AR 710-2, paragraphs 3-16 and DA Pam 710-2-2. Stocks shall be maintained through the

use of SAMSE/ SAMS-IE and/or A WRDS/MWB and within the funding constraints and limitations established by the Government."

187.    There was widespread misappropriation or improper accounting for items procured by AECOM in connection with its performance of the MOSC-A Contract. Numerous items were purchased twice and charged twice to contracts, which, upon information and belief, allowed personnel to illegally sell the equipment for profit on the side. Even if some or all of these goods were not sold illegally, AECOM's failure to track and account for the goods violated its contractual obligations and resulted in substantial overbillings to the Government because unnecessary goods were ordered and billed to the Government and/or were not returned for credit to the Government.

188.    All of the property tracking and accounting issues were exacerbated by AECOM's persistent failure to hire and utilize employees who were certified and competent to use the Army systems. As described in a formal Memorandum for Record filed by a LISMX supervisor: "Current S&S SAMSE workforce does not meet established company qualifications and security SAMSE requirements to operate the SAMSE (SBU) systems. The result of this is non-compliance with security standards and the system generating numerous user errors that cause inaccurate information and a lack of control. A few examples include inexperienced operators double ordering of parts on work orders that excessively charge the Government, the transferring of parts to temporary locations in an attempt to move the double ordered parts that result in OHQ, a failure by operators of not using EUM system built solutions or reports to identify problems caused by operator errors because of lack of experience/qualifications or understanding of the SAMSE system. Additionally the failure to send the mandatory daily SFTP to LIW interface causing an inaccurate or false picture to all levels of system assessment as well as the sleeping giant with the current issues related to recoverable items." These issues are further described below.

189.    AECOM committed to using and maintaining STAMIS (Standard Army Management Information Systems) for parts management and materiel expenses, as directed by the Army, including, but not limited to, AWRDS SAMS-E/1E (Standard Army Maintenance System Enhanced), PBUSE (Property Book Unit Supply Enhanced system), and GTN. AC FIRST LLC, Management Plan – Contract Performance Plan, September 2013. FSS requisitions for Class IX parts used in the performance of the contract are required to be processed through the SAMS-E STAMIS system. This system interlinks with the SARSS-1 at the local Supply and Services where the request is processed and items are released to the contractor. All parts acquired through the local SSA are consumed on work orders received from the customer.

190.    Additionally PWS § 1.2.1 requires that AECOM "operate a full suite of network and retail Standard Army Management Information Systems (STAMIS) to include SAMS-E/SAMS-IE, Army War Reserve Deployment System (AWRDS)/Maintenance Work Bench (MWB), Logistics Modernization Program (LWP), Web Unique Identification Tracking (WEBUIT), Standard Army Retail Supply System (SARSS), Automated Battlebook System (ABS), and Property Book Unit Supply Enhanced (PBUSE)."

191.    The SAMS-E system is widely required to be used by both Field and Sustainment level ground maintenance and Logistics Readiness Center (LRC) installation maintenance personnel worldwide. SAMS-E is the Army's tactical Logistics Information System [LIS] of record for ground maintenance and assists in managing unit level maintenance management, supply, and readiness reporting functions. Of relevance herein, SAMS-E allows tracking of

maintenance events, work-order management, and supply transactions for issue, receipt, and turn-in of property and equipment purchased by contractors to perform their contractual obligations.[12]

192.    The importance of inventory controls and accuracy to the Army is directly reflected within a November 1, 2011 draft version of the PWS which reflects a reconciliation of the Army's amendments to the PWS for Option Year 2. Specifically, this document reflects the language for the introduction of "Critical Metrics": "This PWS is structured with "Critical Metrics"" as distinguished by the 401st AFSB through a collaborative effort for Option Year 2 of this contract. These metrics serve, in general, two key functions: firstly, it allows a simplified grading criteria to evaluate contractor success in various PWS functions quickly and effectively; secondly, it focuses contract effort to locales that provide crucial value to the 401st AFSB. This is not to say that the rest of the PWS is not important or the contractor will not be held accountable for all other areas within this document; this is merely to focus the contractor on the highest valued priorities of the 401st mission and how to measure that success. Critical Metrics are identified at the beginning of each respective section of this PWS with exemption of sections 1.0 General and 2.0 Workforce Management. Nov. 2011 Draft PWS at 8. Further, this document shows the incorporation of the requirement of inventory accuracy to be "98%" and for AECOM to "[e]nsure, with 95% accuracy,

---

[12] Use of the SAMS-E and STAMIS systems that are at issue in these property allegations was intended, in part, to prevent the loss of accountability that AECOM exhibited with regard to the Army property that it was supposed to track under the RPAT program, as discussed in a recent DODIG report and referenced above. Contract Oversight for Redistribution Property Assistance Team Operations in Afghanistan Needs Improvement (Project No. D2015-D000JB-0061.000) DODIG-2015-126 (May 18, 2015). That DOD IG Report also refers to issues with tracking and accounting for property, but that Report concerned property that the Army had turned over to AECOM specifically for AECOM to inventory, track and store or redirect the property to locations where it was needed. As is made clear in Army PWS's and internal AECOM documents discussing the tasks under MOSC-A, this function of dealing with Army equipment through the Army's RPAT programs was a distinct scope of work from the acquisition and tracking AECOM was required to do with regard to property that it had to procure in order to perform its vehicle maintenance functions under MOSC-A.

equipment's correct condition code and location are entered into the appropriate Logistics Information System (LIS) (AWRDS, SAMS, SARRSS/LMP, PBUSE, PBUSE AIT) IAW," as a Critical Metrics. *Id.* at 21, 35.

193.    On February 16, 2012, Major Robert Ellis, Administrative Contracting Officer, DCMA Afghanistan, notified Theater Property Manager, Kenneth Rivera, that a Property Management System Analysis (PMSA) was conducted at Bagram Airfield, Afghanistan by Property Administrator, Dave Wilson in November 2011, which found seven serious discrepancies with FAR § 52.245-1 (2007). DCMA concluded that AC FIRST's system for control and accounting of Government Property at Bagram Airfield was INADEQUATE and requested that Mr. Rivera provide Major Ellis with a Corrective Action Plan addressing all identified deficiencies, noting "Suspense 9 March 2012."

194.    The tracking, accountability, proper billing, and accountability related to property is a material requirement of the MOSC-A Contract and relevant regulations. *See e.g.* AC First Spreadsheet dated 2012 and noting, for example, in connection with "Supply" that "Inventory Accuracy," "Receipt Processing," "Reconciliation," "Supporting Doc," and "Data Integrity," "TSS/OS/APS – Equip Tracking" were all required by the PWSs (i.e., §§ 4.1, 4.2, 4.3, 4.4, 4.5, 5.2, 5.4, 5.5), but that the "current status" of all of them was "not defined." (Verses "in place-manual," "defined" or "started.") Further this document acknowledges that this information was not and that the information was not on the shared portal with the Government.[13] In addition,

---

[13] The foregoing is only representative. AECOM failed to comply with several other categories in the spreadsheet that are germane to property owned (and paid for) by the Army. *See e.g.* Internal AC First Spreadsheet, 2012 at Rows 32-36:

Management Review/PWS/Portal Metrics Status,

internal AECOM spreadsheets and documents include admissions that various federal regulations are incorporated into the MOSC-A Contract that have been violated by AECOM as described herein (*e.g.*, AECOM Spreadsheet, citing, among hundreds of other relevant regulations and contractual provisions, FAR §§ 52.245-1, 52.245-1(f)(1)(3) (2007), which is reproduced above).

### 1.   "Parts Only" Work Orders

195.   AECOM intentionally bypassed the property accounting and tracking systems required by the MOSC-A Contract. For example, AECOM employees used what is called a "parts only" work order ("POWO"), which is not authorized and does not provide for proper tracking of equipment. Thousands, if not tens of thousands, of parts were ordered through POWOs on the MOSC-A Contract, but such procedures were not disclosed to the Army.

---

MR= Management Review

| Process | Metric | MR Metric | PWS Critical? | Status | On Portal |
|---------|--------|-----------|---------------|--------|-----------|
| Supply, Trans, Maint, Facil, Security | GFE Inv Accuracy | No | Yes (3.1) | Not Defined | No |
| Supply, Trans, Maint | GFE OR Rate | No | Yes (3.2) | Not Defined | No |
| Supply, Trans, Maint, Facil, Security | GFE Equip Data Int | No | Yes (3.3) | Not Defined | No |
| Supply, Trans, Maint, Facil, Security | GFE Maint Std | No | Yes (3.4) | Not Defined | No |
| Supply, Trans, Maint, Facil, Security | GFE Veh Data Int | No | Yes (3.5) | Not Defined | No |

196.     Concerns about this issue surfaced no later than late 2013, with inquiries being made to supervisors to determine whether there was some exception in place allowing POWOs. In an email dated December 14, 2013, Joseph H. Cox, Training and Development Supervisor (Northeast) AC FIRST, Afghanistan, stated that employees were not taught to do parts only ordering because it is "just a backdoor way to order parts fraudulently." He continued to explain that "[p]arts ordered on a work order which is not tied to equipment is not authorized and has never been authorized, all parts must either be ordered through the supply process, or through offline transaction."

197.     During the life of the MOSC-A Contract, AECOM opened "a ton of parts only [sic] for existing work orders," according to Cox.

198.     In January 2014, personnel from Task Force White Eagle indicated that they would be creating a "parts only" work order, which various AECOM personnel quickly told them would not be appropriate.

199.     By email dated January 23, 2014, Mandalyn Ford, LISMX Technician, informed AECOM that parts only work orders should not be opened and raised the following questions: "A Work Order is to capture work and parts. Why are we doing just a parts work order? Where are the parts going? How and why were they consumed? Are we doing the labor? Are we going to capture the labor with parts?"

200.     The "parts only" work orders violated the contract provisions (as detailed in various PWS and FAR § 52.245-1 (2007)) because AECOM was required to use SAMS-E STAMIS as the platform for reporting operational data to the Army and DOD. The PWS set forth certain "Critical Metrics" including that "≥ 95% of equipment shall be tracked and enrolled into the appropriate

maintenance system." PWS – Maintenance & Operational Support (Sept. 23, 2012) § 3.0 (Critical Metrics).

201.    Further support for this requirement can be found in the End User Manual for the SAMS-E system, which was incorporated into the contract, and included extensive detail about these systems and their functionality with regard to ordering parts pursuant to a valid work order. PWS § 12.3.

202.    Ordering on a "parts only" work order bypassed checks and balances built into the procurement system to avoid excessive ordering, and to make sure that the contractor was accountable to the Army for both labor charged for working on projects, and for the parts themselves. For example, if tires were properly ordered pursuant to an established vehicle program or work order, the system would trigger an alert if the number of tires did not match the number of trucks or the expected tire usage. A POWO could not be monitored in that fashion because it would not tie to an actual WO.

203.    More specifically, the POWO's violated Army accountability standards, including FAR § 52.245-1(f)(1) (2007), in several ways:

        a.    Invalid Admin numbers: The admin number is an EUM required field for equipment tab that provides specific identification for equipment being worked on, what type of work, what parts are needed, accountability of those parts and the estimated total costs;

        b.    Invalid NSN: National Stock Number provides specific identification for equipment being worked on, what type of work, what parts are needed, accountability of those parts, and the estimated total costs;

        c.    Invalid Serial Number: The serial number is a unique code identifying individual pieces of equipment that provides specific identification for equipment being worked

87

on, what type of work, what parts are needed, accountability of those parts, and the estimated total costs; and

        d.      Invalid Nomenclature: The name of the equipment provides specific identification for equipment being worked on, what type of work, what parts are needed, accountability of those parts, and the estimated total costs.

      204.    Specific examples include the following:

        a.      WO 6HN26C700006z, which has an invalid admin number, invalid NSN, invalid nomenclature, invalid serial number, and improper WO Description. A standard work order for a specific item of authorized equipment would have listed the equipment and would be auditable to validate time charged and accounting of parts. This was especially significant for security-sensitive parts.

        b.      WO 6HN26J700247, which did not include an admin number; had a dummy NSN, referred to a carpentry job that is outside the scope of the MOSC-A Contract and would have required a Letter of Technical Direction ("LOTD").

        c.      WO 6HN26S603914 was listed without a valid NSN, stated "Parts Only" under Nomenclature, and was not linked to any piece of equipment. The estimated cost for this WO was >$45,000.

        d.      WO 6HN26S603868 had no valid admin number or NSN and was not linked to any piece of equipment. Estimated cost $129,000.

      205.    Because AECOM intentionally circumvented SAMS-E STAMIS by utilizing "parts only" work orders, it is impossible that it ever met the PWS § 5.0 requirement to "[e]nsure, with 95% accuracy, equipment's correct condition code and location are entered into the appropriate Logistics Information System (LIS) (AWRDS, SAMS, SARRSS/LMP, PBUSE, PBUSE AIT)

IAW, but not limited to, yard planographs, floor plans and/or location maps IAW AR 710-2 based on a random sample and/or observations."

206.    Since there is time associated with ordering, receiving, storing, otherwise processing and locating the goods, there would also be impermissible and unnecessary labor charged in connection with that equipment. *See e.g.*, s*upra* ¶ 130.

207.    As documented in a February 13, 2012 Forward Operating Base Bagram Airfield Property Management System Analysis, Mr. David Wilson of the Defense Contract Management Agency observed AC FIRST's failure to record property and three property listings where none showed the equal amounts in the equivalent property line. Further, he noted that "failure to record and manage material inventory can have a negative impact on cost and schedule performance."

208.    As further documented within his findings, Mr. Wilson observed that while requisition of Class IX parts are required to be processed through the SAMS-E STAMIS system, over half of the orders in his sampling did not have records. Further, he noted that "failure to follow proper acquisition practices will have a negative impact on cost, schedule and performance of the contract. This can also adversely impact the carrying costs of items which cannot be used to support the contract."

209.    An internal memorandum from the AC FIRST LISMX supervisor, states that over 6,000 line items, worth more than $16 million, included incomplete records.

210.    Screen shots of different line items from the SAMS-E system show entries were not done properly, including instances where there was no record at DODAC (the system on which purchases should be accounted for), which should have existed if AECOM personnel had been running the right reports.

211.    Among the reports and interfaces that AECOM did not run were the CWO ("Contract Work Order") "to be sent to LOGSA (Logistics Support Activity) and the Daily Data Transfer (LOGSA/LIW (Logistics Information Warehouse)). However, AECOM did not make this known to the Army, and instead AECOM represented within its Management Plan-Contract Performance Plan § 4.4 that "[w]e use, SAMS-E/IE/1E to track the daily individual labor and maintenance status with related updates, order parts, perform work loading, manage shop and bench stocks, produce management reports to meet AFSC's requirements, and facilitate internal maintenance operations."

212.    This suggests that the records reflecting the double purchases were either purged, or that AECOM never complied with its obligation to create the proper records.

213.    In order to properly track and account for parts, and minimize duplicative ordering, the systems focus on what is referred to as a work packet, essentially a record of everything pertaining to a particular vehicle assignment. Parts necessary to complete the needed repairs or maintenance are identified and should be ordered through the SAMSE system, to minimize duplicative ordering or ordering parts already available.

214.    Also, once the maintenance is completed, there would often be parts that had not been used, which needed to be tracked or turned in. The packet closure and quality control were required to audit the packets to track duplicate or unused parts.

215.    Upon information and belief, AECOM knowingly presented, or caused to be presented, false or fraudulent claims to the Government by requesting reimbursement for "parts only" work orders and expressly or impliedly certifying in each request for reimbursement that it complied with material applicable legal and contractual requirements, including, but not limited to, FAR § 52.245-1 (2007), when it did not in fact comply with those material requirements,

concealed that fact from the Government, and thus rendered AECOM's certification misleading. For example, upon information and belief, AECOM submitted, and was required to submit under FAR § 1232.7002(b) (2007), one or more Standard Form 1034, titled Public Voucher for Purchases and Services Other Than Personal, for reimbursement of "parts only" work orders and misleadingly certified that the "voucher is correct and proper for payment," when in fact the voucher was not proper for payment because AECOM did not comply with applicable legal and contractual requirements, including, but not limited to, FAR § 52.245-1 (2007). The information that would permit further identification of AECOM's false claims (*e.g.*, AECOM's particular requests for reimbursement) are peculiarly within the AECOM's knowledge and unknown to the Relator. Because the function of AECOM's cost-plus-fee contract is to secure reimbursement from the Government, there is a strong inference that specific false claims for those reimbursements were submitted to the Government. AECOM's failure to disclose its non-compliance with applicable legal and contractual requirements, including, but not limited to, FAR § 52.245-1 (2007), was material to the Government's payment decision because (a) the Government required AECOM to comply with these requirements in order to seek reimbursement and sought to enforce these requirements against AECOM; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper requests for reimbursement; and (c) in light of the substantial size of AECOM's requests for reimbursement of "parts only" work orders. Indeed, AECOM conceded in its internal documents that the applicable legal and contractual requirements were material by labeling them as critical.

216.     In addition, AECOM knowingly made, used, or caused to be made or used, false records or statements material to the false or fraudulent claims alleged in the paragraph above, including, but not limited to, PWS § 5.0, which stated that AECOM would "[e]nsure, with 95% accuracy, equipment's correct condition code and location are entered into the appropriate Logistics Information System (LIS) (AWRDS, SAMS, SARRSS/LMP, PBUSE, PBUSE AIT) IAW," and Management Plan-Contract Performance Plan § 4.4, which stated that AECOM would "use, SAMS-E/IE/1E to track the daily individual labor and maintenance status with related updates, order parts, perform work loading, manage shop and bench stocks, produce management reports to meet AFSC's requirements, and facilitate internal maintenance operations." These records and statements were material to the false or fraudulent claims alleged in the prior paragraph because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements, including, but not limited to, FAR § 52.245-1 (2007); (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper requests for reimbursement; and (c) in light of the substantial size of AECOM's requests for reimbursement "parts only" work orders. Indeed, AECOM conceded in its internal documents that the applicable legal and contractual requirements were material by labeling them as critical.

217.     Further, AECOM knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government by making "parts only" work orders, failing to track ordered parts on SAMS-E, and failing report to the Government that AECOM had excess or unused parts that should be returned to the Government in accordance

with the requirements of the MOSC-A Contract, including, for example PWS §§ 4.1.1.1, 4.1.1.2, 4.1.1.2.1, 4.3.1.4, 4.3.1.5 and FAR §§ 52.245-1(f)(1)(i), (ii), (iii), (vii)(v), (viii)(A). This resulted in an overpayment by the Government for excess or unused parts, which AECOM was obligated to pay back under DCAA Auditor's Manual § 5-1107.11 ("The contractor should have policies and procedures … readily identify contract over/underpayments."), as well as other applicable contractual provisions, and regulatory requirements, as provided for herein. AECOM's systematic pattern of not properly monitoring work orders demonstrates that its concealment of the Government's overpayment was done knowingly.

218.    AECOM also knowingly made, used, or caused to be made or used, a false record or statement material to this obligation to pay or transmit money or property to the Government, including, but not limited to, PWS § 5.0, which stated that AECOM would "[e]nsure, with 95% accuracy, equipment's correct condition code and location are entered into the appropriate Logistics Information System (LIS) (AWRDS, SAMS, SARRSS/LMP, PBUSE, PBUSE AIT) IAW," and Management Plan-Contract Performance Plan § 4.4, which stated that AECOM would "use, SAMS-E/IE/1E to track the daily individual labor and maintenance status with related updates, order parts, perform work loading, manage shop and bench stocks, produce management reports to meet AFSC's requirements, and facilitate internal maintenance operations." These records and statements were material to this obligation to pay or transmit money or property to the Government because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements, including, but not limited to, FAR § 52.245-1 (2007); (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce

the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper requests for reimbursement; and (c) in light of the substantial size of AECOM's request for reimbursement of "parts only" work orders. Indeed, AECOM conceded in its internal documents that the applicable legal and contractual requirements were material by labeling them as critical.

### 2. Double Purchasing of Parts.

219.    Various schemes were employed by AECOM to avoid proper tracking and accounting for property purchased on this contract. Sometimes AECOM procured goods through the Government supply system and simultaneously purchased the same items on the commercial market. This avoided many of system controls, recording and reporting requirements set forth in Sections 3, 4, and 5 of the PWS that might have forestalled this double ordering otherwise.

220.    For example, within an August 28, 2016 email, an LISMX supervisor explained that under a Work Order, WO 6HN26S603868, nine parts were ordered when only four were needed and acknowledged that this was "a systematic issue that has happened since the inception according to system loges, oil amounts, parts ordered and not needed etc. leading to some of the excess parts issues we have run across. No paper work showing how many were received issued or used was provided etc."

221.    Upon information and belief, AECOM knowingly presented, or caused to be presented, false or fraudulent claims to the Government by requesting reimbursement for duplicative work orders and expressly or impliedly certifying in each request for reimbursement that it complied with material applicable legal and contractual requirements, including, but not limited to, FAR § 52.245-1 (2007) and PWS § 5.0, when it did not in fact comply with those material requirements, concealed that fact from the Government, and thus rendered AECOM's certification misleading. For example, upon information and belief, AECOM submitted, and was

required to submit under FAR § 1232.7002(b) (2007), one or more Standard Form 1034, titled Public Voucher for Purchases and Services Other Than Personal, for reimbursement of duplicative work orders and misleadingly certified that the "voucher is correct and proper for payment," when in fact the voucher was not proper for payment because AECOM did not comply with applicable legal and contractual requirements, including, but not limited to, FAR § 52.245-1 (2007) and PWS § 5.0. The information that would permit further identification of AECOM's false claims (e.g., AECOM's particular requests for reimbursement) are peculiarly within the AECOM's knowledge and unknown to the Relator. Because the function of AECOM's cost-plus-fee contract is to secure reimbursement from the Government, there is a strong inference that specific false claims for those reimbursements were submitted to the Government. AECOM's failure to disclose its non-compliance with applicable legal and contractual requirements, including, but not limited to, FAR § 52.245-1 (2007) and PWS § 5.0, was material to the Government's payment decision because (a) the Government required AECOM to comply with these requirements in order to seek reimbursement and sought to enforce these requirements against AECOM; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper requests for reimbursement; and (c) in light of the substantial size of AECOM's requests for reimbursement of duplicative work orders. Indeed, AECOM conceded in its internal documents that the applicable legal and contractual requirements were material by labeling them as critical.

222.    In addition, AECOM knowingly made, used, or caused to be made or used, false records or statements material to the false or fraudulent claims alleged in the paragraph above,

including, but not limited to, PWS § 5.0, which stated that AECOM would "[e]nsure, with 95% accuracy, equipment's correct condition code and location are entered into the appropriate Logistics Information System (LIS) (AWRDS, SAMS, SARRSS/LMP, PBUSE, PBUSE AIT) IAW," and Management Plan-Contract Performance Plan § 4.4, which stated that AECOM would "use, SAMS-E/IE/1E to track the daily individual labor and maintenance status with related updates, order parts, perform work loading, manage shop and bench stocks, produce management reports to meet AFSC's requirements, and facilitate internal maintenance operations." These records and statements were material to the false or fraudulent claims alleged in the prior paragraph because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements, including, but not limited to, FAR § 52.245-1 (2007) and PWS §§ 1, 3, 4; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper requests for reimbursement; and (c) in light of the substantial size of AECOM's requests for reimbursement of duplicative work orders. Indeed, AECOM conceded in its internal documents that the applicable legal and contractual requirements were material by labeling them as critical.

223.   Further, AECOM knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government by making duplicative work orders, failing to track ordered parts on SAMS-E, and failing report to the Government that AECOM had excess or unused parts that should be returned to the Government in accordance with the requirements of the MOSC-A Contract, including, for example PWS §§ 3.3, 4.1.1.1, 4.1.1.2, 4.1.1.2.1, 4.3.1.4, 4.3.1.5 and FAR §§ 52.245-1(f)(1)(i), (ii), (iii), (vii)(v), (viii)(A)

(2007). This resulted in an overpayment by the Government for excess or unused parts, which AECOM was obligated to pay back under DCAA Auditor's Manual § 5-1107.11 ("The contractor should have policies and procedures … readily identify contract over/underpayments."), as well as other applicable contractual requirements, and regulations, as provided for herein. AECOM's systematic pattern of not properly monitoring work orders demonstrates that its concealment of the Government's overpayment was done knowingly.

224.    AECOM also knowingly made, used, or caused to be made or used, a false record or statement material to this obligation to pay or transmit money or property to the Government, including, but not limited to, PWS § 5.0, which stated that AECOM would "[e]nsure, with 95% accuracy, equipment's correct condition code and location are entered into the appropriate Logistics Information System (LIS) (AWRDS, SAMS, SARRSS/LMP, PBUSE, PBUSE AIT) IAW," and Management Plan-Contract Performance Plan § 4.4, which stated that AECOM would "use, SAMS-E/IE/1E to track the daily individual labor and maintenance status with related updates, order parts, perform work loading, manage shop and bench stocks, produce management reports to meet AFSC's requirements, and facilitate internal maintenance operations." These records and statements were material to this obligation to pay or transmit money or property to the Government because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements, including, but not limited to, FAR § 52.245-1 (2007) and PWS § 1, 3, 4; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper requests for reimbursement; and (c) in light of the substantial size of

97

AECOM's requests for reimbursement of duplicative work orders. Indeed, AECOM conceded in its internal documents that the applicable legal and contractual requirements were material by labeling them as critical.

225.    This is a pattern of behavior and something that AECOM has similarly been caught doing on other Government contracts. Notably, serious concerns about duplicative purchases by AECOM were raised in the SIGIR Report (concerning an AECOM contract in Iraq), involving processes that rendered it impossible for the Government to invoice by work order numbers. For example, on that Iraq contract, AECOM overbilled approximately $177,000 in duplicate and triplicate work orders out of the $1.1 million in work orders analyzed. Further, SIGIR's analysis of one invoice, invoice number 9, found over 200 instances where specific parts, ordered for a specific vehicle, were double-and triple-billed. In one case, AECOM charged for 3 windshields, 12 headlamps, and 3 batteries for the same Nissan vehicle, on the same day.

### 3.    Failure to Track or Turn in Recoverables

226.    Pursuant to PWS § 3.3.1 and the SAMS-E End User Manual, which AECOM was contractually obligated to follow, AECOM was required to track and turn into the Army certain items that were removed from vehicles and other equipment, through a process known as "recoverables."

227.    The requirement for AECOM's SAMS-E operators to run a recoverables operation also stems from both the following: SAMSE Operator End User Manual, AISM -25-L21-AHO-ZZZ-EM; Supply Policy Below the National Level, AR 710 -2, (paragraph 2-6E); Supply Support Activity Supply System: Manual Procedures, DA PAM 710 -2 -2; WI 120.01.06 Parts Turn-in Procedures and WI 120.01.01 SAMS-E Operator Functions. PWS § 12.3 (End User Support).

228.   If the STAMIS systems were being used properly, items would be identified as recoverables in various ways, including in work orders in the maintenance process, against equipment faults in the Fault Management process and when placing an offline supply transaction.

229.   In fact, however, on a wide-scale basis, the work order was not being properly created, closed or audited, resulting in recoverable items not being returned or duplicates not being controlled. No comprehensive audits were performed comparing SAMSE data with the individual packets.

230.   The failure to comply with the recoverables function was concealed in part by AECOM's failure to comply with another system requirement: sending Mandatory Daily Interfaces to the Army's Logistics Information Warehouse ("LIW"), a database intended to allow all Army units to order parts regardless of vendor.

231.   These issues were raised a number of times with project management, including meetings with project manager, Robert L. Shirron (a former Army colonel), deputy project manager Bobby Doyle, and others. Project management stated that it would be cheaper to pay a settlement than to fix the problem.

232.   This sentiment was documented by the LISMX supervisor in a formal Memorandum for Record dated May 23, 2015: "it was briefed to me that management has two choices to decide on - come forward and acknowledge the non-compliance or to wait and see if DCAA catches the issues and then bring up internal findings since they did not intend fraud, and that [due] to their previous experience with DCAA the risk of the issue being brought to light was minimal or not at all. The latter course of action was chosen …."

233.   The employee reasoned that "the decision was mainly based on current records in LIW which are inaccurate due to the AC-FIRST SAMSIE user base never using the mandatory

daily interfaces to LIW causing an inaccurate picture of operations to [be] higher [due] to either a lack of understanding of the systems basic day to day functions or intentionally not sending to LOGSA/LIW." In other words, since the required interfaces had not been performed, there was a belief that the illegal conduct would not be caught.

234.    An undated internal memo entitled "AC-FIRST LISMX/SASMO LIW Concerns" reflects discussions with project management about these issues, including that mandatory interfaces were not being run and that efforts were made to avoid detection. The memo expressly noted that "S&S [Supply & Services] unaware or intentionally not sending Mandatory Daily interfaces to LIW."

235.    In late December 2014, the LISMX supervisor reported to the AC FIRST IT Manager as follows: "Not turning the recoverable items in using the EUM method (no credit for the parts SUPER BAD [tire example 6k etc] and incorrect records for the ones that have any legacy data at all as well as the table stack up 3900 on the front side 10K ++ back side risk of discovery during long term audit and not being able to show what the heck we did with the parts or that we did it wrong)."

236.    The SAMS-E End User Manual, terms of which were expressly incorporated into the MOSC-A Contract, includes detailed instructions about the reports and interfaces that are required.

237.    Even if the failure to meet those requirements might have been mistakes initially, the failure to correct the problem and begin proper reporting thereafter was clearly intentional.

238.    On February 25, 2015, AECOM issued a Bagram Air Field ("BAF") ICAR (internal corrective action report) identifying failure to properly turn in recoverable items through the SAMSIE system. Over 10,000 records were involved in that investigation. In its internal document,

labeled "Severity: Major," AECOM characterized the non-conformance as follows: "Incorrect disposition has caused recoverable items to be left on AC FIRST SAMSIE database, and failure of proper credit to the USG [U.S. Government] and significant liability to AC FIRST."

239.    In March 2015, an LISMX supervisor stationed in Afghanistan detailed $15-16 million of improper or undocumented turned in recoverables from one system query only.

240.    In an internal meeting in mid-May 2015, various issues were discussed about the recoverable items including "clearing recoverables" and "removing data from the sytem." Confirmation was provided that mandatory daily LOGSA/LIW interfaces for SAMS-E were not being run, contrary to requirements set out in the End User Manual (EUM), AISM-25-l2S-AHN-ZZZ-EM. At one point, the IT supervisor was directed to make certain changes in the computer records in an effort to hide these double purchases. Specifically, in a draft memo dated April 29, 2015 and finalized on May 15, 2015, Naomi Annino-Luat, Manager, Class IX, AC FIRST – Afghanistan, "requested" that recoverable records from DODAACs W912C4 and W91Y6H from calendar years 2010 – 2013 be removed from the SAMSIE system. A copy of this memo was circulated to Jerrold Allen, Director, Supply & Services, who was the "Person in Charge" for this instruction, as well as to Douglas Harrison, Frank Palafos and others.

241.    The memo instructed as follows: "Request the AC-FIRST LISMX attempt to purge recoverable items from the SAMSIE that can be removed without creating a system error and those records that are not tied to an active/open work order. Below is a breakdown of the records by DODAAC and Calendar Year (CY)." Attached were 125 pages of single-spaced listing of lines or items to be purged, with unit prices listed and a total value of $16,869,642.86.

242.    The document directing the LISMX supervisor to cover up this conduct was shared with project management and was specifically approved by Jerrold Allen, who was the director of client services at the time.

243.    Despite the order to purge records, it may be possible to recover the purged records because SAMSIE creates backups of the database, which these project managers did not understand.

244.    On May 16, 2015, an AECOM Logistics Information System – Maintenance ("LISMX") supervisor documented liability concerns for recoverables in an internal email to the IT supervisor noting that "of course the big question was if we don't have complete records for items of the original 6295 and can't show the military what we did with those items well you get the idea… ."

245.    The LISMX supervisor was threatened internally, in about late April, early May 2015, based on his efforts to have this misconduct addressed.

246.    This LISMX supervisor provided AECOM with recommendations about how to fix the problems and prevent this type of theft of Government property, but his suggestions were never taken seriously. In his memo detailing steps to take to prevent this misconduct, the employee estimated over $16 million in problem purchases, with line by line breakdown of the items, based on only one system query. Again, he was told by senior project management that it would be cheaper to pay if they were caught, rather than to correct these problems.

247.    On May 23, 2015, the LISMX supervisor shared specific concerns and documents with Frank Palafos, AC FIRST IT Manager, including memos about the recoverables, SAMSIE concerns and security concerns about the un-cleared employees being given access to the Army servers. On the recoverable issue, the employee wrote that his concerns included the following:

102

"[r]etaliation or liability for very large & expensive issues identified; [s]till no detailed written guidance or memo for record stating what we are changing after numerous meetings with higher [sic] and detailed solutions offered; [n]o written plan of action for the two LIVE UIC in the SAMSIE system that have the same issues; [n]o written plan of action for the outstanding improper operational issues with the SAMSIE system …; [n]o guidance on the mandatory LOGSA/LIW interfaces."

248.    The LISMX supervisor also documented the history of the problem and the failure of AECOM's management to address the problem, in late May 2015: "Serious concern were raised five months ago, as I brought to the attention of Senior Management the extremely large and growing Recoverable Items Table within the SAMSIE and the adherent problems to include the incomplete records of 6000+ lines, 13K + items at a system billed value of approximately 16.1 million dollars to the 401st, not counting losses in recoverable items credit to the 401st or the liability from operating outside of scope. Shortly after providing a breakdown of the issues and concerns, AC-FIRST quality contacted me to request further details on the slides I had provided my higher, but they were unable to grasp the full scope due to their limited understanding of the SAMSIE system and operations. Multiple meetings were held with appropriate leadership. However my concerns over incomplete records and improper process were not addressed and are still an issue at present."

249.    This employee had concerns that there may have been documents deleted from his computer.

250.    In late 2011 and first quarter of 2012, prior to Relator's employment at AECOM, some of these same issues had been the subject of a Defense Contract Management Agency ("DCMA") Property Management System Analysis conducted of AECOM (AC FIRST) at Bagram

103

Airfield, Afghanistan. The conclusion from that analysis was that "AC FIRST's system for control and accounting of Government Property at Bagram Airfield is INADEQUATE." On the basis of this Analysis, AC FIRST was considered "a high risk" and the shortcomings were deemed to "affect the ability of DoD officials to rely upon information produced by the system."

251.    Of particular significance to the allegations herein, the 2012 Analysis noted that the failure to record and manage inventory "can lead to questions of reasonableness of consumption and verification that property was consumed only in the performance of the contract," which suggests the same concerns about theft of property. With regard to acquisition of needed materials, the 2012 Analysis reviewed many of the same systems as the IT Supervisor checked and observed that the contractor was "unable to locate over half of the records in the sample."

252.    As Relator alleges and supports, similar problems continued after the 2011 time period that was the subject of the DCMA report. AECOM's requests for payment were tainted because the mandatory underlying controls were not in place and did not allow for reliable information from AECOM's systems.

253.    Many internal documents as well as Army Corrective Action Requests (CARs) discuss these property concerns over at least a three year period. For instance, an internal presentation notes that "Mandatory daily LOGSA/LIW interfaces for SAMSIE not being ran."

254.    In addition to the specific concerns raised by the IT supervisor, there were many other indicators that AECOM management was aware of significant problems, but there is no evidence they were disclosed to the Army. For example, on numerous occasions in the MOSC-A Weekly Project Management briefing, particularly in 2013, one of the concerns listed under Supplies and Services, an area listed under the supervision of Jerry Allen, was "movement of property without proper documentation and notifications."

255.    A memo from January 2013 states that a large quantity of equipment in Large Area Maintenance Shelter (LAMS) will not be entered into AWRDS – a system for tracking APS (Army Pre-Positioned Stock).

256.    Upon information and belief, AECOM knowingly presented, or caused to be presented, false or fraudulent claims to the Government by requesting reimbursement for work orders and expressly or impliedly certifying in each request for reimbursement that it complied with material applicable legal and contractual requirements, including, but not limited to, DCAA Contractor's Manual, FAR § 52.245-1 (2007) and PWS §§ 1, 3, 4, 5, when it did not in fact comply with those material requirements, concealed that fact from the Government, and thus rendered AECOM's certification misleading. For example, upon information and belief, AECOM submitted, and was required to submit under FAR § 1232.7002(b) (2007), one or more Standard Form 1034, titled Public Voucher for Purchases and Services Other Than Personal, for reimbursement of duplicative work orders and misleadingly certified that the "voucher is correct and proper for payment," when in fact the voucher was not proper for payment because AECOM did not comply with applicable legal and contractual requirements, including, but not limited to, DCAA Contractor's Manual, FAR § 52.245-1 (2007) and PWS §§ 1, 3, 4, 5. The information that would permit further identification of AECOM's false claims (e.g., AECOM's particular requests for reimbursement) are peculiarly within the AECOM's knowledge and unknown to the Relator. Because the function of AECOM's cost-plus-fee contract is to secure reimbursement from the Government, there is a strong inference that specific false claims for those reimbursements were submitted to the Government. AECOM's failure to disclose its non-compliance with applicable legal and contractual requirements, including, but not limited to, DCAA Contractor's Manual, FAR § 52.245-1 (2007) and PWS §§ 1, 3, 4, 5, was material to the Government's payment decision

105

because (a) the Government required AECOM to comply with these requirements in order to seek reimbursement and sought to enforce these requirements against AECOM; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper requests for reimbursement; and (c) in light of the substantial size of the untracked and unreported recoverables. Indeed, AECOM conceded in its internal documents that the applicable legal and contractual requirements were material by labeling them as critical.

257. In addition, AECOM knowingly made, used, or caused to be made or used, false records or statements material to the false or fraudulent claims alleged in the paragraph above, including, but not limited to, PWS § 5.0, which stated that AECOM would "[e]nsure, with 95% accuracy, equipment's correct condition code and location are entered into the appropriate Logistics Information System (LIS) (AWRDS, SAMS, SARRSS/LMP, PBUSE, PBUSE AIT) IAW," and Management Plan-Contract Performance Plan § 4.4, which stated that AECOM would "use, SAMS-E/IE/1E to track the daily individual labor and maintenance status with related updates, order parts, perform work loading, manage shop and bench stocks, produce management reports to meet AFSC's requirements, and facilitate internal maintenance operations." These records and statements were material to the false or fraudulent claims alleged in the prior paragraph because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements, including, but not limited to, DCAA Contractor's Manual, FAR § 52.245-1 (2007) and PWS §§ 1, 3, 4; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the

Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper requests for reimbursement; and (c) in light of the substantial size of the untracked and unreported recoverables. Indeed, AECOM conceded in its internal documents that the applicable legal and contractual requirements were material by labeling them as critical.

258.    Further, AECOM knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government by failing to track and report recoverables pursuant to DCAA Auditor's Manual, DCAA Contractor's Manual, FAR § 52.245-1 (2007) and PWS §§ 1, 3, 4, 5. This resulted in an overpayment by the Government for excess or unused parts, which AECOM was obligated to pay back under DCAA Auditor's Manual § 5-1107.11 ("The contractor should have policies and procedures … readily identify contract over/underpayments."), and other applicable contractual requirements, and regulatory requirements, as provided for herein. AECOM's systematic pattern of not properly monitoring work orders demonstrates that its concealment of the Government's overpayment was done knowingly.

259.    AECOM also knowingly made, used, or caused to be made or used, a false record or statement material to this obligation to pay or transmit money or property to the Government, including, but not limited to, PWS § 5.0, which stated that AECOM would "[e]nsure, with 95% accuracy, equipment's correct condition code and location are entered into the appropriate Logistics Information System (LIS) (AWRDS, SAMS, SARRSS/LMP, PBUSE, PBUSE AIT) IAW," and Management Plan-Contract Performance Plan § 4.4, which stated that AECOM would "use, SAMS-E/IE/1E to track the daily individual labor and maintenance status with related

updates, order parts, perform work loading, manage shop and bench stocks, produce management reports to meet AFSC's requirements, and facilitate internal maintenance operations." These records and statements were material to this obligation to pay or transmit money or property to the Government because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements, including, but not limited to, DCAA Contractor's Manual, FAR § 52.245-1 (2007) and PWS §§ 1, 3, 4; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper requests for reimbursement; and (c) in light of the substantial size of the untracked and unreported recoverables. Indeed, AECOM conceded in its internal documents that the applicable legal and contractual requirements were material by labeling them as critical.

### 4.    Use of Unqualified and Uncertified Employees, Including Many Who Lack Security Clearance.

260.    Another issue that was raised frequently in connection with the fraudulent purchasing and tracking issues was AECOM's use of unqualified employees to handle some of these functions, directly in violation of contractual requirements, and the use of Other Country Nationals ("OCNs") in violation of clear regulations concerning national security.

261.    In addition to the fact that these uncertified and unqualified personnel were wrongly billed to the Government, the use of these employees facilitated AECOM's ongoing thwarting of Army system requirements and reporting because the employees did not understand the requirements.

262.    The reliance on unskilled or untrained personnel violated the PWS and contributed to substantial cost overruns to the Government through recoverable items not being processed correctly; materials not being accounted for properly; duplicative ordering of parts sometimes already in stock; and lack of proper documentation.

263.    Specifically, PWS § 5.6.6.5 provided: "The Contractor shall manage, maintain, replenish and inventory bench/shop stock IAW standard operating procedures using SAMS. This requirement mandates that the contractor employ a qualified SAMS-1 operator to perform these functions. Qualified SAMS Operator for the purposes of this contract means: a person who was in the last five (5) years employed as a SAMS-1 Operator as either a member of the US Army or working as a contract employee for the US Government. This qualified SAMS Operator must know, as a minimum, how to perform the following tasks using SAMS-1, SAMS-E or SAMS-TE: Open and close out maintenance requests and understand all data elements identified during this process. Perform data backups and restoration of database files. Perform daily NMO/Work Order File Transfers to the appropriate U.S. Government-provided LIS system using the established protocol and interfaces. Contractor shall insure that Order File Transfers are correct and confirm transfer was successful. Perform all aspects of managing, maintaining, ordering, reordering, adjusting and inventorying Bench/Shop Stock and understand the differences between them. Perform and manage all aspects of the Document Control Register and reconcile same with the appropriate SARSS activities. This person must be able to lift 50 lbs or the equivalent weight of a wheel/rim (less tire). This person shall be required to perform all aspects of managing the required repair parts necessary using processes within SAMS-1. The person selected for this position is a bonafide SAMS-1 Operator and NOT merely a data clerk per AR750-8."

264. Upon information and belief, AECOM knowingly presented, or caused to be presented, false or fraudulent claims to the Government by requesting reimbursement for work orders and expressly or impliedly certifying in each request for reimbursement that it complied with material applicable legal and contractual requirements, including, but not limited to, PWS § 5.6.6.5, when it did not in fact comply with those material requirements, concealed that fact from the Government, and thus rendered AECOM's certification misleading. For example, upon information and belief, AECOM submitted, and was required to submit under FAR § 1232.7002(b) (2007), one or more Standard Form 1034, titled Public Voucher for Purchases and Services Other Than Personal, for reimbursement of orders made by unqualified workers and misleadingly certified that the "voucher is correct and proper for payment," when in fact the voucher was not proper for payment because AECOM did not comply with applicable legal and contractual requirements, including, but not limited to, PWS § 5.6.6.5. The information that would permit further identification of AECOM's false claims (e.g., AECOM's particular requests for reimbursement) are peculiarly within the AECOM's knowledge and unknown to the Relator. Because the function of AECOM's cost-plus-fee contract is to secure reimbursement from the Government, there is a strong inference that specific false claims for those reimbursements were submitted to the Government. AECOM's failure to disclose its non-compliance with applicable legal and contractual requirements, including, but not limited to, PWS § 5.6.6.5, was material to the Government's payment decision because (a) the Government required AECOM to comply with these requirements in order to seek reimbursement; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek

reimbursement from AECOM for the improper requests for reimbursement; and (c) in light of the substantial size of AECOM's requests for reimbursement of orders made by unqualified workers.

265. In addition, AECOM knowingly made, used, or caused to be made or used, false records or statements material to the false or fraudulent claims alleged in the paragraph above, including, but not limited to, PWS § 5.6.6.5, which stated that AECOM would employ a qualified SAMS-1 operator to manage, maintain, replenish and inventory a bench/shop stock IAW standard operating procedures using SAMS. These records and statements were material to the false or fraudulent claims alleged in the prior paragraph because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements, including, but not limited to, PWS § 5.6.6.5; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper requests for reimbursement; and (c) in light of the substantial size of AECOM's requests for reimbursement of orders made by unqualified workers.

**E.    Improper Salary Increases Connected to Bluefish Global Payroll Solutions Cards.**

266. Among the issues that AECOM dealt with in Afghanistan was how to pay various foreign nationals, in terms of currency used, deductions, and ability of funds to be wired or transferred to the workers' home countries. Until approximately Fall 2013, payment to other country nationals ("OCNs") or foreign nationals was handled through Wells Fargo, which provided a service that allowed transfers for OCNs to their home countries. Essentially, some system was necessary to allow foreign workers to deal with their AECOM paychecks and transmit funds to their home accounts or directly to family members at home.

267.     Sometime in the spring or early summer of 2013, Mr. Jonathan Nagel ("Nagel"), President & General Manager AECOM/GSS LTD, decided to switch payroll services from Wells Fargo to Bluefish Global Payroll Solutions ("Bluefish") under the guise that Wells Fargo no longer offered the payroll wire services. Once the switch started to get implemented, complaints arose almost immediately about the high transaction fees that Bluefish assessed.

268.     In an effort to justify the switch to Bluefish, Nagel claimed that Wells Fargo no longer provided the services needed.

269.     Bluefish is owned and operated by Mark Atkins ("Atkins"), who is the Bluefish CEO. Atkins and Nagel have a prior business relationship from dealings at Minacs, a global outsourcing and business solutions company.

270.     According to other defense contractor personnel contacted by Relator, the representation that Wells Fargo no longer provided the needed services was false. There was no competitive bid process for this contract and, upon information and belief, AECOM was Bluefish's only customer for these services. At one point, when Nagel was questioned about the reason for the switch to Bluefish, he got angry and refused to answer. Indeed, Code of Federal Regulations Section 52.244-5 requires "The Contractor shall select subcontractors (including suppliers) on a competitive basis to the maximum practical extent consistent with the objectives and requirements of the contract." *Id*. Internal AECOM spreadsheets confirm that CFR 52.244-5 was incorporated into the MOSC-A Contract and was a requirement. On information and belief, Relator pleads that the BlueFish contract was not competitively bid in violation of the MOSC-A Contract, and relevant regulations, and such violation was not disclosed to the Army.

271.     In addition to other fees and costs associated with transferring employees' salaries, often as much as $50, Bluefish imposed a $19.99 transaction fee for each money transfer that it

processed. In an internal Financial Planning & Analysis ("FP&P") memo, dated December 7, 2013, which identified Vance Barron as the AECOM employee with responsibility for this function, AECOM characterized the issue as "Excessive Fees associated to wire transfers." At another point, Barron again listed the fees under "Issues/Concerns."

272.    Various foreign nationals, including specifically those from Kosovar, said that the Bluefish fees made it too expensive to send their pay home on a bi-weekly basis, as it was received. Many started to only have the funds wired at the end of every second pay period, creating hardships for families at home.

273.    In response to these complaints, AECOM decided to increase the hourly pay charged to the Government for these employees, by 2.6%. The memo suggests that there had been some salary increase for the Kosovar employees earlier also.

274.    The salary increases were not appropriate since they were simply paying for unnecessary fees on a crony contract with Bluefish. AECOM's estimate was that this led to a .2% increase in monthly labor billings to the Government.

275.    Various foreign nationals were targeted for the Bluefish cards, including Kosovar and Indian employees.

276.    In addition to the salary increases that were passed on to the Army, the unnecessary and tainted switch to Bluefish entailed a significant amount of time and effort that was also billed to the Government. In November 2013, at least 20 "Bluefish trainers" were assigned to spend two full days assisting with distribution and activation of the cards as well as account holder questions. An email from the Financial Analyst who was deeply involved in the project notes that multiple employees had "all done an amazing job getting Bagram and all of the North East FOBs [forward

operating bases] enrolled in BLUEfish" and that they were "now shifting into the second phase of BLUEfish; Card delivery."

277.    These efforts were still underway into 2014. For example, a Business Management report from April 2014, stated that the financial services group conducted promotion and training associated with the Bluefish Supplementary (Family) card sale.

278.    In addition to the high fees, the Bluefish system did not function well. In an internal document entitled Drawdown – DeMob[ilization], dated 16 March 2014, one of the items listed under "Desired/Needed" was to have an alternative to Bluefish implemented. At another point, in a document titled "Pending Actions," there was a reference to the Blue Fish pay card "glitch."

279.    Although AECOM stopped using Bluefish at some point in 2015, Relator believes that they have started using that company again fairly recently.

280.    Upon information and belief, AECOM knowingly presented, or caused to be presented, false or fraudulent claims to the Government by submitting inflated invoices for reimbursement of labor and expressly or impliedly certifying in each request for reimbursement of labor that it was in compliance with material requirements, such as CFR 52.244-5, when it did not in fact comply with those material requirements, and concealed that fact from the Government, and thus rendered AECOM's certification misleading. For example, upon information and belief, AECOM knowingly engaged Bluefish without a competitive bidding process, which caused an unnecessary salary increase to salaries, which costs were passed onto the Government. Upon information and belief, AECOM submitted these knowingly false claims for payment to the Government. This was material to the Government because it would not have agreed to pay higher salaries just so AECOM could use a different payment processor.

281.     In addition, upon information and belief AECOM knowingly made, used, or caused to be made or used, false records or statements material to the false or fraudulent claims alleged in the paragraph above, including, but not limited to, CFR 52.244-5. Specifically, the records containing higher salaries due to the Bluefish systems were false records or statements which were created in order to send false claims for payment to the Government. These records and statements were material to the false or fraudulent claims alleged in the prior paragraph because (a) they led the Government to believe that AECOM intended to comply, and was complying, with applicable legal and contractual requirements; (b) during the entirety of the time that Relator was working for AECOM he observed nothing that would suggest that the Government knew about AECOM's failure to comply with these requirements, yet paid AECOM anyway without attempting to enforce the contractual requirements and/or penalize or seek reimbursement from AECOM for the improper requests for reimbursement.

## V.     **RETALIATION**

282.     In or about June 2015, Relator raised concerns with AECOM management related to fraudulent AECOM employee air travel ("June 2015 Travel Fraud"). At this time, Relator, in his capacity as Payroll Supervisor, was responsible for various aspects of booking and handling payment for air travel, as well as other payroll related functions.

283.     Relator discovered that the AECOM Travel Coordinator, Mr. Rethinam Rajendran, fraudulently booked a special air travel request for his co-worker and roommate, Mr. Mahesh Parakandy Thattiyot, an AECOM Senior Financial Analyst. Both Mr. Rajendran and Mr. Parakandy reported directly to Relator.

284.     Special air travel requests such as a preferred flight are a violation of FAR § 31.205-46 and similar provisions in the Joint Travel Regulations, as this type of travel is not the lowest cost ticket as specified in the regulations.

285.    Relator was concerned that this travel violation was not an isolated incident because Mr. Rajendran was the AECOM employee who booked travel for other employees and Relator felt this type of violation might have been a recurring issue with respect to other friends of Mr. Rajendran, particularly for other Indian Nationals. Relator's concern about these matters was based, in part, on the prior travel fraud issues involving Indian Nationals that he had uncovered and reported within AECOM and that had led to significant repayment to the Government.

286.    At approximately the same time in or about June 2015, Relator, in accordance with company policy, reported to AECOM management an additional travel related issue concerning an AECOM Payroll Specialist named Saravanan Sankaiah, who also worked in Relator's department and reported directly to Relator.

287.    Mr. Sankaiah did not return from his Paid Leave as scheduled. When Sankaiah did finally return to his post, Sankaiah did not "report in" to Relator as required by AECOM policy and did not report to duty (work) on the day he returned. All of these actions were violations of AECOM policy.

288.    In accordance with AECOM policy, both travel related issues were reported in June 2015 to Relator's manager, John Conrad (AECOM Finance Manager). After an internal investigation, AECOM decided not to take any disciplinary action regarding these travel issues.

289.    AECOM Finance Manager Conrad had previously decorated all three of the above referenced employees with promotions and employee of the month awards (which included monetary awards).

290.    Relator believed that AECOM Finance Manager Conrad's affinity for the employees clouded his managerial judgement and therefore, Relator notified Conrad, that he would take both issues up with the AECOM human resources department. Shortly thereafter,

116

Relator reported the above referenced travel policy violations to John Dearth, AECOM Manager, Employee Relations.

291.    Although Relator was absent on emergency leave from approximately June 4, 2015 through June 18, 2015, he was told that an investigation was conducted.

292.    After his return from leave, on or about June 28, 2015, Relator communicated with John Dearth regarding the status of the reported violations. Relator was notified on or about June 29, 2015 that no disciplinary action would be taken in response to the violations. He indicated to AECOM management that his next step would be to report the issue outside the company.

293.    At about the same time or shortly thereafter, Relator heard rumors that he had been "selected" to be laid off and that his position with AECOM would be eliminated.

294.    On or about July 5, 2015, Relator was terminated, with no advance notice from AECOM. He was treated "like a criminal," not allowed to return to his office or gather his personal belongings, and booked on the next plane out of Dubai, UAE.

295.    In further support of his allegations, and in compliance with Federal law, and Company policy, the Relator made a hot line complaint to the Inspector General's office related to the BlueFish claims (as detailed in this complaint). In his complaint, Relator noted: "Mr Nagel selected a company that is his friend, that company began processing the employee payroll resulting in a huge cost increase to the Government and many pay issues for the employees. The conflict of interest is his secret relationship with the company we use to process our payroll. I have been tipped off that Mr. Nagel benefits financially from the selection of this company in which we are their only client and the company only has 1 employee which is Mr. Nagel's friend." The Relator further noted: "Please investigate and stop this corruption. I have more details to assist is this investigation." DOD Hotline Complaint No. 20141117025205611.

296.     Relator believes he was retaliated against and terminated for raising the travel violations, as well as the BlueFish violations. The reported air travel violation involving Mr. Rethinam Rajendran and Mr. Mahesh Parakandy Thattiyot resulted in fraudulent billing to the Government. Although the late return issue did not directly implicate billing, Relator was concerned that the ongoing pattern of violations in timekeeping undermined the ability of AECOM to record and report time accurately.

297.     Immediately prior to reporting the two June 2015 travel violations, Relator had received a positive performance review and was offered a contract extension. However, after reporting the June 2015 travel issues and indicating that he was not going to let the violations just be swept under the rug, Relator was terminated.

298.     Subsequent to losing his job at AECOM, Relator was contacted by his old manager. She indicated to him that she had recommended him for a position that a recruiter at AECOM, had contacted her about. In speaking with the recruiter Relator learned that the job opening was the very same job that AECOM told him it was downsizing. Relator applied for that job and discussed it with a recruiter at AECOM who indicated that he would be a good fit for the job, given his prior experience. However, when the recruiter got back to him, she told him that per a Business Management Director at AECOM, David Calico, AECOM was not interested in bringing him back. Given that Realtor was qualified for the job and had a positive performance track record, Relator believes he was terminated and not given an opportunity to rejoin AECOM because he was trying to bring attention to AECOM's fraudulent activities.

## VI.   CAUSES OF ACTION

### COUNT I
### FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A) (2010)

299.   Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

300.   Throughout the period of performance on the MOSC-A Contract (starting in April 2010) and continuing at least through AECOM's work on the incrementally funded bridge contract that began on or about January 2015, through to the current date, AECOM knowingly submitted claims for payment on the MOSC-A Contract, and subsequent related contracts that included the following as described herein: (1) False Labor Claims, False Records Claims, and Reverse False Claims Related to Labor Charges to the United States Army. Labor billing claims that address timesheet/labor violations and billing for unqualified, uncertified personnel contrary to contract requirements; (2) False Claims, and False Records Claims, Related to Man-Hour Utilization Issues. Man-hour utilization ("MHU") claims address improper and inflated reporting of Man-Hour Utilization; (3) False Claims, False Records Claims, and Reverse False Claims Related to Property of the United States Army. Property claims that relate to the failure to properly track and account for goods under the contract, including double purchasing of goods and "parts only work orders" where parts were purchased with no recordation of their purpose or expected use; and failure to track and turn in recoverable items; and (4) False Claims and False Records Claims Related to Fraudulent Billing of a Subcontractor. Bluefish claims that concern inflated billing to the 401st to offset charges arising from an improper crony contract with Bluefish, a payroll processing company.

301.   Through these acts, AECOM knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A) (2010).

302.     By virtue of the false or fraudulent claims that AECOM presented or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT II**
**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §3729(a)(1)(B) (2010)**

303.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

304.     AECOM knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States Government in violation of 31 U.S.C. §3729(a)(1)(B) (2010) that included the following as described herein: (1) False Labor Claims, False Records Claims, and Reverse False Claims Related to Labor Charges to the United States Army. Labor billing claims that address timesheet/labor violations and billing for unqualified, uncertified personnel contrary to contract requirements; (2) False Claims, and False Records Claims, Related to Man-Hour Utilization Issues. Man-hour utilization ("MHU") claims address improper and inflated reporting of Man-Hour Utilization; (3) False Claims, False Records Claims, and Reverse False Claims Related to Property of the United States Army. Property claims that relate to the failure to properly track and account for goods under the contract, including double purchasing of goods and "parts only work orders" where parts were purchased with no recordation of their purpose or expected use; and failure to track and turn in recoverable items; and (4) False Claims and False Records Claims Related to Fraudulent Billing of a Subcontractor. Bluefish claims that concern inflated billing to the 401st to offset charges arising from an improper crony contract with Bluefish, a payroll processing company.

305.    By virtue of the false or fraudulent records or statements that AECOM presented or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and civil penalties.

## COUNT III
## FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(1)(D) (2010)

306.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

307.    Throughout the period of performance on the MOSC-A Contract (starting in April 2010) and continuing through to the current date, AECOM had possession, custody or control of property to be used by or on behalf of the United States and knowingly delivered or caused to be delivered less than the proper amount of such property, in violation of 31 U.S.C. § 3729(a)(1)(D) (2010).

308.    By virtue of AECOM's false or fraudulent failure to deliver that property, the United States has suffered actual damages and is entitled to recover treble damages and civil penalties.

## COUNT IV
## FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(1)(G) (2010)

309.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

310.    Throughout the period of performance on the MOSC-A Contract (starting in April 2010) and continuing through to the current date, AECOM knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit property to the Government, in violation of 31 U.S.C.

121

§ 3729(a)(1)(G) (2010) that included the following as described herein: (1) False Labor Claims, False Records Claims, and Reverse False Claims Related to Labor Charges to the United States Army. Labor billing claims that address timesheet/labor violations and billing for unqualified, uncertified personnel contrary to contract requirements; and (3) False Claims, False Records Claims, and Reverse False Claims Related to Property of the United States Army. Property claims that relate to the failure to properly track and account for goods under the contract, including double purchasing of goods and "parts only work orders" where parts were purchased with no recordation of their purpose or expected use; and failure to track and turn in recoverable items.

311.    By virtue of AECOM's false or fraudulent conduct, the United States has suffered actual damages and is entitled to recover treble damages and civil penalties.

**COUNT V**
**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1)(A) (2010)**

312.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

313.    Each extension or modification to the MOSC-A was fraudulently induced by AECOM. Each annual award of the MOSC-A was fraudulently induced by AECOM. Accordingly, every claim for payment presented by AECOM under the modifications, extensions, and annual awards to the MOSC-A is false or fraudulent under 31 U.S.C. § 3729(a)(1)(A).

314.    Throughout the period of performance on the MOSC-A Contract (starting in April 2010), continuing at least through to the current date, and throughout each contract modification or extension, AECOM knowingly falsely certified that they were in compliance with various provisions of the MOSC-A Contract as well as applicable Federal Acquisition Regulations ("FAR"), Performance Work Statements ("PWS"), and related/applicable contractual and legal obligations. The provisions that AECOM, either explicitly or implicitly, falsely certified

compliance with include, but are not limited to, FAR § 52.245-1, FAR § 31.201-2(d), PWS § 2.0, PWS § 3.0, PWS § 4.0, PWS § 5.0, Management Plan-Contract Performance Plan § 4.4, AR 750-1, chap. 4-14. The Government would not have continued to extend the MOSC-A Contract, or at the very least, would have allocated funds differently had it known of AECOM's substantial fraud, false claims, false records, and substantial violation (and non-compliance) with various, material contractual requirements and federal regulations; the intentional non-disclosure of these acts fraudulently induced the Government into additional modifications and extensions of the contract. Thus, every statement submitted to the Government for each extension or modification to the MOSC-A is false.

315.    Additionally, certain modifications expressly incorporated PWS's into their requirements. For example, Amendment/Modification No. 57 to the MOSC-A specifically incorporated the March 8, 2012 revised Performance Work Statement. Also, Amendment/Modification No. 91 to the MOSC-A specifically incorporated the April 4, 2013 revised Performance Work Statement.

316.    Furthermore, as discussed above in paragraph 3, the MOSC-A Contract was extended or modified at least 127 during the course of AECOM's performance. In each of these extensions or modifications, AECOM represented, at least impliedly, that it had been in compliance with the terms of the contract as performed.

317.    However, when entering into these modifications, AECOM had not been, and had no future intention of, fulfilling certain requirements of these PWS's. For example, as discussed above, AECOM had, and continued to: circumvent compliance with SAMS-E/IS requirements, submit false timesheets, submit false work orders, use unqualified workers, and submit false invoices. Indeed, it is apparent that AECOM didn't have many of the required systems and controls

in place either prior to each contract grant, or modification, not subsequent to the grant or modification; as a result, it is apparent that AECOM knew it was not going to comply with the requirement, or knew it was unable to comply with the contract, prior to execution of the contract with the Army, and thus fraudulent inducement is present.

318.   AECOM's course of performance makes clear that is knowingly intended not to fulfill all of its contractual promises. Furthermore, not only did AECOM ignore certain clear contractual requirements, but it also made active efforts to conceal its non-compliance (such as by using parts-only work orders, not pulling the MHU numbers from SAMS, and purging data on recoverables from the system).

319.   In sum, AECOM repeatedly falsely represented that it was going to comply with the terms of the MOSC-A when it knew that it would not.

320.   Had the Government been aware of AECOM's fraudulent activities, it would not have awarded these modifications or extensions to AECOM.

321.   Furthermore, had the Government been aware that AECOM had no intention of performing certain provisions of the contract, it would not have awarded these modifications or extensions to AECOM.

322.   Furthermore, the January 27, 2010 Order for Supplies or Services (the MOSC-A) provided that "[i]n determining whether to award the option years, the Government will take into account the contractor's previous performance on this task order."

323.   Had the Government been aware of AECOM's fraudulent activities, it would not have awarded each of the option years to AECOM.

324.   Through these acts, AECOM knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A) (2010).

Namely, each and every claim for payment under any of the four option years of the MOSC-A, as well as any claims for payment under at least Modifications 57 and 91, were fraudulently induced by AECOM.

325.    By virtue of the false or fraudulent claims that AECOM presented or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT VI
## FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3730(h) (2010)

326.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

327.    Relator's activities, as described above, and particularly his efforts to stop one or more violations of the False Claims Act, constituted protected and lawful activities under the FCA. AECOM had knowledge that Relator engaged in such protected activities and, in response, discharged him under false pretenses.

328.    Through these acts, the Defendant threatened, harassed and in other manners discriminated against Relator in the terms and conditions of his employment, in violation of Section 3729(a)(1)(B) of the Federal False Claims Act. Such claims caused actual damages to Relator.

## VII.    REQUESTS FOR RELIEF

1.    WHEREFORE, Relator, on behalf of the United States, demands that judgment be entered in their favor and against AECOM for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count. This includes three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false

claim, record or statement, and any other recoveries or relief provided for under the Federal False Claims Act.

2.      Relator also demands judgment in his favor against AECOM for the maximum amount of damages arising from his retaliatory discharge.

3.      Further, Relator requests that he receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

Dated: November 16, 2018.          By:  */s/ Patrick J. Conroy*          
                                    Patrick J. Conroy
                                    Texas Bar No. 24012448
                                    Daniel F. Olejko (*pro hac vice* application on file)
                                    Texas Bar No. 24108897
                                    Stephanie R. Wood (*pro hac vice* application on file)
                                    Texas Bar No. 24057928
                                    Brian P. Herrmann (*pro hac vice* application on file)
                                    Texas Bar No. 24083174
                                    **BRAGALONE CONROY PC**
                                    2200 Ross Avenue
                                    Suite 4500W
                                    Dallas, TX 75201
                                    Tel: (214) 785-6670
                                    Fax: (214) 785-6680
                                    pconroy@bcpc-law.com
                                    dolejko@bcpc-law.com
                                    swood@bcpc-law.com
                                    bherrmann@bcpc-law.com

**Glossary of Abbreviations**

| | |
|---|---|
| APS-5 | Army Prepositioned Stock |
| AWRDS | Army War Reserve Deployment System/ |
| BAF | Bagram Air Field |
| BMD | Business Management Division |
| CAP | Corrective Action Plan |
| CAR | Corrective Action Request |
| CDRL | Contract Data Requirements List |
| CPR | Contract Performance Report |
| CSSAMO | Combat Service Support Automation Management Office |
| CWO | Contract Work Order |
| DCAA | Defense Contract Audit Agency |
| DCMA | Defense Contract Management Agency |
| DODAC | Department of Defense Address Code |
| DODIG | Department of Defense Inspector General |
| EUM | End User Manual |
| FAR | Federal Acquisition Regulations |
| FIRST | Field and Installation Readiness Support Team |
| FOB | Forward Operating Base |
| FSS | Federal Supply Schedule |
| GTN | Global Transportation Network |
| ICAR | Internal Corrective Action Report |
| IMS | Integrated Master Schedule |
| IS | Information System |
| KAF | Kandahar Air Field |
| LAMS | Large Area Maintenance Shelter |
| LIS | Logistics Information System |

| LISMX | Logistics Information System - Maintenance |
|-------|---------------------------------------------|
| LIW | Logistics Information Warehouse |
| LOGGA | Logistics Support Activity |
| LOTO | Letter of Technical Direction |
| LRC | Logistics Readiness Center |
| MHU | Man Hour Utilization |
| MOSC-A | Maintenance and Operational Support Contract |
| MUR | Man-Hour Utilization Reports |
| NSN | National Stock Number |
| OCN | Other Country Nationals |
| OIC | Officer in Charge |
| PBUSE | Property Book Unit Supply Enhanced |
| PM | Project Management |
| POWO | Parts Only Work Order |
| PQS | Personal Qualification Standards |
| PWS | Performance Work Statement |
| RPAT | Redistribution Property Assistance Team |
| SAMS | Standard Army Maintenance System |
| SAMS-E | Standard Army Maintenance System - Enhanced |
| SARSS-1 | Standard Army Retail Supply System |
| SASMO | Sustainment Automatic Support Management Office |
| SIGIR | Special Inspector General for Iraq Reconstruction |
| SSB | Sustainment Support Battalion |
| STAMIS | Standard Army Maintenance Information System |
| SWA | Secure Work Area |
| TPE | Theater Provided Equipment |
| UIC | Unit Identification Code |

| WO | Work Order |
|----|------------|