ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA ex rel.**
**HASSAN FOREMAN,**

Plaintiff,

- against -

**AECOM, AECOM GOVERNMENT SERVICES**
**INC., AC FIRST LLC, and AECOM/GSS**
**LTD.,**

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/13/20

16 Civ. 1960 (LLS)

**OPINION & ORDER**

Relator Hassan Foreman brought this qui tam action on
behalf of the United States of America pursuant to the False
Claims Act, 31 U.S.C. §§ 3279-3733 ("FCA"), alleging that
defendants submitted false and fraudulent claims to the
government for payment.  The United States declined to intervene
in this action.  Defendants move to dismiss the Third Amended
Complaint for failure to state a claim upon which relief can be
granted.  For the following reasons, the motion is granted.

## BACKGROUND

The following facts are as alleged in the Third Amended
Complaint ("TAC") (Dkt. No. 66).

Defendants AECOM, AECOM Government Services Inc., AC First
LLC, and AECOM/GSS Ltd. (collectively, "AECOM") are affiliated
defense contractors.

In 2010, AECOM entered into a Maintenance & Operational
Support ("MOSC") contract with the U.S. Army.  Under the

-1-

contract, AECOM provides vehicle and equipment maintenance, facilities management and maintenance, supply and inventory management, and transportation services in support of the 401st Army Field Support Brigade in Afghanistan. AECOM is required to maintain systems and procedures for tracking labor hours, property, and other assets.

The MOSC contract reimburses AECOM for its costs and pays an additional negotiated fixed fee. The contract was modified and extended multiple times between 2010 and 2018. To date, AECOM continues to perform under the contract and has been paid a total of approximately $1.9 billion.

Relator Hassan Foreman began working at AECOM as a Finance Analyst in August of 2013 and was promoted to Finance Supervisor in May of 2014.

Foreman alleges that AECOM and its employees violated numerous obligations under the MOSC contract and federal regulations. Those violations are separated into five categories: (1) improper labor billing, (2) inflated reports of man-hour utilization rate, (3) improper purchasing, tracking, and returning of government property, (4) entry into a "crony" contract with Bluefish, a payroll processing company, and (5) travel violations.

## Labor Billing

AECOM submitted inaccurate labor timesheets to the

government for payment. They listed incorrect hour totals, did not include employee numbers, and did not contain the supervisor's printed name, making it difficult to confirm who signed the timesheets. Instead of on-site supervisors, office-based employees who could not validate the number of hours worked signed the timesheets. AECOM employees submitted and signed timesheets before the two-week pay period was over, reporting work that had not yet been performed.

Employees who slept on the job or engaged in other leisure activities billed full eleven-hour days. AECOM had a policy of billing 154 hours per each two-week period regardless of the actual number of hours worked. On one occasion, six employees billed several hours for replacing and repairing one tire.

AECOM also billed for labor of untrained and uncertified employees when it was required to employ qualified and certified operators to properly track materials and inventory.

When AECOM learned of its billing issues, it attempted to correct old timesheets.

## MHU Rate

Under the MOSC contract, AECOM is required to monitor and report on a monthly basis its man-hour utilization ("MHU") rate, which is calculated by dividing the number of actual labor hours worked by the number of labor hours available. AECOM is required to have an MHU rate of 85 percent or greater, but its

rate was consistently and significantly below 85 percent.  AECOM
provided its own non-standard MHU reports instead of reports
automatically generated from data in the "SAMS-E" system, which
meant "AECOM avoided having a direct tie to actual hours in the
system, allowing essentially made-up labor to be
counted . . . ."  TAC ¶ 188.

### Government Property

AECOM employed untrained and uncertified personnel who
failed to properly account for and process property.

Employees ordered items through unauthorized "parts only"
work orders, which were not tied to particular equipment, and
resulted in orders for excess and unused parts.  "For example,
if tires were properly ordered pursuant to an established
vehicle program or work order, the system would trigger an alert
if the number of tires did not match the number of trucks or the
expected tire usage.  A POWO could not be monitored in that
fashion because it would not tie to an actual WO."  Id. ¶ 216.

Employees purchased the same items twice by ordering parts
through the government supply system as well as on the
commercial market, and requested reimbursement from the
government for those duplicative work orders.

AECOM failed to report and return to the Army excess or
unused parts and recoverable items, which are used items removed
from vehicles and other equipment.

## Bluefish Contract

In 2013, Jonathan Nagel, the President and General Manager of AECOM switched AECOM's payroll services provider from Wells Fargo to Bluefish Global Payroll Solutions ("Bluefish"), falsely claiming that Wells Fargo no longer provided the services needed.  Nagel had a prior business relationship with Bluefish's owner.

Bluefish's system did not function well and imposed high transaction fees for each money transfer.  In response to complaints about the fees, AECOM increased the hourly pay for affected employees by 2.6 percent, which led to a 0.2 percent increase in monthly billings to the government.  AECOM also billed the government for the Bluefish training staff who spent "two full days assisting with distribution and activation of the cards as well as account holder questions."  Id. ¶ 290.

Foreman made a hotline complaint to the Inspector General's office reporting the Bluefish issues and Nagel's relationship with Bluefish's owner.

## Travel Violations

Foreman was responsible for various aspects of booking and paying for AECOM employees' air travel.  In June of 2015, Foreman learned that Rethinam Rajendran, a Travel Coordinator, had booked a special air travel request for his co-worker and roommate Mahesh Parakandy Thattiyot, a Senior Financial Analyst.

That request violated federal regulations for not being the lowest priced airfare available.

Around the same time, Foreman also learned that Saravanan Sankaiah, a Payroll Specialist, did not return from his paid leave as scheduled. When he did return, he did not report to Foreman for duty as required under AECOM policy.

Foreman reported both travel-related issues in June of 2015 to the Finance Manager, John Conrad. After an internal investigation of the issues, AECOM decided not to take disciplinary action. Foreman then reported the issues to the Manager of Employee Relations, John Dearth. Foreman was notified on or about June 29, 2015 that after another investigation, no disciplinary action would be taken. Foreman informed AECOM management that he would report the issues outside the company.

Around the same time or shortly thereafter, Foreman heard rumors that his position at AECOM would be eliminated and that he would be terminated. On or about July 5, 2015, Foreman was terminated, despite receiving a positive performance review immediately prior to reporting the travel violations.

## This Action

Foreman filed this action under seal on behalf of the United States on March 16, 2016. On March 16, 2018, the case was unsealed and Foreman filed an amended complaint. On

November 16, 2018, Foreman filed a second amended complaint.  On May 28, 2019, the government stated that it "has no plan to move to intervene on any claim at this time."  Dkt. No. 47.

Foreman filed the TAC on September 25, 2019, alleging violations of various provisions of the FCA, 31 U.S.C. § 3729(a)(1)(A), (B), (D), (G) and 31 U.S.C. § 3730(h).  First, Foreman claims that defendants falsely certified to the government in invoices and requests for reimbursement that they were in compliance with contractual and regulatory requirements regarding labor billing and timesheets, MHU rate, government property, and the Bluefish contract.  Second, Foreman claims that defendants failed to return property to the government.  Third, Foreman alleges that defendants terminated him in retaliation for reporting the travel and Bluefish violations.

Defendants now move to dismiss the TAC.

## DISCUSSION

On a motion to dismiss under Rule 12(b)(6), the court accepts "all factual allegations in the complaint as true, drawing all reasonable inferences in favor of the plaintiff." Kelly-Brown v. Winfrey, 717 F.3d 295, 304 (2d Cir. 2013).  To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007).  A claim is facially plausible "when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

Defendants argue that the TAC should be dismissed because (1) claims related to labor billing, MHU, and property violations are barred by the FCA's "public disclosure bar," (2) claims related to labor billing, MHU, and property violations do not allege materiality, (3) claims related to the Bluefish contract do not allege how the contract was a violation, (4) claims related to a failure to return property do not allege an obligation to return property or any specific property defendants failed to return, and (5) the retaliation claim does not allege that Foreman engaged in protected activity or that defendants were aware of any protected activity.

## Public Disclosure Bar

The FCA's public disclosure bar states,

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed —
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,

> unless the action is brought by the Attorney General or
> the person bringing the action is an original source of
> the information.

31 U.S.C. § 3730(e)(4)(A).

> With the 1986 amendments, Congress deliberately removed a
> previous provision that barred jurisdiction whenever the
> government had knowledge of the allegations or transactions in
> the relator's complaint. The pre-1986 version of 31 U.S.C.
> § 3730(d) provided that courts had no jurisdiction over qui tam
> actions "based on evidence or information the Government had
> when the action was brought." See LeBlanc, 913 F.2d at 19 n. 1.
> In practice, the "government knowledge" bar proved too
> restrictive of qui tam actions, resulting in under-enforcement
> of the FCA. See Prawer, 24 F.3d at 325-26. Thus, in 1986,
> Congress shifted the examination away from the information in
> the government's possession and instead looked to whether there
> was public disclosure of information given to the government.
> "Congress thus changed the focus of the jurisdictional bar from
> evidence of fraud inside the government's overcrowded file
> cabinets to fraud already exposed in the public domain." United
> States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d
> 675, 684 (D.C. Cir. 1997).

United States ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 729-30

(1st Cir. 2007). "The 1986 amendments attempt to strike a

balance between encouraging private citizens to expose fraud and

avoiding parasitic actions by opportunists who attempt to

capitalize on public information without seriously contributing

to the disclosure of the fraud." United States ex rel. Doe v.

John Doe Corp., 960 F.2d 318, 321 (2d Cir. 1992). "One reason

for the 1986 amendments was to prod the government into action,

rather than allowing it to sit on, and possibly suppress,

allegations of fraud when inaction might seem to be in the

interest of the government." Id. at 323.

Defendants argue that their labor billing, MHU, and

property violations were publicly disclosed in various government documents and communications that are referred to throughout the TAC: audits and reports completed by the Defense Contract Audit Agency ("DCAA"); corrective action requests, corrective action plans, and reports issued by the Defense Contract Management Agency ("DCMA"); a report written by the Department of Defense Inspector General ("DOD IG"); corrective action requests written by the Army; discussions between AECOM and the DCMA; and discussions between AECOM and the Army.

The DOD IG report is the only document or communication Foreman cites that was clearly publicly disclosed, as it is accessible on the Department of Defense's website.[1] The report states that defendant AC First LLC failed to "account for more than 400 pieces of nonrolling stock equipment including three drone systems," "did not conduct causative research to determine the events that led to the loss or the location" of missing property, and "did not report the property loss" to the 401st Army Field Support Brigade in Afghanistan. White Aff. Ex. 1.

However, those statements regarding lost or missing equipment do not disclose the material elements of the property-related fraud alleged in the TAC, which include defendants'

[1] Inspector General, U.S. Department of Defense, Contract Oversight for Redistribution Property Assistance Team Operations in Afghanistan Needs Improvement, Report No. DODIG-2015-126 (May 18, 2015), https://media.defense.gov/2015/May/18/2001713507/-1/-1/1/DODIG-2015-126.pdf.

parts-only work orders, duplicative orders, and failure to
return excess parts and recoverable items to the government.
See United States ex rel. Patriarca v. Siemens Healthcare
Diagnostics, Inc., 295 F. Supp. 3d 186, 196-97 (E.D.N.Y. 2018):

> Earlier disclosures will bar a relator's claim if they were
> "sufficient to set the government squarely upon the trail of the
> alleged fraud." EMSL Analytical, Inc., 966 F. Supp. 2d at 298
> (internal quotations omitted). The bar is triggered if "material
> elements" of the fraud have been publicly disclosed, and does
> not require that the alleged fraud, itself, have been
> disclosed. See U.S. ex rel. Rosner v. WB/Stellar IP Owner,
> L.L.C., 739 F. Supp. 2d 396, 405 (S.D.N.Y. 2010); see also
> Monaghan v. Henry Phipps Plaza W., Inc., 531 Fed. Appx. 127, 130
> (2d Cir. 2013).

Furthermore, Foreman does not cite the DOD IG report in support
of his own fraud allegations; rather, the report's conclusions
merely "demonstrate that this is not the first time AECOM has
been cited for serious property acquisition and tracking
issues." TAC ¶ 53. Thus, the publicly disclosed information in
the DOD IG report is not "substantially the same" as the TAC's
allegations. 31 U.S.C. § 3730(e)(4)(A).

With respect to the other government documents and
communications, Foreman argues that they were not "publicly
disclosed" under the FCA because they were not disclosed to
anyone outside the government. See United States ex rel. Wood
v. Allergan, Inc., 246 F. Supp. 3d 772, 789 (S.D.N.Y. 2017)
("Significantly, nine courts of appeals have held that the bar
applies only where there has been a disclosure outside of the
government.") (emphasis in original).

> These courts have reasoned that "the phrase 'public disclosure'
> would be superfluous" if "providing information to the
> government were enough to trigger the bar." Rost, 507 F.3d at
> 729. Equating the terms "government" and "public," they have
> opined, would also be inconsistent with language elsewhere in
> the FCA and with the purpose of the public disclosure bar,
> which "clearly contemplates that the information be in the
> public domain in some capacity[,] and the Government is not the
> equivalent of the public domain." Kennard v. Comstock Res.,
> Inc., 363 F.3d 1039, 1043 (10th Cir. 2004).
> The Second Circuit has not yet opined on this issue.

Id. (declining to follow "the sole court of appeals to conclude
that disclosure to a competent public figure, without more,
satisfies the 'public disclosure' requirement" and choosing "to
follow the persuasive reasoning of the nine other Circuits to
address the question"); see also United States v. Mount Sinai
Hosp., 256 F. Supp. 3d 443, 454 (S.D.N.Y. 2017) (following Wood
and holding that defendants' submission of a letter to the
Office of the Medicaid Inspector General was "insufficient to
invoke the public disclosure bar.").

There is no allegation or evidence that the other documents
or communications were disclosed outside the government entities
of the DCAA, DCMA, and Army.  On the contrary, the DCMA
corrective action request discussing AECOM's low MHU rate is
designated as "CONFIDENTIAL," White Aff. Ex. 2, and the DCAA
report on AECOM's timesheet issues is labeled "FOR OFFICIAL USE
ONLY," "Confidential – FOIA Exempt," and "Highly Confidential,"
id. Ex. 6.

Defendants argue that the documents and communications were

-12-

disclosed outside the government to AECOM employees such as

Foreman.  In United States ex rel. Doe v. John Doe Corp., 960

F.2d 318 (2d Cir. 1992), a relator filed a qui tam action

against the defendant for overcharging the government under

defense contracts, but the Court of Appeals held that the public

disclosure bar applied.  Before the relator brought suit,

government agencies had already investigated defendant's

premises and questioned defendant's employees about the

overcharges.

> Here, in contrast to Stinson, the allegations of fraud were not
> just potentially accessible to strangers, they were actually
> divulged to strangers to the fraud, namely the innocent employees
> of John Doe Corp. While the search warrant was being executed,
> the investigators spoke to numerous employees of John Doe Corp.,
> some of whom knew of the fraud. But, more importantly, many of
> these individuals knew nothing about defendants' ongoing
> scheme; they were strangers to the fraud. These people were
> neither targets of the investigation nor potential witnesses.
> The government may have hoped that these individuals were
> potential witnesses, but it is clear that they were not.

> When these innocent employees learned of the fraud, they were
> under no obligation to keep this information confidential. We
> cannot accept the relator's argument that simply because other
> members of the public did not have a legal right to pry the
> allegations of fraud from the mouths of these innocent employees,
> there was no "public disclosure". Were this Congress' intent,
> we would expect a narrower exception to jurisdiction, one that
> bars only those actions based on generally accessible government
> documents and news media accounts. Section 3730(e)(4)(A) is not
> so circumscribed.

Id. at 322-23.  "Once allegations of fraud are revealed to

members of the public with no prior knowledge thereof, the

government can no longer throw a cloak of secrecy around the

allegations; they are irretrievably released into the public

-13-

domain.  The fact that they may not be widely disseminated does not inure to the benefit of a qui tam relator."  Id. at 323.

Defendants argue that Foreman was an "innocent" employee who learned of the alleged fraud from the government investigation and audit reports.  Defendants also argue that because Foreman was able to access the documents, they were potentially accessible to other innocent employees as well.  "It is implausible that these reports were not potentially accessible to anyone who went looking for them at AECOM that was similarly situated to Foreman."  Defs. Reply Br. at 7-8.  See Doe, 960 F.2d at 322 (citing Third Circuit holding that "because any diligent member of the public could have gone to court and demanded to see the documents, there was public disclosure. Potential accessibility by those not a party to the fraud was the touchstone of public disclosure.").

It cannot be determined from the TAC that Foreman was an "innocent" employee or a "stranger to the fraud" like those in Doe.  It is unknown at this time how or when Foreman accessed the government reports, and there is no evidence that he lacked prior knowledge of the alleged fraud.  Rather, he personally observed "multiple wasted hours" and "that timesheets for the two-week period were frequently turned in on the second Wednesday of the period."  TAC ¶¶ 84, 163.

Nor is there any evidence or other indication that innocent

AECOM employees without prior knowledge of the fraud had either potential or actual access to those reports, or otherwise communicated to the government about the fraud.

It cannot be determined as a matter of law at this stage that the public disclosure bar applies.

### False Certifications: Labor, MHU, and Property

Foreman alleges that defendants falsely certified to the government in invoices and requests for reimbursement that they were in compliance with requirements under the MOSC contract. See Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989, 1993-94, 195 L. Ed. 2d 348 (2016):

> The implied false certification theory can be a basis for FCA liability when a defendant submitting a claim makes specific representations about the goods or services provided, but fails to disclose noncompliance with material statutory, regulatory, or contractual requirements that make those representations misleading with respect to those goods or services.

A "misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." Id. at 2002. The FCA states, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

"The materiality standard is demanding. The False Claims Act is not 'an all-purpose antifraud statute,' Allison Engine, 553 U.S. at 672, 128 S. Ct. 2123 or a vehicle for

-15-

punishing garden-variety breaches of contract or regulatory violations." Universal Health, 136 S. Ct. at 2003.

> In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

Id. at 2003-04.

Foreman alleges that "AECOM's compliance with applicable legal and contractual requirements was material to the Government's payment decision" because the government "required AECOM to comply with these requirements in order to invoice its labor costs," "emphasized the importance of such requirements in the DCAA Auditor's Manual," and had previously enforced timesheet requirements against another company in a separate action. TAC ¶ 92. He also points to "the substantial size of AECOM's invoices" and "internal AECOM documents and AECOM's public filings" showing that defendants sought to address violations. Id. None of those sufficiently demonstrates materiality. See Universal Health, 136 S. Ct. at 2003 ("A misrepresentation cannot be deemed material merely because the

-16-

Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment.); United States ex rel. Daugherty v. Tiversa Holding Corp., 342 F. Supp. 3d 418, 429 (S.D.N.Y. 2018) (finding that allegations of "general policies of the United States Government stating that compliance with grant conditions is important to the Government" are insufficient to show materiality).

Defendants argue that their false certifications of compliance with respect to labor billing and timesheets, MHU rate, and government property were not material to the government's payment decision because the government was aware of those violations but continued to pay defendants and extend the MOSC contract.

The documents and reports cited in the TAC demonstrate that the government investigated and knew about defendants' violations concerning labor billing, MHU rate, and property.[2] Specifically, a 2014 evaluation by the DCAA found that defendants' employees had access to and "the opportunity to edit other employees' timesheets," were "not properly reviewing timesheets for completeness and accuracy," were signing and

---

[2] "When determining the sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiffs' amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

approving timesheets even though they did not have signatory authority, were not identifying and reporting "idle time associated with labor" on timesheets, were not updating timesheets on a daily basis, were "filling out their timesheets in advance," and were "not properly correcting their timesheets prior to submission." White Aff. Ex. 6.

A 2012 corrective action plan by the DCMA discusses defendants' "Failure to enter labor hours data into SAMS," "Failure to track cost of reworked supplies data in SAMS," and "Failure to track and manage shelf life items using SAMS." Id. Ex. 3. It also states, "Accurate Man Hour utilization is not being maintained in SAMS theater wide. This issue is the most recent in a trend of deficiencies related to the required use of Logistics Information Systems." Id. A 2012 corrective action request by the DCMA states, "Contractor is well under the required Utilization Rate of 85%; Utilization Rate for 1-30Sep12 was 26%." Id. Ex. 2. "The 401st did, indeed, mandate lower staffing levels when it became aware of low utilization rates." TAC ¶ 171.

"In late 2011 and first quarter of 2012," a DCMA property management system analysis concluded that "AC FIRST's system for control and accounting of Government Property at Bagram Airfield is INADEQUATE." Id. ¶ 264. The analysis "noted that the failure to record and manage inventory 'can lead to questions of

-18-

reasonableness of consumption and verification that property was consumed only in the performance of the contract,' which suggests the same concerns about theft of property." Id. ¶ 265. Corrective action requests by the Army "discuss these property concerns over at least a three year period." Id. ¶ 267. Additionally, numerous work order documents, including a memorandum by the Army, mention "parts only" orders, demonstrating the government's knowledge of such orders. White Aff. Ex. 7.

Despite its knowledge of those violations, the government extended the MOSC contract multiple times. See TAC ¶ 41:

> The MOSC-A Contract was a cost-plus fixed fee contract, Contract No. W911SE-07-D-0004-BA01, with a period of performance for one base year (January 28, 2010 to January 27, 2011) plus four option years, which could extend the MOSC-A Contract until January 27, 2015. The Army elected to extend the contract through the four option years. The MOSC-A Contract would have expired on January 27, 2015, but a modification extended it for six months on January 16, 2015 until July 27, 2015 with a plan for a further incrementally funded bridge contract. Each option year constituted a new MOSC-A Contract between AECOM and the Army. On information and belief, the MOSC-A Contract was modified as late as June 5, 2018 and is still being performed.

The contract states, "Option Years 1-4: In determining whether to award the option years, the Government will take into account the contractor's previous performance on this task order." Id. ¶ 45. There is no indication that the government refused to pay defendants or demanded repayment due to the labor billing, MHU, or property violations. Rather, "From 2010 through 2018, the MOSC-A Contract was amended, modified, or extended a myriad of

-19-

times with the vast majority of the amendments and modifications being directed to increasing funding." Id. ¶ 11 (emphasis added). Thus, defendants' misrepresentations about labor, MHU, and property were not material to the government's payment decision.[3] See United States ex rel. Kolchinsky v. Moody's Corp., 238 F. Supp. 3d 550, 559 (S.D.N.Y. 2017) (dismissing action because "the Government—and the general public—was on notice of the very facts relied upon to support the fraud alleged here" and "the Government has nonetheless continued to pay Moody's for its credit-ratings products each year"); United States v. Catholic Health Sys. of Long Island Inc., No. 12-CV-4425 (MKB), 2017 WL 1239589, at *23 (E.D.N.Y. Mar. 31, 2017) ("the reimbursement rate provisions of the DOH regulations could not have been 'material' to the DOH's payment decision where the DOH continued to reimburse the Nursing Home despite understanding that the Nursing Home was using an outdated rate."); United States ex rel. McBride v. Halliburton Co., 848 F.3d 1027, 1034 (D.C. Cir. 2017) (affirming grant of defendant's summary judgment motion and stating "we have the benefit of hindsight and should not ignore what actually occurred: the DCAA

---

[3] Foreman argues that the government "did not have the complete picture" of defendants' conduct because it did not know that the violations continued after the investigations or that defendants "engaged in a cover-up" to conceal the violations. But those activities are the continuation or "cover-up" of the same labor, MHU, and property violations of which the government was already aware.

investigated McBride's allegations and did not disallow any
charged costs.  In fact, KBR continued to receive an award fee
for exceptional performance under Task Order 59 even after the
Government learned of the allegations.").

Foreman's claims regarding defendants' false certifications
of compliance with labor billing, MHU, and property requirements
are not material and therefore not actionable under the FCA, and
are dismissed.

False Certification: Bluefish Contract

Foreman also claims that defendants falsely certified their
compliance with the requirement to "select subcontractors
(including suppliers) on a competitive basis" due to the
Bluefish contract.  TAC ¶ 284.  However, the TAC does not allege
how Bluefish was not selected on a competitive basis or how the
contract was a "crony" contract.  See United States ex rel.
Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.,
865 F.3d 71, 81 (2d Cir. 2017) ("Qui tam complaints filed under
the FCA, because they are claims of fraud, are subject to Rule
9(b)," which "ordinarily requires a complaint alleging fraud to
(1) specify the statements that the plaintiff contends were
fraudulent, (2) identify the speaker, (3) state where and when
the statements were made, and (4) explain why the statements
were fraudulent.") (citation and internal quotation marks
omitted).

-21-

Besides the conclusory assertion that "There was no competitive bid process for this contract," the TAC alleges that Nagel and the owner of Bluefish "have a prior business relationship," that "AECOM was Bluefish's only customer for these services," and that "when Nagel was questioned about the reason for the switch to Bluefish, he got angry and refused to answer."  TAC ¶¶ 283-84.  Those allegations are insufficient to support an inference that Bluefish was not selected on a competitive basis.

Although the TAC alleges that Nagel falsely stated that Wells Fargo "no longer provided the needed services," id. ¶ 284, a letter from a Wells Fargo Managing Director to AECOM's Senior Vice President states that Wells Fargo "has reviewed the AGS Paycard program and determined that the program exceeds our risk tolerance and will be closed down," and "would work closely with AECOM/AGS management team to ensure a smooth transition to a suitable product for the company's payroll/disbursement needs." White Aff. Ex. 9.

Foreman's claims regarding defendants' false certification of compliance with the requirement of competitive bidding of contracts is dismissed.

### Conversion Claim

Foreman claims that in addition to making false certifications to the government, defendants failed to return

property to the government in violation of "the FCA's conversion provision, which imposes civil liability on anyone who 'has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property.'" United States ex rel. Harper v. Muskingum Watershed Conservancy Dist., 842 F.3d 430, 438 (6th Cir. 2016) (quoting 31 U.S.C. § 3729(a)(1)(D)).

The TAC alleges generally that excess parts and recoverable items were not accounted for or returned to the government. It states, "on a wide-scale basis, the work order was not being properly created, closed or audited, resulting in recoverable items not being returned or duplicates not being controlled." TAC ¶ 243. It quotes an AECOM supervisor discussing "parts ordered and not needed etc. leading to some of the excess parts issues we have run across," and stating

> Not turning the recoverable items in using the EUM method (no credit for the parts SUPER BAD [tire example 6k etc] and incorrect records for the ones that have any legacy data at all as well as the table stack up 3900 on the front side 10K ++ back side risk of discovery during long term audit and not being able to show what the heck we did with the parts or that we did it wrong).

Id. ¶¶ 234, 249. It also cites an internal report that states, "Incorrect disposition has caused recoverable items to be left on AC FIRST SAMSIE database, and failure of proper credit to the USG [U.S. Government] and significant liability to AC FIRST."

-23-

Id. ¶ 252. However, those allegations do not identify any specific excess or recoverable item or other property that defendants possessed but failed to deliver to the government.[4]

Accordingly, the FCA conversion claim is dismissed.

### Reverse False Claim

Foreman also brings a "reverse" false claim under 31 U.S.C. 3729(a)(1)(G), which imposes liability on someone who

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

"Subsection (a)(1)(G) is referred to as the 'reverse false claims' provision because it covers claims of money <u>owed to</u> the government, rather than payments <u>made by</u> the government." United States ex rel. Kester v. Novartis Pharm. Corp., 43 F. Supp. 3d 332, 368 (S.D.N.Y. 2014) (citation and internal quotation marks omitted).

"To prove a claim under subsection (a)(1)(G), a plaintiff must show: (1) proof that the defendant made a false record or statement (2) at a time that the defendant had a presently-existing obligation to the government—a duty to pay money or

---

[4] Foreman argues in his brief that defendants also converted money by retaining overpayments from the government, but the TAC's conversion claim does not mention money. See TAC ¶¶ 320-22. It "is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss." O'Brien v. Nat'l Prop. Analysts Partners, 719 F. Supp. 222, 229 (S.D.N.Y. 1989).

-24-

property." Id. at 367 (citation and internal quotation marks omitted).

Foreman's reverse false claim alleges that defendants retained and failed to return overpayments and property from the government. That claim, however, is based on the same labor billing and property violations underlying the direct false claims, which allege that defendants submitted false certifications in their invoices requesting payment and retained those payments. See United States ex rel. Hussain v. CDM Smith, Inc., No. 14-CV-9107 (JPO), 2017 WL 4326523, at *9 (S.D.N.Y. Sept. 27, 2017):

> Hussain's reverse false claim allegation boils down this: CDM received payment on its false claims and thus "retain[ed] Government funds to which they were not entitled." (Dkt. No. 34 at 18.) Hussain cites the legislative history of the reverse false claim provision to argue that Congress intended it to be construed broadly, and that a reverse false claim includes "[the] knowing and improper retention of funds without notice to the Government." (Id.)

> But even if Congress intended the statute to have a broad sweep, this is a sweep too far. "A complaint that 'makes no mention of any financial obligation that the [defendant] owed to the government' and 'does not specifically reference any false records or statements used to decrease such an obligation' must be dismissed." Wood, 2017 WL 1233991, at *34 (alteration in original) (quoting Wood ex rel. United States v. Applied Res. Assocs., Inc., 328 Fed. Appx. 744, 748 (2d Cir. 2009)). Hussain does not "identify any existing financial obligation [that CDM] owed to the Government," let alone "any specific false record or statement that [CDM] made to avoid such a purported obligation." Haas v. Guiterrez, No. 07 Civ. 3623, 2008 WL 2566634, at *5 (S.D.N.Y. June 26, 2008).

The TAC does not identify a separate obligation to return overpayments or excess property to the government. It cites a

DCAA instruction that defendants "should have policies and procedures . . . readily identify contract over/underpayments," TAC ¶ 114 (omission in original), but that is not an obligation to pay the government. See also United States ex rel. Gelbman v. City of New York, No. 14-CV-771 (VSB), 2018 WL 4761575, at *8 (S.D.N.Y. Sept. 30, 2018), aff'd, 790 F. App'x 244 (2d Cir. 2019):

> In support of his reverse false claims, Relator alleges that various providers of health services billed for and received benefits that were "in the form of overpayments known to Defendants." (SAC ¶¶ 182-83.) The SAC, however, is devoid of any factual information to suggest that either Defendant owed a financial obligation to the Government. Relator's reverse false claim allegations—which essentially boil down to various providers allegedly receiving payment on false claims and thus retaining Government funds to which they were not entitled—are not an adequate basis on which to allege a reverse false claim.

Accordingly, the reverse false claim is dismissed.

## Retaliation

Foreman claims that he was terminated in retaliation for reporting AECOM employees' two travel violations and the Bluefish contract, in violation of 31 U.S.C. § 3730(h).

"To sustain an action under § 3730(h), a plaintiff must prove (1) that he engaged in conduct protected under the statute, (2) that defendants were aware of his conduct, and (3) that he was terminated in retaliation for his conduct." United States ex rel. Sarafoglou v. Weill Med. Coll. of Cornell Univ., 451 F. Supp. 2d 613, 624 (S.D.N.Y. 2006) (citation and internal quotation marks omitted).

> To determine whether an employee's conduct was protected under the FCA, courts must evaluate whether "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." United States ex rel. Uhlig v. Fluor Corp., 839 F.3d 628, 635 (7th Cir. 2016) (citation omitted). "[M]ere investigation of an employer's non-compliance with federal regulations is not enough" to constitute protected activity under Section 3730(h)(1). Fisch v. New Heights Acad. Charter Sch., No. 12cv2033 (DLC), 2012 WL 4049959, at *5 (S.D.N.Y. Sept. 13, 2012) (citation omitted). "[A]lthough correcting regulatory problems may be a laudable goal, those problems [are] not actionable under the FCA in the absence of actual fraudulent conduct, and so reporting them [falls] outside the purview of the FCA's anti-retaliation provision." United States ex rel. Booker v. Pfizer, Inc., 847 F.3d 52, 60 (1st Cir. 2017) (citation omitted). In other words, "[m]erely grumbling to the employer about job dissatisfaction or regulatory violations does not . . . constitute protected activity." United States ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 743 (D.C. Cir. 1998). Rather, the employee's investigation "must be directed at exposing a fraud upon the government." Fisch, 2012 WL 4049959, at *5 (citation omitted).

Lawrence v. Int'l Bus. Mach. Corp., No. 12-CV-8433 (DLC), 2017 WL 3278917, at *6 (S.D.N.Y. Aug. 1, 2017).

With respect to the travel violations, Foreman did not engage in protected conduct because the complaints he made about the employees' air travel request and failure to return from leave or report in for duty were not reasonably directed at exposing a fraud upon the government. Those complaints discussed employee violations of a federal regulation and AECOM policy; they were not complaints that the employer, AECOM, engaged in fraudulent conduct actionable under the FCA.

With respect to the Bluefish contract, Foreman complained to the Inspector General's office, but he does not allege that

anyone at AECOM knew about that complaint. Thus, he does not adequately plead that defendants were aware of any protected activity.

Accordingly, the retaliation claim is dismissed.

## CONCLUSION

Defendants' motion to dismiss the Third Amended Complaint (Dkt. No. 67) is granted.

Plaintiff's brief requests leave to amend. The reasons for dismissal of the Third Amended Complaint do not turn on points of pleading. They reflect the underlying invalidity of the merits of the claims, such as the government's continued disregard of defendants' shortfalls as being insufficiently serious or consequential ("material") to justify either litigation or severance of the relationship.

Nevertheless, plaintiff has leave to move for leave to serve a fourth amended complaint, attaching a copy of the proposed pleading.

So ordered.

Dated:    New York, New York
          April 13, 2020

*Louis L. Stanton*

LOUIS L. STANTON
U.S.D.J.