USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/26/25

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```
| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. HASSAN FOREMAN, <br><br> Plaintiff, <br><br> - against - <br><br> AECOM; AECOM GOVERNMENT SERVICES, INC.; AC FIRST, LLC; and AECOM/GSS LTD., <br><br> Defendants. | 16 Civ. 1960 (LLS) <br><br> ORDER & JUDGMENT |

In April 2020, this Court dismissed Relator Hassan Foreman's Third Amended Complaint in its entirety. (Dkt. No. 88). The Court of Appeals affirmed the dismissal of all but one of Foreman's claims: his labor billing allegations. See United States ex rel. Foreman v. AECOM, 19 F.4th 85 (2d Cir. 2021). The Court of Appeals remanded the labor billing claim because this Court had relied on a government report which, although relevant to Foreman's allegations, had no mention in the Complaint and could not properly be considered at the dismissal stage. In so holding, the Court of Appeals recognized that the report "demonstrates the government's knowledge of some of the alleged MOSC-A Contract violations underlying Foreman's claims (and therefore undermines the strength of Foreman's claims)." Id. at 108. Nevertheless, it should not have been considered on a motion to dismiss the Complaint, as it could on one for summary judgment.

On remand, this Court converted the Defendants' motion to dismiss to one for summary judgment. (Dkt. No. 201).

This Court now considers the single issue presented to it: whether "the government had actual knowledge of AECOM's alleged labor

billing violations and continued to pay AECOM's claims notwithstanding them." Id. at 116.

For the reasons given below, Foreman's sole remaining claim cannot survive summary judgment.

### Background

The Court assumes familiarity with the underlying facts, and provides only the background necessary from Foreman's operative Third Amended Complaint ("TAC") to grant summary judgment dismissing it. (Dkt. No. 66).

AECOM and its contracting agent, AC First, entered into a Maintenance and Operational Support Contract ("MOSC-A Contract" or the "Contract") with the United States Army in 2010. Id. ¶ 41. Under the Contract, AECOM provided maintenance and support services to Army programs in Afghanistan. Id. ¶ 43. The Army extended the Contract several times between 2010 and 2018. Id. ¶ 41.

Foreman alleges AECOM violated Sections 3729(a)(1)(A)-(B) of the FCA by (1) submitting invoices to the government based on factually false timesheets, and (2) employing SAMS-E/IE software ("SAMS")[1] personnel who were not properly certified or vetted. Specifically, he claims:

- AECOM submitted timesheets with incorrect supervisor signatures, missing printed supervisor names, and missing employee numbers.
- AECOM employees did not input their time daily and routinely submitted pre-signed timesheets before the conclusion of a two-week pay period.

---

[1] AECOM used the SAMS software "to track the daily individual labor and maintenance status with related updates, order parts, perform work loading, manage shop and bench stocks, produce management reports to meet AFSB's requirements, and facilitate internal maintenance operations throughout the course of performance under the MOSC-A Contract." (TAC ¶ 55).

- AECOM employees billed 154 hours every two-week period without regard to the actual hours worked.
- AECOM employed uncertified and unvetted employees to work on SAMS software.
- AECOM employees billed full days but engaged in leisure activities or slept on the job.
- AECOM employees duplicated labor charge codes, including six employees billing for the same task.

Id. ¶¶ 73, 79, 81, 136-37, 139-140, and 155-57.

The government's Defense Contract Audit Agency ("DCAA") or Defense Contract Management Agency ("DCMA") frequently audited AECOM's performance on the Contract. Id. ¶ 12 n. 5. These audits could result in adjustments to reimbursable contract costs or, if the audit revealed wrongdoing, temporary or permanent contract suspension. Id. ¶ 31. Three government audits or investigations are relevant to the present motion.

The first audit was conducted by DCAA on AECOM's labor billing practices. This audit produced a 2014 report ("DCAA Report" or "Report"), which identified several deficiencies with AECOM's timekeeping policies. (Dkt. No. 69, ex. 6). For example, the DCAA concluded that AECOM's supervisors did not review timesheets for completeness and accuracy, employees did not record idle time on timesheets, and employees did not input their time daily. Id. at 4-5, 10-13, and 20-22. The DCAA found these timekeeping violations occurred at several AECOM locations, including the locations cited in Foreman's TAC. See id.

The second is an October 2012 DCMA Corrective Action Request ("CAR") issued to AECOM "due to the company's failure to provide evidence of qualified employees having the required training, certifications and licenses required to meet the performance standards established in the contract PWS." (Dkt. No. 224, ex. 24 at A-R_0000837341).

AECOM submitted a corrective action plan, which included a table of required trainings, certifications, or licenses for each employee position on the Contract. (Dkt. No. 224, ex. 25 at A-R_0001111258). The table enumerated two requirements for SAMS personnel: (1) They must be trained and qualified, and (2) They must have military training or similar vocational educational training. (Dkt. No. 224, ex. 26). The table also included "Military Training Exp Req'd (i.e. DD-214) VocEd Cert" as the certification, license, or work experience required for SAMS personnel. Id. While the table contained required certifications for other positions, it did not list any specific certifications for the SAMS personnel. See, e.g., id. (requiring HAZMAT certification for painters or Tire Industry of America certification for tire repair personnel).

Finally, in 2015, the Army's Criminal Investigation Division ("CID") investigated AECOM's Logistics Information System Maintenance department and seized information concerning SAMS access. (Dkt. No. 204 at 35). The Army also decided to remove certain foreign nationals' access to the SAMS system. Id.

### Legal Standards

**Summary Judgment**

"The court shall grant summary judgment if the movant shows that

- 4 -

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Baldwin v. EMI Feist Catalog, Inc., 805 F.3d 18, 25 (2d Cir. 2015) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

**Materiality**

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B). Those two statutory provisions are generally treated together because their elements overlap significantly. See United States ex rel. Raffington v. Bon Secours Health Sys., Inc., 405 F. Supp. 3d 549, 555 (S.D.N.Y. 2019).

Foreman must satisfy three elements to prevail on his FCA claim: (1) The existence of a false or fraudulent claim or record; (2) Scienter; and (3) Materiality. See Fed. Deposit Ins. Corp. v. Fifth Third Bank, N.A., No. 23-209-CV, 2023 WL 7130553, at *2-3 (2d Cir. Oct. 30, 2023). The question posed on remand is specific to the third factor, materiality. Foreman, 19 F.4th at 116.

"A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." Universal Health Servs., Inc. v. United States ex rel. Escobar, 579 U.S. 176, 192 (2016). "The materiality standard is

demanding, inasmuch as it serves to protect the FCA from being transformed into a vehicle for punishing garden-variety breaches of contract or regulatory violations." Foreman, 19 F.4th at 109 (citing Escobar, 579 U.S. at 194)(internal quotations omitted).

The relevant materiality factors are: "(1) whether the government expressly designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment; (2) the government's response to noncompliance with the relevant contractual, statutory, or regulatory provision; and (3) whether the defendants' alleged noncompliance was 'minor or insubstantial.'" Foreman, 19 F.4th at 110 (collecting cases).

### Discussion

There is only one issue remaining in this case, and it does not survive summary judgment. Foreman's remaining labor billing claim consists of two primary allegations: (1) AECOM submitted false timesheets, and (2) AECOM employed uncertified, unvetted SAMS personnel. For the reasons explained below, each of those allegations lacks materiality, a necessary element of a valid FCA claim. Because Foreman cannot demonstrate materiality, the Court does not need to consider the other FCA elements in granting summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

**Timesheet Allegations**

Foreman argues that if the government knew about AECOM's timekeeping deficiencies, "the government would have demanded reimbursement from AECOM for the billings associated with AECOM's timesheet errors." (Dkt. No. 204, at 20). But the government did know about AECOM's timekeeping errors. The DCAA Report findings mirror Foreman's TAC allegations almost exactly. The DCAA found:

- Supervisors did not review timesheets for completeness and accuracy and approved timesheets with incorrect labor charge codes.
- Timesheets were signed and approved by personnel without signatory authority.
- AECOM's timekeeping system did not require employees to record idle time on timesheets.
- Employees did not verify the accuracy of labor charge codes and supervisors did not ensure the appropriate delivery and accuracy of labor charge codes.
- Employees did not input their time daily.
- Employees filled out their timesheets in advance, with a specific finding that AECOM management systematically directed employees to fill out their timesheets on the Tuesday before the end of the bi-weekly payroll period.

(Dkt. No. 69, ex. 6 at 4-5, 9-13, and 17-23).

The DCAA found those timesheet errors were widespread across AECOM locations. For example, its report showed that 13.7 percent of timesheets contained incorrect labor charge codes, 25.7 percent of timesheets were not reviewed and approved by supervisors with

signatory authority, and 100 percent of employees reported they did not know how to account for idle time on their timesheets. Id. at 19, 10, and 13. The DCAA Report explicitly warned that AECOM's inadequate timekeeping practices increased the risk of inaccurate labor billing. See, e.g., id. at 5, 10, 19-21, and 23.

Well aware of the audit's findings, the government nevertheless extended the MOSC-A Contract multiple times after the DCAA published its report. "[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." Escobar, 579 U.S. at 195; see also United States v. Teva Pharms. USA, Inc., No. 13 CIV 3702, 2019 WL 1245656, at *34 (S.D.N.Y. Feb. 27, 2019)("Appellate decisions since Escobar confirm that summary judgment is appropriate if the Defendant introduces evidence that the Government conducted a detailed investigation and subsequently declined to take any action against the defendant."). The DCAA Report proves AECOM's inadequate timekeeping policies were not material to the government's payment decision. Therefore, Foreman's timesheet allegations are not material under the FCA.

**SAMS Personnel Certification and Vetting Allegations**

Foreman also alleges AECOM's employment of SAMS personnel who did not have contractually required certifications or appropriate background vetting violated the FCA. His "theory of liability [is] based on AECOM's false certification of compliance with various contractual requirements related to employee qualifications." (Dkt. No. 214 at 59).

However, the Contract and its operative documents do not contain explicit certification or vetting requirements for SAMS personnel. The original MOSC-A Contract and its later modifications and extensions do not mention SAMS. (Dkt. No. 224, exs. 2, 4-11, and 14). The Contract's performance plan similarly does not establish any certification or vetting requirements for employees who use the SAMS software. (Dkt. No. 224, ex. 3).

A 2009 PWS, which described the Contract's measurable outcomes, contained the most detailed description of personnel requirements. It specified that "[c]ontractor personnel shall be trained, qualified, certified and/or licensed and fully capable of performing the requirements specified in this PWS." (Dkt. No. 224, ex. 12 at 9). It also required AECOM to "employ a qualified SAMS-1 operator," defined as:

> [A] person who was in the last five (5) years employed as a SAMS-1 Operator as either a member of the US Army or working as a contract employee for the US Government. This qualified SAMS Operator must know, as a minimum, how to perform the following tasks using SAMS-1, SAMS-E or SAMS-IE: Open and close out maintenance requests and understand all data elements identified during this process. Perform data backups and restoration of database files. Perform daily NMO/Work Order File Transfers to the Logistics Information Warehouse (LIW) using the established SAMS protocol and interfaces. Contractor shall insure that Order File Transfers are correct and confirm transfer was successful. Perform all aspects of managing, maintaining, ordering, reordering, adjusting and inventorying Bench/Shop Stock and understand the differences between them. Perform and manage all aspects of the Document Control Register and reconcile same with the appropriate SARSS activities. This person must be able to lift 50 lbs or the equivalent weight of a wheel/rim (less tire). This person shall be required to perform all aspects of managing the required repair parts necessary using processes within SAMS-1. The person selected for this position is a bonafide SAMS-1 Operator and NOT merely a data clerk per AR750-8.

(Dkt. No. 224, ex. 12 at 41). This description does not reference any SAMS certification or vetting requirements.

Foreman attempts to incorporate several regulatory requirements into the terms of the Contract and PWS. He argues, for example, that certain "applicable disclosure policies," such as the National Disclosure Policy 1, DODD 5230.9, DODD 5230.25, the Arms Export Control Act, and SAMS-E security policies, mandate that SAMS personnel "possess the required favorable security investigation, security clearance, or formal access approvals, and fulfill any need-to-know requirements." (TAC ¶ 140).

The Second Circuit held in this case that:

> [G]eneric and routine appeals to the importance of a multitude of regulatory requirements or broad goals, such as accurate recordkeeping, do not put a contractor on notice of the importance of a given requirement to the government's payment decision, particularly where, as here, the government has not expressly designated compliance with that requirement as a condition of payment.

Foreman, 19 F.4th at 111. Foreman does not establish materiality by referencing regulatory requirements external to the Contract. It is well settled that the FCA is not "a vehicle for punishing garden-variety breaches of contract or regulatory violations." Escobar, 579 U.S. at 194. As the Supreme Court recognized, "billing parties are often subject to thousands of complex statutory and regulatory provisions. Facing False Claims Act liability for violating any of them would hardly help would-be defendants anticipate and prioritize compliance obligations." Id. at 192.

AECOM's evidence persuasively demonstrates the government's actual knowledge of AECOM's SAMS personnel requirements. This further weighs against materiality. The government investigated AECOM's

personnel credentials at least twice (the 2012 CAR and 2015 CID raid). It reviewed and approved AECOM's corrective action plan, which did not include any required certifications for SAMS personnel, despite listing necessary certifications for other Contract positions. The corrective action plan's reference to "VocEd cert" clearly refers to the optional vocational education that may be required for a particular SAMS operator. It is not a specific certification necessary for all SAMS personnel, as Foreman alleges. Regarding vetting, the Army investigated SAMS access and removed certain foreign nationals from the SAMS system. Aware of those investigations and subsequent corrective actions, the government renewed the Contract and continued to pay AECOM's labor costs. There is no evidence the government ever required repayment on the basis that AECOM improperly billed for uncertified or unvetted SAMS personnel.

The fact is that the Army was well aware of AECOM's misdeeds, but they were immaterial to its decision to extend the Contract. On this record, no reasonable juror could find that the Contract or PWS imposed certification or vetting requirements on SAMS personnel. Even if the documents contained such requirements, the government continued the Contract following two investigations of Contract personnel qualifications and SAMS access. Accordingly, Relator is unable to establish such a condition would have been material to the government's payment decision, a necessary element of an FCA claim. Relator's SAMS allegations do not support an actionable FCA claim.

## Conclusion

For the foregoing reasons, the converted Motion for Summary Judgment is granted, and, this last claim being denied, this case is dismissed.

So Ordered.

Dated:   New York, New York
         March 26, 2025

                                    _____
                                    LOUIS L. STANTON
                                          U.S.D.J.